**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RONALD MICHAEL CAUTHERN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:04-1100** |
| | ) | **Judge Trauger** |
| **RICKY BELL, WARDEN,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM</u>

## I. INTRODUCTION

The petitioner, Ronald Michael Cauthern, is a prisoner in the Riverbend Maximum Security Institution in Nashville, Tennessee. He brings this action under 28 U.S.C. § 2254 challenging the constitutionality of his convictions and death sentence.

## II. FACTUAL BACKGROUND

Patrick and Rosemary Smith (Patrick and Rosemary) were husband and wife, Captains in the U.S. Army Nurse Corps, and both assigned to the Blanchfield Army Hospital at Ft. Campbell, Kentucky. When Patrick did not report for duty on Friday, January 9, 1987, Major Kathleen Campbell (Major Campbell), a close friend and head nurse on the ward where Patrick was assigned, inquired into his whereabouts. (Add. 2, Vol. 9, pp. 95-97)[1] On further inquiry, Major Campbell learned that Rosemary also had not reported for duty. (Add. 2, Vol. 9, p. 97)

Concerned, Major Campbell and a sergeant drove to the Smith's home at 352 Hampshire Drive in Clarksville, arriving there at approximately 11:00 a.m. (Add. 2, Vol. 9, pp. 98-99) When they arrived, Major Campbell and the sergeant noticed that the Smith's cars, a Mercedes and a

---

[1] The volumes of the trial transcript provided by the State as part of Addendum 2 are misnumbered. The problem with the transcripts was discussed at length at the the petitioner's post-conviction evidentiary hearing, where counsel characterized the record as "the worst transcripts [counsel had] ever seen in [his] life . . . ." (Add. 8, Vol. 9, pp. 130-33)

Honda Accord, were in the garage. (Add. 2, Vol. 9, p. 102) They also observed that the back door glass had been broken, the glass strewn on the carpet inside, and they could see that the contents of a lower level closet were "jumbled." (Add. 2, Vol. 9, pp. 99-103) Major Campbell went to a neighbor's house and telephoned the police. (Add. 2, Vol. 9, pp. 104-05)

When Officer John Nichols (Officer Nichols) of the Clarksville Police Department (CPD) arrived on the scene, other police units already were there. (Add. 2, Vol. 9, p. 116) With evidence of forcible entry, Officer Nichols and two other officers were detailed to enter the house, secure it, and determine the situation inside. (Add. 2, Vol. 9, p. 117) On entering, Officer Nichols found the house "ransacked." (Add. 2, Vol. 9, p. 117) He also found "a young lady" lying dead on the floor in a bedroom, apparently strangled with a scarf, a vase having been used to tighten the scarf around her neck like a tourniquet. (Add. 2, Vol. 9, p. 122) Officer Nichols then found a "young male" dead in the master bedroom, also apparently killed by strangulation. (Add. 2, Vol. 9, p. 123) Major Campbell identified the bodies as Patrick and Rosemary Smith. (Add. 2, Vol. 9, pp. 112-13)

Detective Earl Crockarell (Detective Crockarell) of the CPD arrived on the scene between 11:30 and 12:00 a.m. (Add. 2, Vol. 9, p. 130) Assigned to the CPD as a crime scene technician, Detective Crockarell was directed to videotape the crime scene before further investigation was undertaken. (Add. 2, Vol. 9, pp. 129, 131) As he videotaped the crime scene, Detective Crockarell observed that the telephone line had been cut at the service box outside. (Add. 2, Vol. 10, p. 36) Shoe prints were present on the back door, and the lock had been torn from the door frame, indicating that someone had tried to kick the door in. (Add. 2, Vol. 9, pp. 149-51)

In the master bedroom, Detective Crockarell observed that the bed against which Patrick's body leaned had been broken, and his body wrapped up in the sheets. (Add. 2, Vol. 10, pp. 11, 19) The condition of the bed, a pillowcase with blood on it, and a lamp broken on the floor, showed that a violent struggle had taken place. (Add. 2, Vol. 10, pp. 11-12, 26) Although the instrumentality

2

of his death was not found at the scene, Patrick's facial contortions and marks on his neck indicated that he had been strangled to death. (Add. 2, Vol. 10, p. 13)

In the adjacent bedroom, Detective Crockarell observed that Rosemary's nightgown had been torn, its buttons scattered around the room. (Add. 2, Vol. 9, p. 164; Vol. 10, pp. 2-3) There was physical evidence on Rosemary's body and the comforter on which she lay that suggested she had been sexually assaulted. (Add. 2, Vol. 9, p. 165; Vol. 10, pp. 6-7) As already noted, she too had been strangled, the scarf around her neck, and the vase used to tighten it, still in place. (Add. 2, Vol. 9, pp. 162-63) Detective Crockarell noted from marks on their fingers that Patrick and Rosemary normally wore wedding rings, but no rings were found. (Add. 2, Vol. 10, pp. 17-18)

Detective Crockarell found a mason's hammer upstairs (Add. 2, Vol. 9, p. 154), two Bartles and Jaymes wine cooler caps on the floor upstairs, and two empty Bartles and Jaymes bottles downstairs in the kitchen trash can (Add. 2, Vol. 9, pp. 160-62; Vol 10, pp. 23-24). He also noted that a VCR and some luggage appeared to be missing (Add. 2, Vol. 9, pp. 143, 148-49), and that Rosemary's credit cards, driver's license, and other identification were not in her purse (Add. 2, Vol. 10, p. 22). No latent fingerprints were found, only smudges suggesting that the killers had worn gloves. (Add. 2, Vol. 9, pp. 149, 160-62, 166; Vol. 10, pp. 18, 24, 35) Finally, Detective Crockarell discovered a note in the master bedroom with the petitioner's name on it. (Add. 2, Vol. 10, p. 33)

On Monday, January 12, Jacquelyn Lambert (Lambert) went to the CPD and surrendered a lady's ring set and wristwatch to Officer Nichols.[2] (Add. 2, Vol. 9, pp. 125-26) Lambert told Officer Nichols that the petitioner, her erstwhile boyfriend, had given them to her "to hold on to . . . for him for awhile." (Add. 2, Vol. 13, pp. 63-64) James Andrew (Andrew), who was in the U.S. Army at the time, and who knew the petitioner, provided information/evidence to the police that

---

[2] Jacquelyn Lambert was married by the time of the trial, her last name having changed to McCook. The name "Lambert" is used throughout for the sake of consistency.

same day implicating the petitioner in the murders.  (Add. 2, Vol. 12, pp. 129-30)

Based on the information provided by Lambert and Andrew, the petitioner and two others, Brett Patterson (Patterson) and Eric Barbee (Barbee), were arrested later that day in front of their apartments at 112-114 Faith Drive in Clarksville.  (Add. 2, Vol. 12, pp. 36-37)  The petitioner was living there with Barbee and Patterson.  (Add. 2, Vol. 10, p. 49)  At the time of their arrest, the petitioner, Patterson, and Barbee were working on a Camaro that Gary Hilton had given to the petitioner to work on several months earlier.[3]  (Add. 2, Vol. 11, p. 17; Vol. 12, pp. 36-37)  The Camaro was parked in front of the apartment with its hood up, trunk open, and a black leather jacket lying on top of it.  (Add. 2, Vol. 12, pp. 33-35)

The petitioner signed a release to search the Camaro, and he, Patterson, and Barbee were taken into custody.  (Add. 2, Vol. 12, pp. 37-38; Vol. 23, p. 1)  In searching the trunk, police officers, including Detective Steven Poston (Detective Poston) of the CPD, seized blank checks, drivers licenses, credit cards, club membership cards, and identification cards belonging to Patrick and Rosemary.  (Add. 2, Vol. 10, pp. 52-55)  Also in the trunk was a bag containing military cold weather gear, including two ski masks, a yellow box that contained several pairs of wire cutting tools, and a length of military "880 cord."  (Add. 2, Vol. 10, pp. 57, 62-64, 66)  A pair of black leather driver's gloves was found inside the Camaro on the driver's side, as well as a black cap and four more pairs of wire cutters.  (Add. 2, Vol. 10, pp. 65-66)

In searching the black leather jacket, eight credit cards belonging to Patrick and Rosemary were found in one pocket (Add. 2, Vol. 10, p. 58), and one hundred fifty dollars ($150.00) in cash in another.  (Add. 2, Vol. 10, pp. 58-61)  When the Camaro was later taken to the police impound lot, a loaded .38 caliber revolver was found concealed between the center "console and the

---

[3]  Apart from owning the Camaro, Hilton was not otherwise involved in the case.

4

floorboard . . . ." (Add. 2, Vol. 10, pp. 43-45)

The police searched the Faith Drive apartments. (Add. 2, Vol. 10, p. 67) Patterson lived in 112 and Barbee in 114. (Add. 2, Vol. 10, p. 67) The officers observed that the wall between the two apartments had been "taken out," and a person "could walk from one apartment into the other, with no door." (Add. 2, Vol. 10, p. 67) A loaded .45 semi-automatic pistol was found on Patterson's bed, with a round in the chamber, and an extra clip loaded with five rounds. (Add. 2, Vol. 10, pp. 68-70)

A "blue tote bag" was discovered on Patterson's side of the apartments in which was found two "full face ski mask[s]," a green military flashlight, a pair of black leather gloves, a black leather holster that would have accommodated the .45 semi-automatic, two other holsters, one of which was capable of accommodating the .38 revolver found in the Camaro, the other a shoulder holster that was a "perfect fit" for the .38 revolver found in the Camaro, a sawed-off shotgun, and a diploma issued to Patterson certifying him as a jungle warfare expert. (Add. 2, Vol. 10, pp. 85-90)

Two sets of keys were found in a cowboy hat in Patterson's closet, one with a Mercedes emblem on the key ring and the other with keys to a Honda. (Add. 2, Vol. 10, pp. 71-72) The police determined subsequently that keys on both rings fit the doors to the Smiths' home, the keys on the ring with the Mercedes emblem started the Smiths' Mercedes, and the ring with the Honda keys started the Smiths' Honda. (Add. 2, Vol. 10, pp. 73-75) Also seized from Patterson's closet was a gray Members Only jacket with a piece of 880 cord in the inside pocket. (Add. 2, Vol. 10, pp. 76-79) The ends of the 880 cord had been melted to keep them from fraying, just as the ends of the length of 880 cord found in the trunk of the Camaro had been. (Add. 2, Vol. 10, pp. 77-78)

A "white cooler" was found in the kitchen on Barbee's side of the apartment with Patrick's name, address, and telephone number on it. (Add. 2, Vol. 10, pp. 79-80) A black Army purse was found in the kitchen trash. (Add. 2, Vol. 10, pp. 79-81) Although the purse was "almost empty," the police found leave-and-earnings statements with Patrick's and Rosemary's names on them, and

a "little brown wallet" in which the vehicle registration for the Smiths' Honda was found.  (Add. 2, Vol. 10, pp. 81-82)  Spools of 880 cord were found in the kitchens on both sides of the apartments. (Add. 2, Vol. 10, pp. 84-85)

The information provided by Andrew led the police to a trailer at Beal's Mobile Home Park in Oak Grove, Kentucky that he shared with two other men, one named Joe Denning (Denning), and the other named Jimmy Holshire (Holshire).  Detective James Bryant of the CPD (Detective Bryant) was instructed to photograph evidence at the trailer and seize it.  (Add. 2, Vol. 12, p. 13)  Among the evidence seized was a suitcase (Add. 2, Vol. 12, pp. 14-15) and a brass Korean urn from Andrew's room in which more credit cards belonging to Patrick and Rosemary were found, as well as Rosemary's Geneva Convention card.  (Add. 2, Vol. 12, pp. 16-18)

The petitioner gave three statements to the police.  In his first statement, made shortly after he was taken into custody, the petitioner denied any knowledge of the murders.  (Add. 2, Vol. 12, pp. 40-41)

The petitioner made a second statement that same day after he was booked.  In this unrecorded statement, the petitioner told Officers Joe Griffy ("Officer Griffy") and Charles Denton ("Officer Denton") that Rosemary had called him on January 8th and asked him to come by her house late that evening.  (Add. 2, Vol. 12, pp. 43-44)  The petitioner claimed that he and Patterson went to the Smiths' house and knocked on the back door.  When no one answered, Patterson tried to kick the door in.  (Add. 2, Vol. 12, p. 44)  Unable to kick the door in, Patterson broke the glass and opened the door by reaching in and unlocking it.[4]  (Add. 2, Vol. 12, p. 44)  The petitioner also told the officers that Patterson cut the telephone line to the house.  (Add. 2, Vol. 12, pp. 44-45)

---

[4]  This part of the factual background is derived from Officer Griffy's testimony and the un-redacted version of the statement that the petitioner gave to Officers Griffy and Denton the following day, discussed *infra*.  (Add. 2, Vol. 12, pp. 43-46, 57-87; Vol. 26).

The petitioner told Officers Griffy and Denton that, when he went upstairs, Patterson was fighting with Patrick in the master bedroom. (Add. 2, Vol. 12, p. 45) The petitioner claimed that he took Rosemary to another bedroom to get her away from Patterson, where he told her to be quiet and that she would be alright. (Add. 2, Vol. 12, pp. 44-45) According to the petitioner, Patrick was unconscious when he returned to the master bedroom. (Add. 2, Vol. 12, p. 45) The petitioner also told the officers that Rosemary was coming down the hall and that he took her back to the bedroom where he had taken her initially, at which time she voluntarily "started taking her clothes off . . . ." (Add. 2, Vol. 12, p. 45) The petitioner claimed that Rosemary then had consensual sex with him and Patterson, after which Patterson drank two wine coolers, and they left. (Add. 2, Vol. 12, pp. 45-46)

The following day, the petitioner told the jailer that he wanted to speak with Officer Denton. (Add. 2, Vol. 12, p. 47) Officers Griffy and Denton went to see the petitioner, and the petitioner agreed to give them a third statement. (Add. 2, Vol. 12, pp. 47-48) The petitioner, who had been appointed counsel, waived his right to have his attorney present during the interview. (Add. 2, Vol. 26, p. 2) Officer Griffy recorded the interview with two tape recorders, one of which was concealed. (Add. 2, Vol. 12, pp. 48-49)

In this his third statement, the petitioner repeated his claim that he received a call from Rosemary about 4:30 p.m. on the afternoon of the murders and that she asked him to come see her that night. (Add. 2, Vol. 26, pp. 2, 7-8, 12) The petitioner told Officers Griffy and Denton that he had not been concerned about going to the Smiths' home because "a lot of times, [Patrick] le[ft] her alone." (Add. 2, Vol. 26, p. 13) The petitioner also claimed that he had been seeing Rosemary "[o]n and off" for some time and that, in addition to having sex with her at Faith Drive the day just before the murders, he had sex with her in her Mercedes several months earlier. (Add. 2, Vol. 26, pp. 6-9) The petitioner claimed that Rosemary was "going to get rid" of Patrick . . . no matter what it took," and that he and Rosemary had even "talked about killing" him. (Add. 2, Vol. 26, pp. 13, 17)

7

The petitioner claimed that "Patterson was driving the Camaro" the night of the murders and that he and Patterson arrived at the Smith home between 10:30 and 11:00 p.m. (Add. 2, Vol. 26, p. 2) When his knock at the back door went unanswered, the petitioner said that he started to leave. (Add. 2, Vol. 26, p. 3) According to the petitioner, however, Patterson had a gun, wanted to go inside, and tried to kick the door in. (Add. 2, Vol., 26, p. 3) The petitioner told the officers that, when he was unable to kick the door in, Patterson broke the window, opened the door by reaching inside and, using a flashlight that "he had in his pocket," looked "all through the house . . . and the basement . . . and there wasn't a trace of anybody there." (Add. 2, Vol. 23, p. 3)

The petitioner claimed that he was "still standing out at the back door . . . [a]nd ready to leave" when Patterson "started to go upstairs." (Add. 2, Vol. 26, p. 3) The petitioner stated that Patterson "heard a noise," came "back out, went to the car, got a pair of pliers and went for the phone line and cut it." (Add. 2, Vol. 26, pp. 3, 15) The petitioner maintained that the toolbox and wire cutters belonged to Patterson and denied cutting the telephone line himself. (Add. 2, Vol. 26, pp. 5, 13) When Patterson went back inside, the petitioner"followed." (Add. 2, Vol., 26, p. 15)

The petitioner told the officers that Patterson "went back inside . . . went upstairs and went straight to the back bedroom where Pat[rick] sat up in bed and yelled who is it," whereupon Patterson "grabbed him." (Add. 2, Vol. 26, p. 3) The petitioner claimed that Rosemary woke up and screamed when Patrick yelled and that he – the petitioner – "grabbed her and tried to get her away from Pat[terson]." (Add. 2, Vol. 26, p. 3) The petitioner stated that, while Patterson and Patrick were fighting, he "got [Rosemary] out of the room . . . took her in to the [center] [bed]room and told her to . . . get in the closet and hide." (Add. 2, Vol. 26, p. 3) The petitioner told the officers that he ran downstairs to use the telephone, but "didn't realize [the phone] was out." (Add. 2, Vol. 26, pp. 3, 16) Unable to call out, he stated that he went back upstairs, where he found Patrick unconscious. (Add. 2, Vol. 26, p. 3) The petitioner said that he did not think that Patrick was dead

8

because he "could still hear him." (Add. 2, Vol. 26, p. 3)

The petitioner told Officers Griffy and Denton that, when he saw Patrick unconscious on the bed, he "ran through the house again, went back downstairs and . . . came back up [but] . . . Rose[mary] wasn't in the closet . . . ." (Add. 2, Vol. 26, p. 3) According to the petitioner, Rosemary was in the hall, where "Pat[terson] grabbed her" and took her "back into the bedroom," that "she took her clothes off[] voluntarily," and then "willingly" had sex with Patterson. (Add. 2, Vol. 26, pp. 3, 9, 14) The petitioner claimed that, after Patterson was finished with Rosemary, Patterson got a piece of rope "[o]ut of his coat pocket" and "went back in the bedroom and tied [the] rope around Patrick's neck . . . ." (Add. 2, Vol. 26, p. 3) The petitioner stated that he "went to stop him, [but] he had a gun on him and [he] couldn't . . . ." (Add. 2, Vol. 26, p. 4) The petitioner also told the officers that, after Patterson left the room, Rosemary "told [him] that she was sorry" that she had sex with Patterson, and then "willingly" had sex with him too. (Add. 2, Vol. 26, pp. 9-10, 12, 14, 17)

The petitioner told Officers Griffy and Denton that Patterson was not going to kill Rosemary at first, but that he did anyway, strangling her with a scarf that he found in the house. (Add. 2, Vol. 26, p. 4) The petitioner said that he "checked" and believed that Rosemary still was alive when Patterson stopped choking her, but when he "went back upstairs later" it appeared that she was dead because Patterson had taken "a ball or something . . . twisted on her neck . . . and left her there." (Add. 2, Vol. 26, pp. 4-5) The petitioner claimed that he first knew for sure that the Smiths were dead after they left the house and Patterson told him they were. (Add. 2, Vol. 26, p. 16)

The petitioner maintained that nothing had been touched in the house while he was there, that he took nothing from the house, that he did not see a VCR, and that he just "found all this stuff in [his] car." (Add. 2, Vol. 26, pp. 5, 10-12) The petitioner later told the officers that he was aware that things had been removed from the house, but said that Patterson "must have went back" later. (Add. 2, Vol. 26, pp. 18-20) The petitioner told Officers Griffy and Denton that Patterson gave him

9

the watch and ring that he, in turn, gave to Lambert.  (Add. 2, Vol. 26, p. 11)

The petitioner denied being armed with a .38 revolver at the time of the break-in, denied having a penlight flashlight, denied touching either of the victims, and denied having a short section of rope with him, although he maintained that Patterson had a piece of rope.  (Add. 2, Vol. 26, pp. 12-13)  The petitioner denied that either he or Patterson wore masks and claimed that he was not wearing gloves, although he told the officers that Patterson was wearing a "right-hand glove."  (Add. 2, Vol. 26, pp. 3, 9-11)  The petitioner denied drinking any wine coolers, but said that Patterson drank two – one upstairs and one downstairs just before they left.  (Add. 2, Vol. 26, p. 10)  The petitioner also claimed that he had never been beyond "the front doorsteps" of the Smiths' home and that "he never went to their house for any other reason than to pick up a check one time."  (Add. 2, Vol. 26, p. 13)

The petitioner denied going to the Smiths' house to rob it, maintaining throughout the interview that he had gone there because Rosemary had asked him to.  (Add. 2, Vol. 26, p. 12)  The petitioner also insisted that he "didn't strangle anybody, [he] didn't take anything and [he] didn't plan it."  (Add. 2, Vol. 26, pp. 13, 15, 17)

### III.  PROCEDURAL BACKGROUND

The Grand Jury returned an eight-count indictment against the petitioner and Patterson on February 3, 1987: Count One – first-degree felony murder (felony murder) in Patrick's death; Count Two – felony murder in Rosemary's death; Count Three – first-degree burglary; Count Four – aggravated rape; Count Five – rape; Count Six – third-degree burglary; Count Seven – grand larceny; and Count Eight – armed robbery.[5]  (Add. 1, Vol. 1, pp. 2-5)  The petitioner and Patterson were tried together the following year.

---

[5]  Counts 6 through 8 did not pertain to the Smith murders and were severed by the trial court.  (Add. 1, Vol. 1, p. 107)  The petitioner was acquitted by a jury on those counts on April 25, 1989.  (Add. 4, Vol. 1, p. 5)

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 10 of 168 PageID #: 1930

## A. The 1988 Trial

The guilt-innocence phase of the trial began on February 18, 1988. The following evidence was adduced at trial in addition to that presented *supra* to establish the factual background.

Denning, who had known the petitioner since high school, testified that the petitioner and Patterson came to his trailer "four to five days" prior to the murders to "acquire a handgun." (Add. 2, Vol. 11, pp. 5-8) Denning testified that the petitioner had carried a .38 revolver for "about a year," and, when he asked the petitioner where the .38 revolver was, the petitioner told him that he "needed another [gun] . . . to pull a job." (Add. 2, Vol. 11, pp. 6-8) Denning recalled that the petitioner told him about a man with lots of money in his trunk, that "[h]e was going to take him down, kill him, take the money and run . . . ." (Add. 2, Vol. 11, p. 53)

Denning testified that his ex-roommate had stolen three guns, the petitioner's .38 revolver, a .22 revolver, and .45 semi-automatic. (Add. 2, Vol. 11, p. 9) Denning no longer had access to the .45 semi-automatic because it had been used as a deposit on the trailer where he lived, so he gave the .22 revolver to the petitioner who, in turn, gave it to Patterson. (Add. 2, Vol. 11, pp. 10-11) The petitioner and Patterson returned the .22 revolver the next day, telling Denning that, when they pointed it at their intended victim, "the man just laughed at them . . . ." (Add. 2, Vol. 11, p. 12)

According to Denning, the petitioner and Patterson came to the trailer again at about 8:00 a.m on January 8– the morning of the murders – and that the petitioner wanted to buy the .45 semi-automatic. (Add. 2, Vol. 11, pp. 16-17) The petitioner, Patterson, and Denning drove to Nashville to see the man to whom the .45 semi-automatic had been given as a deposit, James McManness (McManness). (Add. 2, Vol. 11, pp. 17-18) Denning met with McManness, gave McManness fifty dollars that the petitioner had given to him as a down payment on the .45 semi-automatic, and McManness, in turn, gave the .45 semi-automatic to Denning, who then gave it to the petitioner. (Add. 2, Vol. 11, pp. 18-19) After obtaining the .45 semi-automatic, the petitioner, Patterson, and

11

Denning drove to a hardware store, where Patterson bought two boxes of .45 caliber ammunition and an extra clip. (Add. 2, Vol. 11, pp. 19-20) The petitioner and Patterson then dropped Denning off at his trailer and left together. (Add. 2, Vol. 11, p. 20)

Lambert corroborated Denning's story about obtaining a handgun, testifying that the petitioner had talked with her the Saturday before the murders about driving to Nashville where he was going to get a "good deal" on an unregistered gun. (Add. 2, Vol. 13, p. 62) Lambert also told the jury that, on the evening of the murders, the petitioner and Patterson picked her up at approximately 9:30 p.m., after she got off work from her day job at the Governor's Square Mall. (Add. 2, Vol. 13, pp. 52-53) The petitioner and Patterson were both dressed in black leather jackets and blue jeans. (Add. 2, Vol. 13, p. 54) The three of them went from the Governor's Square Mall to Arby's, where Lambert ate a sandwich before having to go to work at 10:00 p.m. at the Rockvegas, where she worked nights as a bartender. (Add. 2, Vol. 13, p. 53) Lambert testified that the two were "laid back," and both appeared to be "on acid." (Add. 2, Vol. 13, p. 53)

Lambert drove her car from Arby's to the Rockvegas, with the petitioner as a passenger, and Patterson drove away in the Camaro. (Add. 2, Vol. 13, pp. 55-57) Lambert and the petitioner arrived at the Rockvegas at approximately 10:05 p.m. (Add. 2, Vol. 13, p. 56) When Patterson, who was supposed to meet them there, did not show up, Lambert asked the petitioner if he was going in. (Add. 2, Vol. 13, p. 57) The petitioner told her that he did not have enough money to pay the three dollar cover charge. (Add. 2, Vol. 13, p. 57) After waiting for about five minutes, Lambert left the petitioner in her car and went inside to go to work. (Add. 2, Vol. 13, p. 57) When she got off work at about 3:30 a.m., her car was locked, the petitioner was gone, and she did not see either the petitioner or Patterson the rest of the night. (Add. 2, Vol. 13, pp. 57-58)

Andrew, who shared the trailer with Denning, testified that he went to bed at about 11:00 p.m. on the night of the murders. (Add. 2, Vol. 12, p. 103) The petitioner and Patterson awakened

him between 3:30 and 4:00 a.m. the next morning, when they showed up at the trailer. (Add. 2, Vol. 12, p. 103) The petitioner and Patterson awakened Denning and "put a bottle of some kind of liquor on the counter," at which time Andrew went back to bed. (Add. 2, Vol. 12, p. 104)

Denning testified that the petitioner and Patterson came to the trailer between 2:30 and 3:00 a.m. on Friday morning. (Add. 2, Vol. 11, p 22) According to Denning, the petitioner and Patterson "were dressed really nicely," "a lot better than they normally dressed, in expensive clothes." (Add. 2, Vol. 11, pp. 22-23) Denning described the petitioner as "all ready to go out and party," and Patterson as if "he was coming down off a high, and didn't feel like doing anything but going to bed." (Add. 2, Vol. 11, p. 24) When Denning asked where the petitioner got his new clothes, the latter told him that "his girlfriend . . . [Lambert] . . . bought them for him at the place she works . . . ." (Add. 2, Vol. 11, p. 25) According to Denning they drank and smoked marijuana for about an hour; then the petitioner and Patterson left to go partying. (Add. 2, Vol. 11, pp. 25-26)

Denning told the jury that the petitioner was at his trailer again when he woke up at about 10:00 a.m. (Add. 2, Vol. 11, p. 27) The petitioner and Denning drove the Camaro to pick up Patterson at approximately 11:00 a.m. (Add. 2, Vol. 11, pp. 27-28) At about noon, while the petitioner, Patterson and Denning were driving back to the trailer, the petitioner asked Denning if he knew how to use stolen credit cards and then showed him "some stolen credit cards, checkbook and stuff" belonging to "Rosemary and Patrick Smith" that he produced from a "yellow ammo case" in "the front seat." (Add. 2, Vol. 11, pp. 29-31) The petitioner also showed Denning a "plastic bag with a wedding ring in it." (Add. 2, Vol. 11, p. 30) Although Denning could not recall whether he had seen a ladies watch, he testified that the petitioner pulled the ring "[f]rom inside his breast pocket of his coat." (Add. 2, Vol. 11, p. 31) Denning testified that the petitioner told him that he was going to give the ring to his girlfriend. (Add. 2, Vol. 11, p. 33) According to Denning, Patterson then said, for no apparent reason, that "they had killed two people . . . one more wouldn't

13

matter." (Add. 2, Vol. 11, p. 34)

Denning testified that he was at the Faith Drive apartments on Friday evening after the murders, where he was shown three Polaroid photographs of the petitioner, Patterson, and Barbee wearing black coats and blue jeans and posing with a .38 revolver, a .45 semi-automatic, and a sawed-off shotgun. (Add. 2, Vol. 11, pp. 57-58) According to Denning, Barbee burned the photographs. (Add. 2, Vol. 11, p. 58)

Andrew testified that he saw the petitioner and Patterson with a .38 revolver and the .45 semi-automatic that same evening at the trailer, that the .45 semi-automatic was the one that the petitioner had gotten from McManness, and that the .38 revolver appeared to be the .38 revolver that the petitioner had gotten from Denning previously. (Add. 2, Vol. 12, pp. 122-24) Although he could not remember whether it was Friday or Saturday, Andrew testified that the petitioner brought "a bunch of new clothes by [the trailer], somebody's clothes . . . and . . . threw them in [Denning's] room and he was going through them to figure out what he could wear." (Add. 2, Vol. 12, p. 127) According to Andrew, the petitioner told him that "he got them at Mr. Smith's." (Add. 2, Vol. 12, p. 128)

Denning saw the petitioner again on Saturday morning at about 8:00 a.m. (Add. 2, Vol. 11, p. 37) The petitioner's father dropped him off at the trailer, where the petitioner stayed "all morning and most of the afternoon." (Add. 2, Vol. 11, pp. 37-38) Denning testified that he first became aware of the murders when the petitioner brought a newspaper with him that carried the story. (Add. 2, Vol. 11, p. 38) Denning read the story in the newspaper and later saw the report of the murders on television. (Add. 2, Vol. 11, p. 39)

Denning told the jury that Andrew was reading the article later and asked, "who would do such a thing like this, and [the petitioner] said – I did." (Add. 2, Vol. 11, pp. 39-40) Denning testified that, when Andrew did not believe him, the petitioner produced a checkbook and credit

14

cards from the Camaro. (Add. 2, Vol. 11, pp. 40-41) Still not believing the petitioner, Andrew asked the petitioner some questions about the murders. (Add. 2, Vol. 11, p. 42) Denning testified that the petitioner told them that he "broke the window out and opened the door and he went upstairs and shined a light in the eyes of the victims and woke them up." (Add. 2, Vol. 11, p. 42) After telling " the woman to get in the closet," the petitioner went to the bedroom "where the man was," "to help" in the struggle with Patrick, and that "he mentioned a piece of rope and that Mr. Smith was strangled." (Add. 2, Vol. 11, pp. 43, 45-46)

The petitioner then told them that he raped Rosemary after Patrick had been strangled, that he had "gotten some Bartles and Jaymes . . . told the woman to get out of the closet" and, when she did, "he told her to take off her clothes . . . and he poured the Bartles and Jaymes all over her . . . [t]hen raped her." (Add. 2, Vol. 11, pp. 46-47) Denning described the petitioner as "[e]xcited, happy, bragging" as he recounted the rape. (Add. 2, Vol. 11, p. 47) Denning testified that he walked out of the room when the petitioner started to describe how he strangled Rosemary with the scarf and the vase. (Add. 2, Vol. 11, p. 47)

Denning also testified that the petitioner described how he and Patterson went through the house after the petitioner murdered Rosemary. (Add. 2, Vol. 11, pp. 47-48) The petitioner told them that "he took the VCR and put books back where the VCR was and put the cover over the books and then . . . started piling articles of value on the couch . . . the he was going to take, *i.e.*, "[w]allets, car keys, a VCR, liquor, a wedding ring, and $70.00." (Add. 2, Vol. 11, p. 48) According to Denning, the petitioner was "pissed off because that was all [the money] they had." (Add. 2, Vol. 11, p. 48) The petitioner told them that he already had given Rosemary's wedding ring to his girlfriend. (Add. 2, Vol. 11, p. 49)

The petitioner told Denning that he chose the Smiths because he "used to work for them," and they had "a lot of money." (Add. 2, Vol. 11, p. 50) Denning testified that the petitioner never

said anything about having an affair with Rosemary.  (Add. 2, Vol. 11, p. 50)  Finally, Denning

testified that, although the victims' names had not yet been released publically, the petitioner used

the Smith's names when he recounted the murders.  (Add. 2, Vol. 11, pp. 49-50)

With respect to the events of Saturday morning, Andrew testified that the petitioner's father

dropped the petitioner off at the trailer at 8:00 or 9:00 a.m.  (Add. 2, Vol. 12, p. 107)  Sometime after

lunch, Andrew was reading the paper about the murders and asked, "who would do something like

that, and [the petitioner] said – I did."  (Add. 2, Vol. 12, p. 108)  When Andrew said that he did not

believe him, the petitioner told him:

> how they broke into the house, they kicked the door and they broke
> the window in the door, they opened the door, went in and they said
> they are sleeping and they woke up and Mr. Smith – you know, kept
> saying – what do you want and he said – [the petitioner] said that
> Patterson had jumped Mr. Smith and [the petitioner] had told Mrs.
> Smith to get in the closet.  While he was doing that, they were trying
> to strangle – said they was trying to strangle Mr. Smith and [the
> petitioner] took Mrs. Smith in another room and said he had raped her
> then and went back in to help Patterson with Mr. Smith, and they said
> they couldn't get him down and they had to use a strap or belt, I don't
> know, to strangle him, and when they got him down, they both went
> in and then they raped her and then [the petitioner] killed Mrs. Smith.

(Add. 2, Vol. 12, p. 109)  According to Andrew, the petitioner told him that Rosemary "enjoyed"

being raped, and that he tried to strangle Rosemary with his hands but, when he could not, he

"grabbed [a] scarf, wrapped it around her neck and put a vase in it like a tourniquet and turned it

until she strangled."  (Add. 2, Vol. 12, p. 110)  Andrew testified that the petitioner admitted killing

both victims.  (Add. 2, Vol. 12, pp. 109, 143, 154)

The petitioner told Andrew that he and Patterson wore gloves so there would be no

fingerprints, that they wore masks so no one would recognize them, and that they "cut the phone line

the first thing so they couldn't call out . . . ."  (Add. 2, Vol. 12, p. 119)  The petitioner also told

Andrew that:

16

> [t]hey started going through the house, that they were piling up things they were going to take in one pile and they took a VCR and there was a cord on the TV, they put this cord behind the TV and put books on the TV so it would look like they didn't have one.

(Add. 2, Vol. 12, p. 110)

Andrew told the jury that the petitioner showed him "Mr. Smith's . . . wedding band," which he took from a pocket of the black vinyl jacket he was wearing, and told him that he had given Mrs. Smith's wedding ring to his girlfriend. (Add. 2, Vol. 12, pp. 111, 114-15, 118) When Andrew still did not believe him, the petitioner got an "old Army ammunition box" from the Camaro that contained a checkbook, credit and identification cards, the names on which were the same as the names that the petitioner had told him, and the same as those released on the 5:00 o'clock news. (Add. 2, Vol. 12, pp. 113-15)

The petitioner told Andrew that they had killed the Smiths because they only had seventy dollars. (Add. 2, Vol. 12, p. 116) Andrew also told the jury that the petitioner had told him that "he had no feelings" about killing the Smiths, that he "wanted to be popular, [and] he was going to be on the front page," that he was going to "fuck with the police and . . . . do it again five houses down . . . kill another family, do the same thing." (Add. 2, Vol. 12, p. 117) According to Andrew, the petitioner also told him that he "was going to kill Patterson . . . go[] to Florida, take some time off and then come back and kill his ex-wife." (Add. 2, Vol. 12, p. 117)

Andrew testified that he decided to tell the police what he knew because "[i]t bothered [him] that he raped [Rosemary] and then killed her . . . ." (Add. 2, Vol. 12, p. 129) Andrew also told the jury that he stole several of the credit cards as proof while the petitioner was "taking a shower," and hid them in a brass Korean urn in his bedroom. (Add. 2, Vol. 12, p. 130) Andrew told the jury that he did not go to the police immediately because the petitioner threatened him with the sawed-off shotgun, and told him that he would kill him if he told anyone. (Add. 2, Vol. 12, p. 120) Andrew

17

identified the sawed-off shotgun introduced into evidence (Exhibit 65) as similar to the one that Andrew had pointed at him. (Add. 2, Vol. 12, pp. 120-21) Andrew left the trailer on Sunday and stayed with a friend Sunday night because he did not feel safe. (Add. 2, Vol. 12, p. 132) Finally, Andrew testified that the petitioner "always told us who he was messing around with" and that he never mentioned having an affair with Rosemary. (Add. 2, Vol. 12, p. 122)

Denning testified that he saw the petitioner and Patterson again Sunday evening, January 11, when the three of them were riding around together. (Add. 2, Vol. 11, p. 51) When they stopped at a convenience store, Denning asked Patterson about his involvement in the murders, to which Patterson replied that "he had killed these two people, [and] that he had to help [the petitioner] kill one of them." (Add. 2, Vol. 11, p. 52)

In addition to the foregoing, Lambert identified the ladies ring set (Exhibit 5) and the wristwatch (Exhibit 6) as those that the petitioner had given to her the day after the murders. (Add. 2, Vol. 13, pp. 72-73) Denning, in turn, identified the ladies ring set as the one that the petitioner had showed him the day after the murders. (Add. 2, Vol. 11, p. 32) Constance Smith, Patrick's mother, identified the ladies ring set as Rosemary's and the wristwatch as the "same type, make, [and] color" as Rosemary's. (Add. 2, Vol. 9, pp. 35-36)

Detective Poston identified the black leather jacket (Exhibit 38) as the one that was seized from on top of the Camaro, in the pockets of which were found eight credit cards belonging to Patrick and Rosemary (Exhibit 39) and $150 in cash (Exhibit 40). (Add. 2, Vol. 10, p. 59) Lambert, in turn, identified the black leather jacket as looking like the one that the petitioner had been wearing just prior to the murders when he did not have enough money to cover the three dollar cover charge at the Rockvegas. (Add. 2, Vol. 13, pp. 54-57) Denning also identified the black leather jacket as looking like the jacket that he had seen the petitioner wearing before the murders and the one that the petitioner was wearing Friday morning when the petitioner showed him the ladies ring set

18

(Exhibit 5).  (Add. 2, Vol. 11, pp. 31-32)

Detective Poston identified the checks, credit and identification cards belonging to Patrick and/or Rosemary that were seized from the trunk of the Camaro (Exhibit 36) – fifty items in all – and a yellow box that also had been in the trunk (Exhibit 41).  (Add. 2, Vol. 10, pp. 52-56, 63) Denning testified that, when the petitioner asked him on Friday if he knew how to use stolen credit cards, the petitioner showed him "some stolen credit cards, checkbook and stuff" with the Smiths' names on them that he had in a "yellow ammo case."  (Add. 2, Vol. 11, pp. 29-31)  Denning identified Exhibit 41 as the "yellow ammo case" in which the Smiths' checks, credit and identification cards had been kept.  (Add. 2, Vol. 11, pp. 35-36)  Andrew testified that, when the petitioner showed him the checks, credit and identity cards on Saturday morning, there were "more than 20" of them in an "[o]ld Army ammunition box."  (Add. 2, Vol 12, pp. 111-14)  When shown Exhibit 36, Andrew identified a Social Security card as having been among the items that had been in the box.  (Add. 2, Vol. 12, p. 114)

Detective Poston identified the two key rings in evidence (Exhibits 48 and 49) as those that were seized from Patterson's closet at Faith Drive.  (Add. 2, Vol. 10, p. 72)  Detective Poston testified that it was determined subsequently that the house keys on the key rings opened the doors to the Smiths' home, and the car keys started the Smiths' Mercedes and Honda.  (Add. 2, Vol. 10, pp. 73-74)  Detective Poston also identified the white cooler and luggage tags with Patrick's name found in the kitchen at the Faith Drive apartments (Exhibit 51), and the Army purse found in the kitchen trash with papers belonging to Rosemary in it (Exhibit 52).  (Add. 2, Vol. 10, pp. 79-82)

Detective Bryant identified the brass Korean urn (Exhibit 71) that he had seized from Andrew's trailer, as well as four credit cards belonging to Patrick and/or Rosemary and Rosemary's Geneva Convention card (Exhibit 72) that were in the urn when he seized it.  (Add. 2, Vol. 12, pp. 17-18)  Andrew, in turn, identified the brass Korean urn, as well as two of the credit cards in Exhibit

72 as those he had taken from the petitioner and hidden in the urn while the petitioner was showering. (Add. 2, Vol. 12, p. 137)

Detective Crockarell identified the .38 revolver (Exhibit 34) as the one found concealed in the center console of the Camaro. (Add. 2, Vol. 10, pp. 44-45) James Pruitt (Pruitt), an employee at a transmission repair shop in Clarksville that the petitioner frequented, testified that he knew the petitioner, that he had personal knowledge that the petitioner carried a .38 revolver long before the murders, and that the .38 revolver in evidence was the petitioner's. (Add. 2, Vol. 13, p. 92)

Pruitt also testified that the petitioner visited the shop prior to the murders and that he had a .45 semi-automatic with him at that time. (Add. 2, Vol. 13, p. 93) Although Pruitt testified that he could not positively identify the .45 semi-automatic in evidence as the one that the petitioner had showed him, he did testify that it "could very possibly be the one" that the petitioner brought into the shop. (Add. 2, Vol. 13, pp. 95-96) Denning and Andrew, on the other hand, both identified the .45 semi-automatic in evidence as the one the petitioner obtained the week prior to the murders from McManness. (Add. 2, Vol. 11, p. 11; Vol. 12, p. 125)

Dean Akin (Akin), another employee at the transmission shop in Clarksville, testified that the petitioner came to see him at work between 3:00 and 4:00 p.m. the Saturday after the murders to sell him a VCR. (Add. 2, Vol. 13, pp. 28-29) Akin agreed to buy the VCR (Add. 2, Vol. 13, pp. 29-30) and testified that the VCR in evidence (Exhibit 9) appeared to be the VCR that the petitioner had sold him (Add. 2, Vol. 13, p. 35).

Karen Rivetna (Rivetna), Rosemary's sister, testified that the VCR was identical to the one that she and her husband bought for Patrick and Rosemary the previous Memorial Day holiday, and the VCR box in evidence (Exhibit 10) that had been recovered from the house was the one in which they had brought the VCR to Patrick and Rosemary. (Add. 2, Vol. 9, pp. 47-48, 50) Detective Crockarell testified that the serial number on the box matched the serial number on the VCR in

evidence. (Add. 2, Vol. 10, pp. 29-30) Notwithstanding the petitioner's statement to the police that he had never been inside the Smiths' house, Rivetna testified that the petitioner came to the Smiths' home once while she was there and that he spent approximately one-half hour downstairs in the family room hooking up the VCR. (Add. 2, Vol. 9, pp. 56-58; Vol. 26, p. 13)

Finally, the following expert testimony was presented to the jury. Constance Howard, a forensic serologist with the TBI, testified that the two samples provided to her by the CPD tested positive for the presence of spermatozoa, as did her test of the rape kit swab provided to her by the medical examiner. (Add. 2, Vol. 13, pp. 8-10, 12) Her tests established that both Rosemary and the petitioner were PGM-Type I secretors and that the fluids found on the vaginal swabs could be attributed either to Rosemary and/or the petitioner, but not to Patterson who was a PGM-Type II secretor. (Add. 2, Vol. 13, p. 14)

Doctor Charles Harlan (Dr. Harlan), the Chief Medical Examiner for Metropolitan-Nashville, Davidson County, testified that the cause of Patrick's death was ligature strangulation and that Patrick was alive at the time he was strangled. (Add. 2, Vol. 13, pp. 121-24, 135) Doctor Harlan testified that Patrick would have lost consciousness within thirty seconds to a minute and that death would have followed within six to eight minutes. (Add. 2, Vol. 13, pp. 127-28) According to Dr. Harlan, the injuries around Patrick's neck could have been caused by the length of 880 cord in evidence (Exhibit 50). (Add. 2, Vol. 13, p. 130)

Doctor Harlan testified that the cause of Rosemary's death also was ligature strangulation. (Add. 2, Vol. 13, p. 148) He testified that the external injuries around Rosemary's neck were consistent with the scarf tied around it and that an injury in the back of the neck was consistent with a knot formed if an object "such as the vase" were used to tighten the ligature. (Add. 2, Vol. 13, pp. 142-43) Doctor Harlan testified further that he found marks on Rosemary's neck that were consistent with fingernail marks made by someone who is conscious trying to remove the ligature.

(Add. 2, Vol. 13, p. 143)  Doctor Harlan told the jury that Rosemary would have lost consciousness within approximately thirty seconds to a minute of the ligature having been applied and that death would have followed within three to six minutes.  (Add. 2, Vol. 13, pp. 144-45)

The petitioner offered no proof at the guilt-innocence phase of the trial.  (Add. 2, Vol. 11, pp. 81-82)  Following instruction by the court, the jury retired at 10:16 a.m. on February 23, 1988 and returned at 2:16 p.m. the same day, having found the petitioner guilty on Counts 1 through 4, but not on Count 5.  (Add. 1, Vol. 1, pp. 138-39; Add. 2, Vol. 14, pp. 42-44)

The penalty phase of the trial began the same day and concluded on February 25, 1988.  After presentation of proof and receiving the charge of the court, the jury retired at 12:27 p.m. to consider the question of punishment.  (Add. 2, Vol. 18, p. 51)  The jury returned to open court at 6:46 p.m. the same day, returning a sentence of death against the petitioner on Counts 1 and 2.[6]  (Add. 1, Vol. 1, pp. 145-46; Add. 2, Vol. 18, pp. 54-55)  In returning the verdict of death against the petitioner, the jury found three statutory aggravating circumstances, *i.e.*, the murder was especially heinous, and the murder occurred while engaged in, or an accomplice to, the felonies of rape and burglary.  (Add. 2, Vol. 18, p. 54)  The jury also found that the statutory aggravating circumstances outweighed the mitigating circumstances.  (Add. 2, Vol. 18, pp. 54-55)

The petitioner was formally sentenced to death on March 18, 1988 on Counts 1 and 2, Count 2 to be served consecutively to Count 1.  (Add. 1, Vol. 2, p. 157)  He also was sentenced to ten (10) years on Count 3, to be run concurrently with Count One, and to forty (40) years on Count 4, to be served consecutively to Counts 1 and 2.  (Add. 1, Vol. 2, pp. 158-59)

The petitioner filed a notice of appeal on May 20, 1988.  (Add. 1, Vol. 2, p. 193)  The Tennessee Supreme Court affirmed the judgment with respect to the felony murder convictions, but

---

[6] The jury sentenced Patterson to life on Counts 1 and 2.  (Add. 1, Vol. 2, p. 147; Add. 2, Vol. 18, p. 55)

remanded the case for resentencing because the trial court erred in not suppressing the portions of the third statement that he gave to law enforcement officials after he rescinded his waiver of his Fifth Amendment right to remain silent. (Add. 3, Vol. 3, pp. 7-9) The United States Supreme Court denied the petitioner's petition for a writ of *certiorari*. *Tennessee v. Cauthern*, 495 U.S. 904 (Apr. 23, 1990).

### B. The 1995 Resentencing Hearing

Venue for the resentencing hearing was transferred from Montgomery County to Gibson County due to adverse publicity. (Add. 4, Vol. 1, p. 4) The resentencing hearing was held on January 24 and 25, 1995. The following testimony was adduced in that proceeding.

Constance Smith, Patrick's mother, testified again at the 1995 resentencing hearing. (Add. 5, Vol. 1, pp. 104-19) She testified about her son's and Rosemary's personal and professional background, as well as their plans and aspirations. (Add. 5, Vol. 1, pp. 107-12) She also identified the gray leather jacket as having belonged to her son, identified Rosemary's wedding ring from a photograph, and testified that her son's wedding ring and Rolex wristwatch were missing from the house. (Add. 5, Vol. 1, pp. 112-18)

Officer Nichols, who testified at the 1988 trial, testified at the 1995 resentencing hearing that the Smiths' back door had been broken, the door kicked in, and their house "ransacked." (Add. 5, Vol. 1, p. 123) He also testified that he observed Rosemary's body with "a scarf around her neck with a vase of some type tied in knots as though it was a tourniquet . . . ," and Patrick's body "on his knees" in the adjacent bedroom, leaning against the bed, appearing "as though he had been strangled." (Add. 5, Vol. 1, pp. 124-27)

Doctor Harlan, who testified at the 1988 trial, testified again that Patrick died from ligature strangulation. (Add. 5, Vol. 1, pp. 135-36, 140) He described the physiological effects of ligature strangulation (Add. 5, Vol. 1, pp. 135-42), noting that there were "four parallel abrasions . . . roughly

the length of a fingernail" on the left side of the neck, indicating that Patrick fought against the ligature (Add. 5, Vol. 1, pp. 139, 144). Doctor Harlan testified that, under the circumstances of the crime, it would have taken Patrick "three to six minutes" to die. (Add. 5, Vol. 1, p. 142) Finally, Dr. Harlan testified that the injuries he observed on Patrick were consistent with a violent struggle. (Add. 5, Vol. 1, pp. 144-45)

Doctor Harlan testified that Rosemary also died of ligature strangulation. (Add. 5, Vol. 1, p. 146) He testified that force in excess of 34 foot-pounds was used to strangle her, resulting in the fracture of the thyroid cartilage, that the presence of abrasions on her neck showed that she struggled to free herself from the ligature, that using the vase as a tourniquet to tighten the scarf around her neck would have been a "protracted event," and that it also would have taken Rosemary "three to six minutes" to die. (Add. 5, Vol. 1, pp. 146-49) Doctor Harlan concluded that neither Patrick nor Rosemary died instantaneously. (Add. 5, Vol. 1, p. 149)

Detective Crockarell testified that he made a videotape of the murder scene, which was shown to the jury. (Add. 5, Vol. 2, pp. 156-62) After the videotape was shown, Detective Crockarell testified that the glass in the back door had been "shattered" and that the door had been "kicked three times" so that the "lock mechanism was totally pulled out of the door." (Add. 5, Vol. 2, p. 163) Detective Crockarell testified that the outside phone lines had been cut at the service box. (Add. 5, Vol. 2, p. 164) He also testified that there were two Bartles and Jaymes bottle caps in the hall outside the bedrooms where the bodies were found and two bottles in the trash can in the kitchen. (Add. 5, Vol. 2, p. 165) Detective Crockarell testified that the two bottle caps found upstairs were less than six feet from Rosemary's body and approximately ten feet from Patrick's. (Add. 5, Vol. 2, pp. 165-66)

Detective Crockarell testified that Patrick had been involved in a "very, very violent struggle." (Add. 5, Vol. 2, p. 167) He described the bed against which Patrick's body was found

leaning as follows: "The bed rail braces and bolts had been broken away from the headboard itself – splintered. The left headboard was laying up against the wall. The bed rails, bed frame, and the mattress . . . was down on the floor." (Add. 5, Vol. 2, p. 167) Regarding Patrick's body, Detective Crockarell testified that "It appeared to me that . . . he was turning back and forth struggling . . . and in the commotion he had wrapped . . . the bed sheets around himself twice and between his legs . . . ." (Add. 5, Vol. 2, p. 168)

Detective Crockarell testified that he observed Rosemary's body in the bedroom next to the bedroom in which her husband had been murdered. (Add. 5, Vol. 2, p. 169) Detective Crockarell testified that he observed as the scarf was removed from around Rosemary's neck, that the scarf itself was wrapped around her neck once, a knot tied at the back of her neck, a second knot tied on top of the vase, and the vase twisted three times, leaving a one-eighth indentation "completely around her neck." (Add. 5, Vol. 2, pp. 170, 182-84)

Detective Crockarell testified that a pair of panties was found next to her body and a nightgown in a corner, with two buttons that appeared to have been torn off, one of which was found on the bed and the other at the foot of the bed. (Add. 5, Vol. 2, pp. 171, 181) He also testified that he observed what appeared to be "several spots of a semi-clear liquid" on the comforter on which Rosemary's body was found and that he found a similar substance approximately four inches from her mouth and "on her inner thigh – pubic area." (Add. 5, Vol. 2, pp. 178-80)

In addition to the foregoing, Detective Crockarell testified about the hammer that was found at the top of the stairs, a throw rug found askew by the front door, items that were missing from the house, *e.g.*, electronic equipment, credit cards, jewelry, clothing, and a piece of paper with the petitioner's name on it. (Add. 5, Vol. 2, pp. 172-77) He also testified about the circumstances under which the petitioner was taken into custody, finding a fully loaded .38 revolver under the console of the Camaro on which the petitioner was working when he was arrested, and the circumstances

of the subsequent search of the car and the Faith Drive apartments.  (Add. 5, Vol. 2, pp. 185-89)

Detective Poston testified about his search of the Camaro and the Faith Drive apartments. (Add. 5, Vol. 2, pp. 197-225)  Detective Poston essentially repeated the testimony adduced at the 1988 trial regarding the incriminating evidence seized in these searches, *supra* at pp. 4, 18-19.

Detective Denton testified again at the 1995 resentencing hearing.  (Add. 5, Vol. 1, pp. 226-89)  It was through his testimony that the petitioner's second and third statements were introduced into evidence, previously discussed, *supra* at pp. 6-7, 9-10.

Rosemary's sister, Karen Rivetna, testified at the 1995 resentencing hearing.  (Add. 5, Vol. 3, pp. 302-10)  Rivetna told the jury that the petitioner came to the Smiths' home on Memorial Day weekend in 1986 to set up the VCR that she had bought as a gift for her sister and Patrick and that Rosemary told her that she did not like the petitioner.  (Add. 5, Vol. 3, pp. 302-05)  Rivetna also identified her sister's wedding ring and watch, and Patrick's jacket, all recovered by the CPD during the course of its investigation.  (Add. 5, Vol. 3, pp. 306-10)

Lambert – whose name was Pigue at the time of the resentencing hearing – testified that the petitioner gave her Patrick's wedding ring and watch the day after the murders and that she turned them over to the police the morning after she learned of the petitioner's involvement in the Smith murders.  (Add. 5, Vol. 3, pp. 312-15, 318)

Denning testified again at the 1995 resentencing hearing.  (Add. 5, Vol. 3, pp. 348-79) Denning essentially repeated the testimony that he gave at the 1988 trial, discussed *supra* at pp. 11-16, 18-20.  Particularly relevant at the 1995 resentencing hearing was Denning's testimony that, after reading a newspaper account of the murders, the petitioner told Denning that he murdered Rosemary by tying "a scarf around [her] neck," and when he "didn't have enough strength to kill her [he] tried to twist it with a vase or something" (Add. 5, Vol. 3, pp. 364-66), that the petitioner admitted that he "raped [Rosemary] and poured Bartles and James [*sic*] all over her . . . ," and that

26

he was "real excited" as he described the rape and murders, especially when recounting pouring the Bartles and Jaymes on Rosemary's body.  (Add. 5, Vol. 3, pp. 369-70)

Andrew was the State's final witness at the 1995 resentencing hearing.  (Add. 5, Vol. 3, pp. 381-94)  Although Andrew's testimony in 1988 about the murders, discussed *supra* at pp. 4, 3, 13-20, had faded by the time of the 1995 resentencing hearing, he repeated his earlier testimony that the petitioner admitted having raped Rosemary, adding that the petitioner viewed raping her as a "great trophy," and that he was "proud of it."  (Add. 5, Vol. 3, pp. 390-91)

In their case in chief, the defense presented the testimony of Charles Tracy, a teacher hired by the Tennessee Department of Correction, for whom the petitioner worked as a teacher's aide, as well as the testimony of the petitioner himself.  (Add. 5, Vol. 3, pp. 401-43)  The jury subsequently sentenced the petitioner to life imprisonment for Patrick's murder and to death for Rosemary's.  (Add. 5, Vol. 4, pp. 481-84)

The petitioner filed a notice of appeal from the resentencing hearing on June 19, 1995.  (Add. 4, Vol. 1, p. 32)  Finding no reversible error, the Tennessee Court of Criminal Appeals (the Court of Criminal Appeals) affirmed the judgment of the trial court on December, 2, 1996.  (Add. 6, Vol. 1, Attach. Opinion)  The Tennessee Supreme Court affirmed the judgment of the trial court on March 23, 1998 (Add. 11, Attach. Opinion),[7] following which the petitioner's petition for a writ of *certiorari* was denied, *Cauthern v. State*, 525 U.S. 967 (Nov. 2, 1998).

The petitioner filed a *pro se* petition for state post-conviction relief on January 15, 1999.  (Add. 7, Vol. 1, pp. 000001-10)  He then filed a first amended and an amended first amended petition through counsel on March 20 and April 10, 2000 respectively.  (Add. 7, Vol. 1, pp. 000037-94; Vol. 2, pp. 98-170)  The petitioner's petition for post-conviction relief was denied following an

---

[7]  The Tennessee Supreme Court's opinion is attached as the last document in Add. 11.

evidentiary hearing on December 4-5, 2000, April 20, June 4, and August 8 and 13, 2001. (Add. 7, Vol. 3, pp. 000300-62) The petitioner filed a notice of appeal on December 19, 2001. (Add. 7, Vol. 3, p. 000366) The Court of Criminal Appeals affirmed the judgment of the post-conviction court on February 19, 2004, and the Tennessee Supreme Court denied the petitioner's application for permission to appeal on August 30, 2004. (Add. 10, Vol. 4, 6)

The petitioner filed a *pro se* application for appointment of counsel in the instant action to investigate, prepare, and file a petition for *habeas corpus* relief under 28 U.S.C. § 2254. (DE # 1) Counsel and co-counsel were appointed on December 16, 2004. (DE # 4) The petitioner filed his petition for federal *habeas corpus* relief through counsel on June 3, 2005, following which he filed an amended petition on August 1, 2005. (DE # 12, 16)

The respondent filed an answer on December 5, 2005 and an amended answer on December 22, 2005. (DE # 26, 29) On September 15, 2006, the petitioner filed a traverse. (DE # 34)

On January 29, 2007, the petitioner filed a motion for discovery (DE # 40). The petitioner's motion was granted to determine whether there was evidence that: 1) the State suppressed evidence that Andrew received a reward and other consideration in exchange for his testimony; 2) the State suppressed evidence that Barbee, acting on Patterson's behalf, or others, sought to influence Andrew's testimony; 3) the State withheld evidence that wine coolers had not been poured on Rosemary's body; 4) defense counsel was ineffective for not cross examining Andrew regarding his expectation of receiving a reward and other compensation in exchange for his testimony; 5) defense counsel was ineffective for not cross examining Denning regarding his testimony that the petitioner had poured wine coolers on Rosemary; 6) defense counsel was ineffective for not investigating a 1981 New Mexico homicide in which the victim had been raped and murdered, and in which Patterson was the primary suspect. (DE # 76)

The petitioner and the respondent both filed motions for summary judgment on September

28

14, 2009.  (DE # 121, 123)  Both parties filed a response (DE # 145-146), and both filed a reply (DE # 151, 164).

## IV. ANALYSIS

Petitions for federal *habeas corpus* relief filed after April 24, 1996 are subject to the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996) (AEDPA).  *See Martin v. Mitchell*, 280 F.3d 594, 602 (6th Cir. 2002)(citing *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1977).  Title 28 U.S.C. § 2254, as amended by the AEDPA, provides the following with respect to granting a writ of *habeas corpus* to prisoners who are in custody pursuant to a state court judgment:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "unreasonable application" of clearly established federal law differs from an "incorrect application."  *Williams v. Taylor*, 529 U.S. 362, 365 (2000).  Under the former, "a federal *habeas corpus* court may grant relief if the state court identifies the governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*.  The latter clause is satisfied when a state court "arrives at a conclusion opposite that reached by [the Supreme] Court on a question of law or . . . decides a case differently than the Court . . . on a set of materially indistinguishable facts."  *Id*. at 364-65.  Where state courts have made factual determinations regarding issues presented for federal *habeas corpus* review, such

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 29 of 168 PageID #: 1949

determinations are presumed to be correct, and the petitioner has the burden of rebutting that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Miller-el v. Cockrell*, 537 U.S. 322, 324 (2003).  Under the AEDPA, the purpose of federal *habeas corpus* review is to "ensure that state court convictions are given effect to the extent possible under the law," not to conduct a federal re-trial.  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

## A.  Prosecutorial Misconduct During Closing
## Argument at Resentencing
## (First Claim)

The petitioner alleges in his petition that the prosecution engaged in "improper, unconstitutional, and inflammatory closing arguments at [his 1995] resentencing hearing" in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments.  (DE # 16, ¶¶ 10-13, pp. 3-6)  The petitioner asserts that the closing argument at issue "'so infected the [resentencing] with unfairness as to make the [death sentence] a denial of due process.'"  (DE # 16, ¶ 13, p. 6)

The respondent argued in his response to the petition that the Tennessee Supreme Court determined on direct appeal that, "although the prosecutor's argument was improper, it did not affect the verdict to the prejudice of the defendant."  (DE # 26, p. 16)  The respondent also argued that the Tennessee Supreme Court's ruling was "neither contrary to nor an unreasonable application of clearly established federal law . . . and [that it] was based on a reasonable determination of the facts in light of the evidence presented in the state court proceeding."  (DE # 26, p. 16)

In his traverse, the petitioner replied that the respondent failed to address the Sixth Circuit's decision in *Bates v. Bell*, 402 F.3d 635 (6th Cir. 2005), where the Sixth Circuit "unanimously found the Tennessee Supreme Court's treatment of prosecutorial misconduct during closing argument to be unreasonable and contrary to federal law."  (DE # 34, p. 1)  The petitioner maintained that the four factors set forth in *Bates*, addressed *infra* at p. 32, "demonstrate[] the unreasonableness of the Tennessee Supreme Court's decision in [his] case."  (DE # 34, p. 3)

30

The respondent repeats his earlier arguments in his motion for summary judgment. (DE # 122, pp. 15-16) The petitioner argues to the contrary. (DE # 146, ¶ V.A, pp. 26-36)

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004); *see Lundgren v. Mitchell*, 440 F.3d 754, 778 (6th Cir. 2006). "[T]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see Lundgren*, 440 F.3d at 778 (quoting *Darden* and *Donnelly*). "The touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982); *see Serra v. Mich. Dep't Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993). Federal *habeas corpus* relief may be granted "only if the statements were so flagrant as to render the entire trial fundamentally unfair." *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003).

To obtain federal *habeas corpus* relief on this issue, the petitioner must establish that "the prosecution's conduct was both improper and so flagrant as to warrant reversal." *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003). The Sixth Circuit has adopted a two-part test to that end. *See United States v. Carroll*, 26 F.3d 1380, 1385-90 (6th Cir. 1994); *see also Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006). The first part of the test is to determine whether the offending remarks were improper. *Carroll*, 26 F.3d at 1387-89. Such review includes defense counsel's conduct as well as the nature of the prosecutor's response, *i.e.*, the "invited response." *United States v. Young*, 470 U.S. 1, 11-12 (1985)(citing *Lawn v. United States*, 355 U.S. 339, 359 n. 15 (1958)(defendant was not denied fair trial when prosecution's argument was invited in response to an argument presented by the defense)). If the reviewing court determines that the remarks were improper, then analysis of the second half of the test is required.

The second part of the test is to determine whether the remarks were flagrant. The Sixth

Circuit has adopted the following four-part test to determine whether remarks such as those at issue were flagrant: 1) the likelihood that the prosecutor's remarks tended to mislead the jury or prejudice the defendant; 2) whether the remarks were isolated or extensive; 3) whether the remarks were deliberately or accidently made; and 4) the total strength of the evidence against the defendant. *See United States v. Kuehne*, 547 F.3d 667, 687-88 (6th Cir. 2008); *Bates*, 402 F.3d 635 at 641; *Mason*, 320 F.3d at 635. If the reviewing court determines that the remarks were flagrant, then a new trial should be ordered. *See Carroll*, 26 F.3d at 1384, 1389-90.

Whether or not the remarks are determined to have been flagrant, the court also should determine whether the error was harmless. *See United States v. Bess*, 593 F.2d 749, 753-57 (6th Cir. 1979); *Carroll*, 26 F.3d at 1390. An error is harmless "unless it 'had a substantial and injurious effect of influence in determining the jury's verdict.'" *Bates*, 402 F.3d at 641 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). In the context of a death penalty case, the question is whether the conduct alleged "influenced the jury's decision between life and death." *Beuke v. Houk*, 537 F.3d 618, 659 (6th Cir. 2008)(citing *Bates*, 402 F.3d at 641). More particularly, where the evidence pointing to the defendant's guilt is strong, and the prosecutor's improper comments go to the nature and intent of the crime rather than the defendant's guilt or innocence, *habeas corpus* relief is not warranted if "the jury would probably have returned the verdict of guilty anyway." *Hamblin v. Mitchell*, 354 F.3d 482, 495 (6th Cir. 2003).

District Attorney General Clayburn Peeples closed for the State. (Add. 5, Vol. 3, pp. 443-49) Thereafter, defense counsel Hugh Poland gave the closing argument for the defense.[8] (Add. 5, Vol. 3, pp. 449-50; Vol. 4, pp. 451-61) In his remarks, attorney Poland argued that civilized societies do not kill others no matter how "gruesome" their crime. (Add. 5, Vol. 3, pp. 449-50) He also

---

[8] Mr. Robert Bateman also spoke on closing, but his remarks were brief, focusing on the difficult decision that the jury faced. (Add. 5, Vol. 4, p. 461)

confronted the jury with how they would feel if someday they learned that the petitioner had been executed (Add. 5, Vol. 4, pp. 455, 457), attempted to put them in the position of "throw[ing] that switch" when the petitioner was electrocuted (Add. 5, Vol. 4, p. 456), told them that, if they voted for the death penalty, their decision was going to be "something . . . in your gut real deep that you're going to feel for the rest of your life" (Add. 5, Vol. 4, p. 456), and implied that, if they voted for the death penalty, they would not be "act[ing] as civilized individuals" (Add. 5, Vol. 4, p. 457). Referring to "Owl Creek Bridge,"[9] attorney Poland then sought to put the jurors in the petitioner's place when the petitioner's life flashed before his eyes at the moment of his death. (Add. 5, Vol. 4, p. 458) Finally, quoting the lyrics of "the Green, Green Grass of Home,"[10] attorney Poland appealed to the sympathies of the jury, arguing that the petitioner was "worth saving." (Add. 5, Vol. 4, p. 460)

> Assistant District Attorney General Steve Garrett began his rebuttal for the state as follows:

> > Cruel act – heinous act – acts involving torture. There's no better way to describe those words than that videotape that you saw yesterday, and that camera panned the room where Rosemary Smith lay. You saw that white vase and the pink scarf tied, twisted, and turned around her neck. She lay there nude in total degradation – degradation beyond imagination, beyond description wearing only socks. Over in the corner, we saw her again . . . .

(Add. 5, Vol. 4, p. 462) At this point, attorney Poland objected that General Garrett "should only direct [his] final closing as to our remarks and nothing new." (Add. 5, Vol. 4, p. 462) Responding that he "intend[ed] to make it relevant to counsel's remarks as rebuttal," General Garrett resumed, making the following remarks that are at issue:

---

[9] *An Occurrence at Owl Creek Bridge* is a short story by Ambrose Pierce about a Confederate sympathizer who is condemned to die by hanging. In that instant between life and death, the condemned man imagines that the rope breaks and he escapes the hangman, only to be yanked back to reality when he reaches the end of his rope.

[10] *Green, Green Grass of Home*, a song written by Charley Putnam, is about a man awaiting execution who can only return home when he is dead and buried.

Counsel asked, "Why should Ronnie Cauthern die?" An image flashes in my mind based upon the evidence in this case of Cauthern standing over Rosemary Smith pouring the bottle of Bartles and James [*sic*] wine coolers on her and bragging to Joe Denning. How do we comprehend this? I don't know. I've struggled with it. I know each one of you have struggled with it. I know that I've said one thing that's probably true – each one of us has been indelibly marked by our participation in this case.

Yes, we are asking for the death penalty. Why? Why should Ronnie Cauthern die? I once heard an interpretation of the Lord's Prayer. 'Deliver us from evil,' originally translated and actually read, 'Deliver us from the evil one' – far more personally [*sic*], far more graphic, and far more intense – the evil one.

In the 1960's, the Rolling Stones came out with a song. The refrain after each chorus was, 'Pleased to meet you. Hope you guess my name.' And, I suggest to you it was a song about the evil one appearing in person throughout the ages in many different guises. Mr. Poland says civilized society – in civilized society, we don't kill. But in civilized society, we must address – we must stand up to, we must confront the realities of our daily existence and our daily survival not only of ourselves but of our children and their children.

It came to dawn on me after I thought about, 'Pleased to meet you, hope you guess my name' – that on January the 8th and January the 9th, 1987, the evil one descended upon Patrick and Rosemary Smith, and the evil one is smart, the evil one is skilled, the evil one is wily, and the evil one is manipulative. A simple demonstration of that, ladies and gentlemen, is this. The evil one appeared today and produced greeting cards – 'Merry Christmas,' 'Happy Holidays.'[11]

But on January the 8th, 1987, the evil one appeared at the door of 351 Hampshire Drive, a home not unlike yours in a neighborhood not unlike yours – the evil one appeared there in disguise – a mask, a black jacket, a pistol, strangling rope, and the evil one is capable of taking advantage of what was available inside their house.

Yes, whether you like it or not – whether you volunteered or not, you are engaged in the ultimate battle in everyday combat with the evil one, and he's not going to go away. He appeared in Minnesota in the

---

[11]  Holiday greeting cards, drawn "free hand" by the petitioner while in prison, were introduced as mitigation evidence by the defense. (Add. 5, Vol. 3, p. 424 & Ex. 36)

form of Jeffrey Dahlmer [*sic*]. He appeared in Union, South Carolina, and on January the 9th, he appeared in the door of Patrick and Rosemary Smith. You cannot deal in good faith with the evil one. You have got to destroy and destroy, or he and his benefactors will destroy you. He'll destroy us. He'll destroy our children.

The evil one took the name of Ronnie Cauthern on that day. That was his name, and he's beyond redemption. He's beyond rehabilitation. There is no treatment for this individual posing in a mask and taking human form. There is no treatment for this person. This person has been around through the ages and will appear again. You cannot cure him. Don't try to save him. Engage him in combat and destroy him. Do your duty. When you open that paper and you find that the State has carried out your instruction, you will have scaled the ramparts at least one time, and you will have been part of bringing back peace and tranquility in your community and in our community, and you will send a message to the evil one. You will send a message that we stand ready – armed, and ready to fight for all in the world, for everything that you believe in, for the sanctity of your home, the blessing of seeing your children reach adulthood and have your grandchildren, and you will take that step and leave a legacy to your children that they someday will not have to grapple with what the Smiths had to deal with and what Karen Rivetna and her mother have to deal with.

'Holiday Greetings' – a time for loved ones to get together. Horrible chaos has been reaped and racked on this family. I'm asking you to do your duty. Stand tall. Thank you.

(Add. 5, Vol. 4, pp. 462-65)

The Court of Criminal Appeals addressed this claim on appeal from the 1995 resentencing hearing. (Add. 6, Vol. 1, Attach. Opinion, pp. 26-31) Although the Court of Criminal Appeals determined that the remarks were "irrelevant" and "patently improper," the Court of Criminal Appeals ultimately determined that the remarks at issue did not affect the verdict and, as a result, did not prejudice the petitioner. (Add. 6, Vol. 1, Attach. Opinion, pp. 30-31)

The Tennessee Supreme Court also considered General Garrett's remarks on direct appeal. (Add. 11, Attach. Opinion, pp. 17-19) Concluding that the "State's argument was highly improper," the Tennessee Supreme Court addressed "whether the improper conduct could have affected the

35

verdict to the prejudice of the defendant." (Add. 11, Attach. Opinion, p. 18) In its review, the Tennessee Supreme Court considered: 1) the remarks in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court; 3) the intent of the prosecutor in making the improper statements; 4) the cumulative effect of the remarks and any other errors in the record; and 5) the relative strength or weakness of the case. (Add. 11, Attach. Opinion, p. 18)

After considering the factors enumerated above, the Tennessee Supreme Court determined: 1) that the remarks constituted "only a portion of the prosecution's summation . . . ." ; 2) that the defense did not object; 3) that "[i]t appeared] . . . the prosecution's motivation in making the argument was to respond to defense counsel's assertion that the defendant should not receive a death penalty in a civilized society and also to rebut the defendant's evidence of his rehabilitative potential"; and 4) given the "overall record and the overwhelming strength of the State's case," the remarks "did not affect the sentence or render the jury's decision arbitrary or unreliable under the Eighth and Fourteenth Amendments . . . ," nor did they "affect the sentence or render the jury's decision arbitrary or unreliable . . . ." (Add. 11, Attach. Opinion, p. 19)

Although the remarks at issue clearly were improper, the ultimate question before this court is whether they "influenced the jury's decision between life and death." The record supports the Tennessee Supreme Court's determination that they did not. First, the strength of the evidence against the petitioner in this gruesome double murder was overwhelming. Second, immediately following the remarks at issue, the trial court instructed the jury that "remarks of the lawyers are . . . not evidence, "and that "[a]ny statements that . . . are not supported by the evidence should be disregarded . . . ." (Add. 5, Vol. 4, p. 466) Third, General Garrett's remarks constituted an "invited response" to attorney Poland's own questionable closing arguments. Fourth, General Garrett's remarks were not likely to have convinced the jury that the petitioner was, in fact, the devil incarnate. Finally, the jury did not sentence the petitioner to death for Patrick's murder, which also

36

was before it. General Garrett's remarks took aim at both murders, not just the one for which the petitioner received the death sentence. Had General Garrett's remarks influenced the jury's decision between life and death, the jury would have returned a sentence of death on both charges.

The petitioner has not shown that the decision of the Tennessee Supreme Court on this issue was contrary to, or involved an unreasonable application of, clearly established federal law. Neither has he shown that its decision amounted to an unreasonable determination of the facts in light of the evidence. This claim is without merit.

### Certificate of Appealability

Where, as here, the district court denies a ground for relief on the merits in a *habeas corpus* action, a certificate of appealability (COA) "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### B. Trial Court Error for not Permitting the Petitioner to Present Mitigation Evidence (Second Claim)

The petitioner alleges that the trial court violated his rights under the Eighth and Fourteenth Amendments at the 1995 resentencing hearing by not permitting him to enter into evidence a letter from his son telling the petitioner that "he loved [him] and was looking forward to seeing him again." (DE # 16, ¶¶ 14-15, p. 6)

The respondent argued in his response to the petition that the Tennessee Supreme Court determined on direct appeal that "any error in excluding evidence 'did not affect the jury's verdict and was harmless beyond a reasonable doubt.'" (DE # 26, p. 17) The respondent argued further that the Tennessee Supreme Court's determination was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of

37

the facts in light of the evidence presented.  (DE # 26, p. 17)

In his traverse, the petitioner challenged whether the Tennessee Supreme Court's determination of this issue "reasonably applied United States Supreme Court authority as to prejudice."  (DE # 34, pp. 3-4)  More particularly, the petitioner argued that [t]he United States Supreme Court has never engaged in harmless error review when a jury has been deprived of the ability to consider mitigating evidence" and, as such, "the remedy is to remand [this case] for resentencing."  (DE # 34, p. 4)

In his motion for summary judgment, the respondent argues again that the decision of the Tennessee Supreme Court was neither contrary to nor an unreasonable application of clearly established federal law and that its decision was a reasonable determination of the facts in light of the evidence presented.  (DE # 122, pp. 16-17)  The petitioner disagrees on both points in his response.  (DE # 146, ¶ V.B, pp. 36-44)

"The constitution requires States to allow consideration of mitigating evidence in capital cases."  *McKoy v. North Carolina*, 494 U.S. 433, 442 (1990).  "[S]tates cannot limit the sentencer's consideration of any relevant circumstances that could cause it to decline to impose the [death] penalty."  *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987); *see Mills v. Maryland*, 486 U.S. 367, 384 (1988); *Eddings v. Oklahoma*, 455 U.S. 104, 113-15 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  More particularly, the juror may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Penry v. Lynaugh*, 492 U.S. 302, 317 (1989)(quoting *Lockett*, 438 U.S. at 604 (italics in the original)), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304, 321 (2002)(internal quotations omitted).  "As the exclusion of mitigating evidence potentially undermines the reliability of sentencing determinations, the burden is on the state to prove that the error was harmless beyond a reasonable doubt," *see Carter v. Bell*,

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 38 of 168 PageID #: 1958

218 F.3d 581, 594 (6th Cir. 2000)(citing *Satterwhite v. Texas*, 486 U.S. 249, 258 (1988); *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986); *Chapman v. California*, 386 U.S. 18, 24 (1967)), *i.e.*, that it did not have "a substantial and injurious effect of influence in determining the jury's verdict," *Brecht*, 507 U.S. at 638.  In the context of a death penalty case, the question is whether "the constitutional error influenced the jury's decision between life and death."  *See Bates*, 402 F.3d at 641.

The letter at issue reads as follows: "Dear Dad I Love you Dad I hope I come again gen [*sic*]. Some time.  We went to Chuck Cheese.  We went to Wall Mart and we had fun.  Love always Ryan."  (Add. 5, Vol. 4, Ex. 34)  The only part of the note that can be construed as mitigation evidence is the statement that the petitioner's son loved him and that his son hoped that he could visit the petitioner again.  Reference to having gone to Chuck E. Cheese's and having fun at WalMart have nothing to do with the petitioner's character or record that might conceivably establish grounds for a sentence other than death.

On appeal from the verdict of the 1995 resentencing hearing, the Court of Criminal Appeals determined that the letter at issue did not "depict anything additional about the appellant's character." (Add. 6, Vol. 1, Attach. Opinion, p. 43)  More particularly, the Court of Criminal Appeals determined that the note was "cumulative," because evidence already had been put before the jury that the petitioner "had a son" who visited him "every three or four months," and that the trial court instructed the jury that it should consider the fact that the petitioner had a minor child as a mitigating circumstance.  (Add. 5, Vol. 4, p. 474; Add. 6, Vol. 1, Attach. Opinion, p. 43)  The Court of Criminal Appeals concluded that the decision to admit or exclude evidence is a matter left to the sound discretion of the trial court and, given the cumulative nature of the note at issue, the trial court did not abuse its discretion in not admitting it.  (Add. 6, Vol. 1, Attach. Opinion, p. 43)

The Tennessee Supreme Court determined on review "that the trial court erred in excluding

the letter written to the defendant by his son." (Add. 11, Attach. Opinion, p. 20)  However, citing *McKoy*, *Satterwhite*, and *Chapman*, *supra* at pp. 38-39, the Tennessee Supreme Court determined that "the error in excluding this evidence did not affect the jury's verdict and was harmless beyond a reasonable doubt."  (Add. 11, Attach. Opinion, p. 20)  In making the latter determination, the Tennessee Supreme Court relied on the petitioner's testimony in open court that he had an eight year old son named Ryan who came to visit him in prison "every three, four, or five months . . . ." (Add. 5, Vol. 3, pp. 413-14), and a photograph of the petitioner with his son that had been introduced into evidence (Add. 5, Vol. 4, Ex. 32 (Photo)).  (Add. 11, Attach. Opinion, p. 20)  Given that evidence of the petitioner's relationship with his son was presented to the jury by other means, and given that the jury was instructed that it could consider the petitioner's relationship with his son as mitigating evidence, the petitioner cannot show that the mere failure to introduce the letter influenced the jury's decision between life and death.

The petitioner has not shown that the Tennessee Supreme Court's decision on this issue was contrary to, or involved an unreasonable application of, clearly established federal law.  Neither has he shown that it was an unreasonable determination of the facts in light of the evidence.  This claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### C.  Trial Court Error for Not Instructing the Jury That it Could Consider Nonstatutory Mitigating Circumstances, and for Not Instructing the Jury That it Could Consider a Life Sentence Other than Death out of Mercy (Third Claim)

The petitioner alleges that the trial court erred at the 1995 resentencing hearing for not providing instructions on the following nonstatutory mitigating circumstances requested by the

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 40 of 168 PageID #: 1960

petitioner: 1) his co-defendant, Patterson, received a life sentence; 2) since being incarcerated, he

had been a model prisoner; and 3) since being incarcerated, he had helped others both in and out of

prison.  (DE # 16, ¶¶ 16-18, p. 7)  The petitioner further alleges that the totality of the instructions

failed to convey to the jury that it could consider these nonstatutory mitigating circumstances and

that the trial court erred in "fail[ing] to grant the Petitioner's special request number three which

inform[ed] that jury that they may in mercy consider and sentence the Petitioner to a sentence less

than death."  (DE # 16, ¶¶ 17-18, p. 7)

The respondent argued in his response to the petition that the Tennessee Supreme Court

rejected the petitioner's nonstatutory mitigating-circumstances claim on direct appeal from the

resentencing hearing because, "at the time of the petitioner's offense, Tennessee law did not require

instructions on specific nonstatutory mitigating circumstances."  (DE # 26, p. 18)  Arguing further

that the United States Supreme Court "has never imposed a constitutional mandate upon trial courts

to instruct capital sentencing juries on nonstatutory mitigating factors," the respondent maintained

that the state court's decision on this issue was neither contrary to nor an unreasonable application

of established federal law, and "[t]o grant petitioner relief would . . . constitute the use of federal

habeas corpus to announce a new rule of constitutional law/procedure, which is prohibited . . . ."

(DE # 26, p. 18)

The petitioner replied in his traverse that the retroactivity principle in *Teague v. Lane*, 489

U.S. 288 (1989) imposes no bar on the court's consideration of this claim.  (DE # 34, pp. 5-6)  The

petitioner argued further that the cases on which he relied, *Lockett* and *Eddings, supra* at p. 38, and

*Hitchcock v. Dugger*, 481 U.S. 393 (1987), were decided before his case became final on November

2, 1998, and that those cases "permit[ted] the introduction of all relevant mitigating evidence."  (DE

# 34, p. 6)  The petitioner concluded by arguing that "the state court's determination of [his claim

pertaining to factors in mitigation] was contrary to and/or unreasonable [*sic*]."  (DE # 34, p. 6)  The

41

petitioner did not mention his original mercy-instruction claim in his traverse.

In his motion for summary judgment, the respondent again argues that the decision of the state courts on this issue was neither contrary to, nor an unreasonable application of, clearly established federal law. (DE # 122, p. 17) The respondent also repeats his argument that granting relief on this issue would announce a new rule of constitutional criminal law/procedure which is prohibited by *Teague, supra* at pp. 41-42, and *Saffle v. Parks*, 494 U.S. 484 (1990). (DE # 122, p. 17) The petitioner argues in his response that the Tennessee Supreme Court's determination on this issue was an unreasonable determination. (DE # 146, ¶ V.C, pp. 44-46)

As an initial point, the court notes that jury instructions in state criminal cases involve matters of state law. Because federal *habeas corpus* relief does not lie for errors of state law, federal courts may grant a writ of *habeas corpus* based on errors in state jury instructions only in extraordinary cases. *Daniels v. Lafler*, 501 F.3d 735, 742 (6th Cir. 2007)(citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). More particularly, alleged errors that pertain to jury instructions are reviewable only if the petitioner was deprived of constitutional due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Durr v. Mitchell*, 487 F.3d 423, 446 (6th Cir. 2007); *Byrd v. Collins*, 209 F.3d 486, (6th Cir. 2000). Errors pertaining to jury instructions violate due process only if the error is so egregious that it renders the entire trial fundamentally unfair. *See Estelle*, 502 U.S. at 76; *Mitzel v. Tate* 267 F.3d 524, 536 (6th Cir. 2001), *cert. denied*, 535 U.S. 966 (2002).

### 1. Failure to Instruct the Jury on Nonstatutory Mitigating Circumstances

As previously established, *supra* at pp. 38-39, the constitution requires that states allow consideration of mitigating evidence in capital cases. Moreover, the trial judge must instruct the jury that it may consider evidence of nonstatutory mitigating factors presented by the defendant,

42

*Hitchcock*, 481 U.S. at 398-99, but only when supported by the evidence presented, *see Delo v. Lashley*, 507 U.S. 272, 277 (1993).  Just as a jury need not be instructed on a particular statutory mitigating factor, they need not be instructed on nonstatutory mitigating factors, so long as the jury is instructed that all mitigating factors should be considered.  *See Buchanan v. Angelone*, 522 U.S. 269, 275-77 (1998).  In other words, a "catch-all" instruction on mitigation is constitutionally sufficient unless the instruction as a whole creates "a reasonable likelihood that the jury [will] appl[y] the . . . instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).  The question is "what a reasonable juror could have understood that charge as meaning." *Francis v. Franklin*, 471 U.S. 307, 315-16 (1985); *see Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979).

The trial court provided the following instructions to the jury with respect to mitigation evidence:

> [Y]ou are authorized to weigh and consider ***any mitigating circumstances*** . . . which may have been raised by the evidence throughout the entire course of this hearing.
>
> . . .
>
> Tennessee law provides that in arriving at the punishment, the jury shall consider as heretofore indicated, ***any mitigating circumstances*** which shall include, but are not limited to, the following . . . .

(Add. 5, Vol. 4, pp. 470-71, 473)(emphasis added)  At the conclusion of the second instruction, the trial court specified four (4) statutory mitigating factors, and three (3) nonstatutory mitigating factors, while providing a further instruction that the jury could consider:

> ***[a]ny other mitigating factor*** which is raised by the evidence produced by either the prosecution or defense at the hearing of this matter; that is, you shall consider ***any aspect of the defendant's character or record***, or ***any aspect of the circumstances*** of the offense favorable to the defendant which is supported by the evidence.  ***No distinction shall be made between mitigating***

43

*circumstance one (1) through (8) and those otherwise raised by the evidence* which are specifically requested either by the State or Defense.

(Add. 5, Vol. 4, p. 474)(emphasis added)

The Court of Criminal Appeals addressed this issue on appeal from the 1995 resentencing hearing.  (Add. 6, Vol. 1, Attach. Opinion, pp. 39-41)  The Court of Criminal Appeals determined that: 1) the trial court was not obliged to instruct the jury on specific nonstatutory mitigating factors under the law as it existed at the time of the crimes; 2) because the law in effect at the time of the crimes did not require the trial court to instruct the jury on nonstatutory mitigating factors, the trial court did not err in refusing to do so; and 3) because the trial court did instruct the jury on several nonstatutory mitigation factors that inured to his benefit, any error in not instructing the jury on other nonstatutory mitigating factors was harmless.  (Add. 6, Vol. 1, Attach. Opinion, p. 41)

The Tennessee Supreme Court did not analyze this issue on appeal.  The Tennessee Supreme Court did, however, "affirm the thorough and well-reasoned decision of the Court of Criminal Appeals" on this issue.  (Add. 11, Attach. Opinion, pp. 23, 29-30)[12]

Turning to the first nonstatutory mitigating factor at issue – Patterson's lesser sentences – the record shows that the trial judge informed the jury for its "information only" that Patterson received a life sentence for his role in the Smith murders.  (Add. 5, Vol. 3, p. 442)  The trial judge advised the jury that the information "in no way ha[d] any bearing on what [the jury was] to do in this case."  (Add. 5, Vol. 3, p. 442)  The trial court's instruction was based on the fact that  no evidence had been  presented to the jury.  Because no evidence had been presented to the jury, there was no evidence pertaining to Patterson's lesser sentence to consider in mitigation.  Thus, the trial court did not err in refusing to give the instruction on this point.

---

[12]  The Tennessee Supreme Court attached the relevant portions of the Court of Criminal Appeals' opinion as an Appendix to its own opinion.

Regarding the other two nonstatutory mitigating factors, *i.e.*, that the petitioner had been a model prisoner and that he had helped others in and out of prison, the record shows that evidence was adduced at the 1995 resentencing hearing as to these two factors. This evidence was introduced by Tracy, for whom the petitioner had worked as a prisoner teacher's aide, and through the petitioner's own unchallenged testimony. (Add. 5, Vol. 3, pp. 401-29) Since it is presumed that juries follow instructions, *Greer v. Miller,* 483 U.S. 756, 766 n. 8 (1987), the jurors at the 1995 resentencing hearing are presumed to have followed the trial judge's instructions that they could consider such evidence as mitigating evidence. As previously noted, there is no due process violation where the trial court's constitutional, "catch-all instruction" permits the jury to consider such evidence as mitigating circumstances. It is clear from the record that a "reasonable juror" would have understood from the court's instructions that he/she was free to consider any mitigating factor that was supported by the evidence.

Next, the petitioner asserts that "[t]he totality of the instructions failed to convey to the jury that it should consider this evidence," *i.e.*, that the petitioner had been a model prisoner and that he had helped others in and out of prison. The petitioner has not provided any argument in support of this claim in either his petition or amended petition and, in his response to the respondent's motion for summary judgment, he asserts only that:

> The totality of the instructions failed to convey to the jury that it should consider this evidence. Again, as recognized by the Supreme Court in *Skipper*, this is powerful mitigation.

(DE # 146, ¶ V.C, p. 45) The petitioner's totality-of-the-instructions claim is conclusory as pled. The Sixth Circuit Court of Appeals has held that conclusory claims, without supporting facts or evidentiary support, do not provide a basis for *habeas corpus* relief. *See Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001).

The petitioner has not shown that the Tennessee Supreme Court's decision on this issue was

45

contrary to, or involved an unreasonable application of, clearly established federal law. Neither has he shown that the Tennessee Supreme Court's decision on this issue was an unreasonable determination of the facts in light of the evidence. This claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### 2. Trial Court Error for Not Instructing the Jury That it Could Consider a Sentence Less than Death out of Mercy

The instruction at issue, "special request number three[,] which inform[ed] the jury that they may in mercy consider and sentence the Petitioner to *a sentence less than death*" (DE # 16, ¶ 18, p. 7)(emphasis added), read as follows:

> Even if you do not find that the mitigating factors outweigh the aggravating factors, you may recommend mercy for Ronnie M. Cauthern. You may decide to sentence Ronnie M. Cauthern to *life imprisonment* simply because you find it appropriate to exercise *mercy*.

(Add. 4, Vol. 1, p. 10)(emphasis added)

The Tennessee Court of Criminal Appeals addressed this issue on appeal from the 1995 resentencing hearing. (Add. 6, Vol. 1, Attach. Opinion, p. 48) Noting that the Tennessee Supreme Court had previously upheld a trial court's decision not to give a mercy instruction, the Court of Criminal Appeals concluded that the claim was without merit. (Add. 6, Vol. 1, Attach. Opinion, p. 48) Once again, the Tennessee Supreme Court did not address this issue. Rather, it "affirm[ed] the thorough and well-reasoned decision of the Court of Criminal Appeals" on this point. (Add. 11, Attach. Opinion, pp. 23, 29-30)

The Sixth Circuit has held that failure to give the jury a "mercy" instruction does not violate the petitioner's constitutional rights, where a "mercy" instruction is not required. *See Mapes v.*

46

*Coyle*, 171 F.3d 408, 416 (6th Cir. 1999)("[T]here is no . . . entitlement to a 'merciful discretion' instruction in light of the likely tendency of such an instruction to lead to arbitrary differences in whom is selected to be sentenced to death."). There is no requirement under Tennessee law that requires a "mercy" instruction be given at the penalty phase in a capital case. *See State v. Thacker*, 164 S.W.3d 208, 256 (Tenn. 2005)(citing *Cauthern*, 967 S.W.2d 726, 749 (Tenn. 1998)); *State v. Bigbee*, 885 S.W.2d 797, 813-14 (Tenn. 1994), *superseded by statute on other grounds as stated in State v. Odom*, 137 S.W.3d 572 (Tenn. 2004); *State v. Melson,* 638 S.W.2d 342, 366-68 (Tenn. 1982). Because there was no requirement under Tennessee law to give a "mercy instruction" in a capital case, the petitioner cannot show that the trial court's refusal to do so in his case violated his due process rights.

For the reasons previously explained, *supra* at pp. 42-43, this part of the petitioner's claim is not cognizable on federal *habeas corpus*. Moreover, because the petitioner has not shown that the decision of the Tennessee courts on this issue was contrary to, or involved an unreasonable application of, clearly established federal law, this claim also is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### D. Violations of *Brady v. Maryland*, 373 U.S. 83 (1963)
### (Fourth Claim)

The petitioner asserts that the prosecution withheld material, exculpatory evidence prior to the 1988 trial. (DE # 16, ¶¶ 19-24, pp. 7-9) The petitioner alleges that: 1) the defense was not provided a copy of a police report dated January 23, 1987, in which Detective R.J. DiFiore (Detective DiFiore) noted that efforts had been made to influence Andrew's testimony; and 2) the State did not disclose compensation expected/received by Andrew. For the reasons explained *infra*

47

at pp. 56-69, the court also will address the petitioner's *Brady* claim as it pertains to Denning's wine cooler testimony, a claim raised for the first time in his motion for discovery.

The respondent argued in his response to the petition that the Court of Criminal Appeals applied *Brady* on appeal from the judgment of the post-conviction court and determined that "the petitioner . . . failed to demonstrate a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different." (DE # 26, p. 19) The respondent argued further that the ruling of the Court of Criminal Appeals was neither "contrary to, nor involved an unreasonable application of law, as determined by the United States Supreme Court." (DE # 26, p. 19) In his traverse, the petitioner challenged the respondent's argument that "the state court's determination regarding whether the suppressed evidence satisfies materiality was not contrary to or an unreasonable" application of federal law. (DE # 34, p. 7)

The petitioner and respondent filed cross-motions for summary judgment on this issue. (DE # 122, p. 18; DE # 123, ¶¶ C.1, D, pp. 4-10) The petitioner argues in his motion for summary judgment that the evidence pertaining to Andrew was suppressed within the meaning of *Brady*. (DE # 123, ¶¶ C.1, D, pp. 4-10) The respondent argues in his motion for summary judgment that the determination of the state courts on this issue was neither contrary to, nor involved an unreasonable application of, clearly established federal law. (DE # 122, p. 18) The respondent argues in his response to the petitioner's motion for summary judgment that the determination of the state courts on this issue is "sound and proper." (DE # 145, pp. 2-6) The petitioner "incorporates in its entirety his arguments from his Summary Judgment Motion" as his response to the respondent's motion for summary judgment. (DE # 146, ¶ V.D, p. 46)

"[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material to guilt or punishment . . . ." *Brady*, 373 U.S. at 87. A true *Brady* violation comprises three elements: 1) the evidence at issue must be favorable to the accused

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 48 of 168 PageID #: 1968

because it is either exculpatory or impeaching; 2) the evidence must have been suppressed by the government, either willfully or inadvertently; and 3) prejudice to the defendant must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

*Brady* encompasses exculpatory evidence known to the prosecution and/or to police officials, but not disclosed to the defendant. *See Kyles v. Whitley*, 514 U.S. 419, 438 (1995); *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). Whether the prosecution acted in "good faith or bad faith" is irrelevant. *Brady*, 373 U.S. at 87. Suppression occurs even "when the government fails to turn over . . . evidence that 'is known only to police investigators and not to the prosecutor.'" *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006)(quoting *Kyles*, 514 U.S. at 438). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *See Kyles*, 514 U.S. at 438.

Notwithstanding the foregoing, "Brady . . . does not impose an affirmative duty upon the government to take action to discover information which it does not possess." *Graham*, 484 F.3d at 417. Nor does a *Brady* violation arise when a defendant knew or should have known of the essential facts permitting him to take advantage of the information, or where the evidence was available to the defendant from another source. *Id.*; *Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004); *United States v. Delgado*, 350 F.3d 520, 527 (6th Cir. 2003).

A *Brady* violation requires more than the suppression of evidence favorable to the defense. *United States v. Ross*, 245 F.3d 577, 584 (6th Cir. 2001). The petitioner has a constitutional remedy only if he can show that the result of the trial would have been different, *i.e.*, that he was prejudiced. *Kyles*, 514 U.S. at 433; *Campbell v. Coyle*, 260 F.3d 531, 559 (6th Cir. 2001). To establish prejudice under *Brady*, the petitioner must show that the suppressed favorable evidence was "material."

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood*, 547

U.S. at 870 (citing *Sticker*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)(quoting *Bagley*, 473 U.S. at 682. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Srickler*, 527 U.S. at 289-90 (quoting *Kyles*, 514 U.S. at 434).

Determining materiality under *Brady* does not use a sufficiency of the evidence test. *Kyles*, 514 U.S. at 434-35. In examining whether suppressed evidence is "material" for *Brady* purposes, a court must consider the suppressed evidence collectively, not item by item. *Kyles*, 514 U.S. at 436-37; s*ee Schledwitz v. United States*, 169 F.3d 1003, 1012 (6th Cir. 1999); *see also Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003). Considered collectively, the *Brady* material must be such that the state court's conclusion on materiality is an unreasonable application of federal precedent. *Castleberry*, 349 F.3d at 291.

### 1. Alleged Suppression of Evidence Pertaining to Andrew

The first part of the petitioner's *Brady* claim involving Andrew pertains to Detective DiFiore's January 23, 1987 report. (DE # 16, ¶ 20, p. 8) The report (Add. 9, Vol. 47) reveals that Andrew told Detective DiFiore that Barbee had gone to see Andrew on the night of January 19, 1987, and that he asked Andrew to tell Patterson's attorney that the petitioner committed the murders while Patterson remained in the car and that Andrew had not seen the petitioner and Patterson together on the night of the murders. (DE # 16, ¶ 20, p. 8) The report also reveals that someone vandalized Andrew's car two nights later, the inference being that Andrew's car had been vandalized in a further effort to influence his testimony. (DE # 16, ¶¶ 23-24, pp. 8-9) The petitioner asserts that the report was in the prosecution's files but that it was not disclosed to the defense. (DE # 16, ¶¶ 20-21, p. 8)

50

In the second part of his *Brady* claim pertaining to Andrew, the petitioner asserts that the State had information that Andrew was compensated for his testimony but did not disclose that information to the defense. Specifically, the petitioner claims that Andrew contacted the police expecting to receive the $5,000 reward offered in the case, that he ultimately received a reward, and that he also received $300 in cash to help him move back on-post at Fort Campbell. (DE # 16, ¶¶ 23-24, pp. 8-9; Add. 9, Vol. 50, ¶ 1.e, p. 2)

The crux of the petitioner's argument in his motion for summary judgment is that the state courts erred in determining that the evidence at issue was not material. (DE # 123, ¶ D, pp. 9-10) The respondent counters in his response that "[n]either the alleged attempt to influence Andrew's testimony, nor Andrew's expectation of a reward nor the vandalism of Andrew's vehicle can overcome the evidence proving that the petitioner committed the offenses of which he was convicted" at the 1988 trial. (DE # 145, p. 6) More particularly, the respondent argues that "none of the suppressed evidence negated the suffering and torture of Mrs. Smith, which justifie[d] imposition of the death penalty." (DE # 145, p. 6)

The petitioner counters in his reply that, had the suppressed evidence been presented at the 1988 trial, "a single juror could have entertained reasonable doubt given the consideration provided to this witness." (DE # 151, ¶ A.1, p. 3) The petitioner maintains further that the evidence shows that "Patterson, through Barbee, attempted to alter the testimony of a key witness" and that this attempt to influence the testimony of others could have been used "as impeachment of Patterson in a trial that centered around which defendant was the more culpable." (DE # 151, ¶ A.1, p. 4) The petitioner also argues that the state court "never addressed materiality in the . . . context . . . [of] Patterson." (DE # 151, ¶ A.1, p. 4)

As to the 1995 resentencing hearing, the petitioner argues that the state court "simply missed the point in its analysis," focusing on Andrew's testimony rather than Patterson, and that

"Patterson's misconduct would have tipped the balance in at least one juror's mind." (DE # 151, ¶ A.2, p. 6) Finally, the petitioner argues that the Court of Criminal Appeals determination was "contrary to and/or an unreasonable application of Brady and its progeny," because the court considered the fact that the jury returned only one death sentence rather than two, and that the "suppressed evidence did not negate the aggravator relied upon by the [State]." (DE # 151, ¶ A, pp. 5-6)

Andrew's testimony at the 1988 trial and 1995 resentencing hearing was addressed at the post-conviction evidentiary hearing. (Add. 8, Vol. 8, pp. 157-59; Vol. 9, pp. 79, 82-89; Add. 9, Vol. 50) Although Andrew did not testify, the parties stipulated what Andrew's testimony would have been, had he done so. (Add. 8, Vol. 9, pp. 113-14, 116; Add. 9, Vol. 50)

The post-conviction court, relying on *Brady*, analyzed these two factual predicates pertaining to Andrew in its Order denying the petitioner's request for post-conviction relief, each in the context of the 1998 trial and the 1995 resentencing hearing. (Add. 7, Vol. 3, pp. 000339-46) The post-conviction court determined that the defense had requested the report at issue but that the State had failed to provide it. (Add. 7, Vol. 3, p. 000342) The post-conviction court determined further that, while the vandalism of Andrew's car was not favorable to the defense, evidence of compensation and efforts to influence Andrew's testimony would have been. (Add. 7, Vol. 3, p. 000342) The post-conviction court also noted that, because defense counsel at the 1988 trial already had the information pertaining to the compensation through a newspaper article found in defense counsel's files, the State had no duty to disclose the information. (Add. 7, Vol. 3, p. 000342)

Assuming for the sake of argument that the State was required to provide a copy of the report, the post-conviction court determined further that, had evidence pertaining to the compensation received by Andrew been presented at the original 1988 trial, it would have had "minimal, if any, impeachment value" because, had defense counsel attempted to impeach Andrew's

testimony by raising the question of the compensation, Andrew would have explained that his life had been threatened for going to the police and that he needed the money to get out of Clarksville. (Add. 7, Vol. 3, p. 000343; Add. 9, Vol. 50, ¶¶ 1.c–f)

The post-conviction court also determined that efforts by Barbee and/or others to influence Andrew's testimony had no impeachment value, highlighting that: 1) Andrew was subject to threats and vandalism as a result of his cooperation with the authorities; 2) Andrew, who expected the police to protect him after he had been threatened, would not have reported his conversation with Barbee if Andrew intended to alter his testimony as a result of that conversation; 3) the petitioner's assertion that Barbee approached Andrew at Patterson's request was speculation unsupported by the record; 4) because Patterson never attempted to convince the police that he remained in the car, Barbee's efforts appeared to be a "misguided attempt to help a friend"; 5) the evidence did not support the conclusion that Barbee influenced Andrew's testimony, because Patterson gave his sworn statement, in which he described the roles that he and the petitioner played in the murders, to the police seven days before Barbee approached Andrew; 6) had defense counsel tried to impeach Andrew based on the conversation with Barbee, the state could have rehabilitated Andrew by showing that his testimony was consistent with his prior statement to the police; and 7) although defense counsel was successful in his effort to use inconsistencies in Andrew's statement to impeach him, Andrew's testimony was consistent with his statement to the police regarding which defendant killed which victim. (Add. 7, Vol. 3, pp. 000343-46; Add. 9, Vol. 50, ¶¶ 1.c–f)

Having determined that the evidence in the report had minimal to no impeachment value, the post-conviction court then turned its attention to the question of materiality. (Add. 7, Vol. 3, pp. 000345-46) Noting that the "most damaging aspect of Andrew's testimony . . . was his assertion that the petitioner admitted to personally killing the victims," the post-conviction court determined that, because the petitioner was "charged with felony murder, as opposed to premeditated murder,

and because the jury was instructed on the theory of aiding and abetting, the identity of the actual murderer was irrelevant." (Add. 7, Vol. 3, p. 000345) The post-conviction court also noted that the petitioner's "very active participation [in the murders] . . . was established through the testimony of numerous witnesses, many of whom corroborated aspects of Andrew's testimony." (Add. 7, Vol. 3, p. 000345) Based on the foregoing, the post-conviction court concluded that, "when this 'favorable' evidence is considered along with the extensive proof of petitioner's guilt, it cannot 'reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict', and the trial 'result[ed] in a verdict worthy of confidence.'" (Add. 7, Vol. 3, p. 000345)

With respect to the 1995 resentencing hearing, the post-conviction court determined that: 1) Andrew's testimony that his interest in the reward money was a matter of survival would, once again, not have benefitted the petitioner; 2) Barbee's attempt to influence Andrew did not affect Andrew's statement to the police, because Andrew gave his sworn statement to the police before Barbee approached him; 3) Barbee's conversation with Andrew prior to the 1988 trial would not have motivated Andrew to direct his testimony away from Patterson at the 1995 resentencing hearing, because Patterson was in prison and no longer a potential threat; and 5) because Andrew's memory had "faded" in the eight years between the 1988 trial and the 1995 resentencing hearing, his "somewhat brief and insignificant" testimony  was unlikely to have affected the jury's determination that Rosemary's murder was heinous, atrocious, or cruel.   (Add. 7, Vol. 3, pp. 000345-46)  Once again, the post-conviction court determined that "the information regarding Andrew's compensation and Barbee's conversation with Andrew could not 'reasonably be taken to put the whole case in such a different light as to undermine the confiden[ce] of the verdict." (Add. 7, Vol. 3, p. 000346)

The Court of Criminal Appeals, also relying on *Brady*, conducted an in-depth review of the

54

post-conviction court's findings of fact and conclusions of law on this issue. (Add. 10, Vol. 4, pp. 24-25, 41-43) "[P]art[ing] company" only with the post-conviction court's conclusion that the vandalism of Andrew's car was not favorable to the defense, the Court of Criminal Appeals concluded the following with respect to the 1988 trial:

> Andrew's testimony was damaging primarily because it placed before the jury the petitioner's admission to killing the Smiths. The state, however, prosecuted the homicides as felony murders, pursuant to which it was unnecessary for the state to prove that the petitioner personally killed the victims. Evidence, independent of Andrew's testimony, solidly linked the petitioner to the burglary of the Smiths' residence. Therefore, even if Andrew's credibility [had] been thoroughly demolished, confidence in the outcome of the 1988 trial is not undermined.

(Add. 10, Vol. 4, p. 43) As to the 1995 resentencing hearing, the Court of Criminal Appeals determined similarly that, "even if the suppressed evidence would have persuaded the jury that Andrew testified falsely and was motivated to collect reward money, confidence in the death sentence for Mrs. Smith's homicide is not undermined." (Add. 10, Vol. 3, p. 43)

In support of its conclusion, the Court of Criminal Appeals reasoned that: 1) it was unlikely that Barbee influenced Andrew's testimony, because Andrew provided the information in the report to law enforcement before Barbee visited him; 2) if Patterson sent Barbee to see Andrew, Patterson's intent would have been to "negate [his own] involvement in the homicides, which did not occur," thus impeaching Andrew would not have shown that Patterson "was 'more' culpable than the petitioner"; 3) Andrew's testimony at the 1995 resentencing hearing was "far from compelling," *e.g.*, "[t]he jury declined to impose the death penalty for Mr. Smith's homicide even without knowing about Andrew's reward-money motivation"; and 4) impeaching Andrew did not "negate[] the suffering and torture that Mrs. Smith experienced, and demonstrating the petitioner's participation in her death does not hang on Andrew's credibility." (Add. 10, Vol. 4, p. 43)

The record of the state court proceedings supports the conclusion that the evidence at issue

55

was not suppressed within the meaning of *Brady*, because the newspaper article in defense counsel's files shows that defense counsel was, or should have been, aware of the information by other means prior to the 1988 trial. (Add. 9, Vol. 46) Because the information was available to defense counsel from other sources, the State was under no obligation to disclose it. Even if it were determined that the information was suppressed within the meaning of *Brady*, there is ample evidence in the record to support the conclusion that the information had little or no impeachment value and that, standing alone, it would not have put the case in such a different light so as to undermine confidence in the verdict.

The petitioner has not shown that the decision of the Tennessee courts on this issue was contrary to, or involved an unreasonable application of, clearly established federal law. Neither has he shown that the Tennessee Supreme Court's decision was an unreasonable determination of the facts in light of the evidence. This claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### 2. Alleged Suppression of Evidence Regarding Whether a Wine Cooler Had Been Poured on Rosemary's Body

As previously noted, *supra* at pp. 28-29, the court granted the petitioner's request that he be permitted to search TBI and TBI Laboratory (TBIL) records to ascertain whether there was any forensic evidence that wine coolers had been poured on Rosemary's body. The issue here is whether the State suppressed evidence that would have contradicted/discredited Denning's wine-cooler testimony at the guilt/innocence phase of the 1988 trial and the 1995 resentencing hearing.[13] (Add.

---

[13] The petitioner did not raise this claim in the context of *Brady* in either his petition or amended petition. The petitioner first raised it as such in his motion for discovery. (DE # 40, ¶ B.1, p. 4) The petitioner also mentioned this

56

2, Vol 11, pp. 46-47, 63-64; Add. 5, Vol. 3, p. 366)

The AEDPA places notable restrictions on a federal court's ability to grant *habeas corpus* relief to state prisoners. Federal *habeas corpus* courts may only consider claims that a *habeas* petitioner has previously raised before the state courts. *See* 28 U.S.C. § 2254(b); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002). The exhaustion requirement pertains to claims arising under *Brady*. *See Banks v. Dretke*, 540 U.S. 668, 690 (2004); *Gray v. Netherland*, 518 U.S. 152, 162 (1996). Claims that have not been raised in state court are deemed unexhausted, and ordinarily are dismissed without prejudice so that the *habeas* petitioner may pursue them in state court. *Alley*, 307 F.3d at 385 (citing *Rose v. Lundy*, 455 U.S. 509, 518 (1982)). However, if the petitioner is barred from raising an unexhausted claim in state court due to a state procedural rule, then that claim is procedurally defaulted for purposes of federal *habeas corpus* review. *See Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991). A claim also is procedurally defaulted where that claim was presented to the state court, but the court, rather than reaching the merits of the claim, relied on an independent and adequate state ground, such as a state procedural rule barring review of the claim, in deciding the issue. *Id.* at 734-735. Procedural default pertains to *Brady* claims. *See Banks,* 540 U.S. at 668; *Jamison v. Collins*, 291 F.3d 380 (6th Cir. 2002).

If a claim is procedurally defaulted, then federal *habeas corpus* review is prohibited unless the petitioner demonstrates both "cause" <u>and</u> "prejudice" for his failure to raise the claim in state court while state court remedies were available, or that a miscarriage of justice will result if the claim is not reviewed. *Alley*, 307 F.3d at 386; *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000). To establish "cause," a petitioner must "show that some objective factor external to the defense

---

claim in his reply (DE # 49, ¶ B.1, p. 6) to the respondent's response to his motion for discovery (DE # 45), and the court ultimately granted his motion for discovery on this issue (DE # 76, ¶ I, pp. 4-5). Although neither party mentions this claim in the context of *Brady* in their cross-motions for summary judgment, or in their response/replies related thereto, having granted the petitioner's motion for discovery on the matter, the court will address the issue out of an abundance of precaution.

impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Rust v. Zent*, 17 F.3d 155, 161 (6ᵗʰ Cir. 1994). "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel, or that 'some interference by officials' made compliance impracticable," constitutes "cause" under this standard. *Murray*, 477 U.S. at 488 (citations omitted); *see also Jamison*, 291 F.3d at 388 ("Cause is shown when the factual basis of the claim was 'reasonably unknown' to the defendant's counsel."). To show "prejudice," default of the claim must not merely have created a possibility of prejudice to the defendant, it must have "worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *Jamison*, 291 F.3d at 388 (citing *United States v. Frady*, 456 U.S. 152, 170-171 (1982)). Finally, to demonstrate a "fundamental miscarriage of justice," a petitioner must show that the alleged constitutional violation probably resulted in the conviction of one who actually is innocent. *Murray*, 477 U.S. at 496. This exception applies only in "extraordinary cases," *Id.*, and requires a petitioner to show that he is "actually innocent," *see Schlup v. Delo*, 513 U.S. 298, 327 (1995).

"These rules apply both to entirely new legal claims and to new factual bases for relief; for a claim to be considered exhausted, the petitioner must have 'fairly presented' to the state courts the 'substance of his federal habeas corpus claim.'" *Alley*, 307 F.3d at 386 (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982))(internal citations omitted); *see also Wong v. Money*, 142 F.3d 313, 322 (6ᵗʰ Cir. 1998)("[T]he doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal courts."). "Although 'bits of evidence' which were not before the state courts will not render a claim unexhausted, where a federal *habeas* petitioner presents newly discovered evidence or other evidence not before the state courts such as to place the case in a significantly different posture, the state courts must be given the opportunity to consider the evidence." *Sampson v. Love*, 782 F.2d 53, 57 (6ᵗʰ Cir. 1986)(quoting

*Jones v. Hess*, 681 F.2d 688, 691 (10th Cir. 1982)(internal citations omitted)).

As shown in the footnote below,[14] the petitioner did not raise his wine-cooler claim in any state court prior to raising it in the instant action. Consequently, the claim is unexhausted. The next question is whether this claim is procedurally defaulted under Tennessee state law.

The post-conviction statute in effect in Tennessee at the time of the petitioner's original conviction, Tenn. Code Ann. § 40-30-102 (repealed in 1995), provided the following:

---

[14] The record shows that Denning's testimony about the wine coolers was not raised under any legal theory on direct appeal from the 1988 trial, nor did the Tennessee Supreme Court address the issue *sua sponte*. (Add. 3, Vol. 1, pp. 7-8; Vol. 3) The record also shows that the petitioner did not raise Denning's wine-cooler testimony on direct appeal in the Court of Criminal Appeals from the 1995 resentencing hearing. (Add. 11, Attach. Brief of Appellant) The petitioner did, however, argue in his brief on appeal from the 1995 resentencing hearing that the evidence was insufficient to prove beyond a reasonable that the HAC aggravator should have been applied. (Add. 11, Attach. Brief of Appellant, pp. 10-11) Although the petitioner did not raise the wine-cooler evidence in his sufficiency-of-the-evidence claim, the State did, asserting that, "at some point during the rape and murder, Cauthern took pleasure in pouring 'Bartles and James' [*sic*] wine coolers all over Rosemary." (Add. 11, Attach. Brief of Appellee, p. 11) Despite the State having raised this evidence in its argument, the petitioner did not address the wine-cooler evidence in his later supplemental brief. (Add. 11, Attach. Supp. Brief of Appellant) In affirming the judgment of the trial court at the 1995 resentencing hearing, the Court of Criminal Appeals wrote that, "[a]fter the rapes occurred, the assailants *further* tortured and ridiculed Mrs. Smith by pouring two bottles of wine coolers over her naked body." (Add. 6, Attach. Copy of *State v. Cauthern*, CCA No. 02C01-9506-CC-00164 at p. 20 (Tenn. Crim. App., Dec. 2, 1996)(italics in the original))

Notwithstanding the Court of Criminal Appeals' reference to the wine coolers, the petitioner made no effort to clarify the issue in his sufficiency-of-the-evidence claim on appeal in the Tennessee Supreme Court. (Add. 6, Vol. 1, pp. 10-12) In its brief, however, the State referred to the Court of Criminal Appeals' opinion, arguing that Rosemary had been subjected to mental torture, because "Cauthern took pleasure in pouring 'Bartles and James' [*sic*] wine coolers all over [her]." (Add. 6, Vol. 2, pp. 11, 15) In his reply brief, the petitioner challenged the State's argument regarding whether the evidence was sufficient to support the HAC aggravator, but again made no reference whatsoever to the wine-cooler evidence, or lack thereof. (Add. 6, Vol. 3, pp. 3-5) Neither did he in his later supplemental brief. (Add. 6, Vol. 4, pp. 14-17) In addressing the petitioner's sufficiency of the evidence claim on direct appeal from the 1995 resentencing hearing, the Tennessee Supreme Court specifically noted that the petitioner raped and "poured alcohol" on Rosemary's body. (Add. 11, Attach. Copy of *State v. Cauthern*, 967 S.W.2d 726, 733 (Tenn. 1998), p. 14)

Finally, the record shows that the wine-cooler evidence was not raised under any legal theory in the petitioner's *pro se*, first amended, or amended first amended petitions for post-conviction relief, during the post-conviction evidentiary hearing, or in the petitioner's closing brief. (Add. 7, Vol. 1, pp. 000001-10, 000037-93; Vol. 2, 000098-170; Vol. 3, pp. 000255-89; Add. 8, Vol. 2-12) Neither did the post-conviction court address the issue in its Order denying the petitioner's request for post-conviction relief. (Add. 7, Vol. 3, pp. 000300-63) The record shows that the petitioner first raised the wine-cooler evidence on appeal from the judgment of the post-conviction court under the general rubric of ineffective assistance of counsel, *i.e.*, that "[t]here [wa]s no independent proof that a wine cooler was poured on Mrs. Smith and no cross-examination of the witness on this point." (Add. 10, Vol. 1, ¶ I.I.(3), pp. 51-54) The Court of Criminal Appeals determined that, as a separate issue, the claim was waived, and as an ineffective assistance claim, the "cursory statement that counsel abandoned their duty to challenge the state's case is wholly insufficient to merit post-conviction relief." (Add. 10, Vol. 4, p. 41) Although the petitioner asserted in his application for permission to appeal in the Tennessee Supreme Court that there is no forensic proof that wine coolers were poured on Rosemary's body (Add. 10, Vol. 5, pp. 22-23), the petitioner did not raise the wine-cooler evidence in his brief as a *Brady* claim (Add. 10, Vol. 5, ¶ IV, pp. 72-74). Rather, he couched the claim solely in the context of evidentiary sufficiency.

59

> A prisoner in custody under sentence of a court of this state must petition for post-conviction relief under this chapter within three (3) years of the date of the final action of the highest state appellate court to which an appeal is taken or consideration of such petition is barred.

On May 10, 1995, the present Post-Conviction Procedure Act ("the present Post-Conviction Act") replaced the prior Act in its entirety. *See* 1995 Tenn. Pub. Act 207, §§ 1 and 3. In passing the present Post-Conviction Act, the Tennessee Legislature provided, *inter alia*:

> This act shall take effect upon becoming a law, the public welfare requiring it and shall govern all petitions for post-conviction relief filed after this date, and any motions which may be filed after this date to reopen petitions for post-conviction relief which were concluded prior to the effective date of this act.

1995 Tenn. Pub. Act 207, § 3. The Tennessee Supreme Court has determined that the present Post-Conviction Act applies to criminal cases in which judgment became final under the previous Act. *See Carter v State*, 952 S.W.2d 417, 420 (Tenn. 1997). Thus, the present Post-Conviction Act pertains to the petitioner's case.

Under the present Post-Conviction Act, Tennessee's post-conviction statute, Tenn. Code Ann. § 40-30-102 (1995), provides, *inter alia*:

> Except as provided in subsections (b) and (c), a person in custody under a sentence of a court of this state must petition for post-conviction relief under this part within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of such petition shall be barred. The statute of limitations shall not be tolled for any reason, including any tolling or saving provision otherwise available at law or equity. Time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this chapter, and the one-year limitations period is an element of the right to file such an action and is a condition upon its exercise.

*Id*. at § (a). The Tennessee post-conviction statute goes on to state that:

> This part contemplates the filing of only one (1) petition for post-

60

conviction relief. In no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment. If a prior petition has been filed which was resolved on the merits by a court of competent jurisdiction, any second or subsequent petition shall be summarily dismissed. A petitioner may move to reopen a post-conviction proceeding that has been concluded, under the limited circumstances set out in § 40-30-117.

*Id*. at § (c). The limited circumstances in Tenn. Code Ann. § 40-30-117 (1995) are that:

"The claim in the motion is based on a final ruling of an appellate court establishing a constitutional claim that was not recognized as existing at the time of trial. . . ."

"The claim in the motion is based upon new scientific evidence establishing that such petitioner is actually innocent . . . ."

"The claim asserted in the motion seeks relief from a sentence that was enhanced because of a previous conviction and such conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid . . . ."

"It appears the facts underlying the claim, if true, would establish by clear and convincing evidence that the petitioner is entitled to have the conviction set aside or the sentence reduced."

*Id*. at §§ (a)(1)-(a)(4).

The petitioner's conviction became final on direct review on November 2, 1998, when his petition for a writ of *certiorari* was denied by the United State's Supreme Court following his 1995 resentencing hearing. More than one year has passed since then. The petitioner also has filed a petition for state post-conviction relief. He is not entitled to file another. Neither has the petitioner sought to reopen his post-conviction petition under § 40-30-117, nor are any of the grounds to reopen applicable with respect to this claim.

As explained above, the petitioner's wine-cooler claim under *Brady* is procedurally defaulted under state law. The next question is whether it is procedurally barred for purposes of federal *habeas corpus* review.

61

As previously established, *supra* at p. 58, the petitioner may overcome the procedural default of this claim to have it heard in federal court if he can establish "cause" and "prejudice" to excuse the procedural default. When, as here, a petitioner has procedurally defaulted a *Brady* claim, he shows "cause" when "the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence," and prejudice when "the suppressed evidence [wa]s 'material' for *Brady* purposes." *Banks*, 540 U.S. at 691; *see also Strickler*, 527 U.S. at 282). In other words, to determine whether a *Brady* claim is procedurally defaulted for purposes of federal *habeas corpus* review, the court must, in essence, address the first and second parts under *Brady* on the merits.

### a. Cause/Suppression

For the reasons previously noted, *supra* at pp. 59-60 n. 14, the petitioner knew, or should have known, following the 1988 trial, that he might have a *Brady* claim. In other words, in view of Denning's wine-cooler testimony at the 1988 trial and numerous references to that testimony in the state proceedings that followed, the petitioner ought to have realized that the defense had not received any forensic reports that corroborated Denning's wine-cooler testimony. The record shows that the petitioner has made no effort to challenge Denning's wine-cooler testimony in the context of *Brady* between the time of his 1988 trial and when he raised the question in his motion for discovery in this action. Where the failure to file a *Brady* claim is due to the defendant's neglect, rather than suppression, cause does not exist to excuse the default. *See Hutchison v. Bell*, 303 F.3d 720, 742 (6th Cir. 2002).

The next question is whether the evidence at issue was suppressed. The record shows that defense counsel cross-examined Denning on his wine-cooler testimony in 1988, at which time the following colloquy occurred:

Q     Now, you have [given] several statements to the

62

authorities, have you not?

A     Yes, sir.

Q     Do you remember how many you have made?

A     No. Sir.

Q     Do you remember making four?

A     I remember making a lot of statements. I don't know exactly how many I made.

Q     And you are making the fifth one in Court today, correct?

A     Yes, sir.

Q     Why did you make so many statements?

A     They kept – the police kept coming back telling me that I was lying, and I kept writing the same thing over and over.

Q     Well, I have looked through all four of these statements that you have given, and **you have mentioned here today that Ronnie Cauthern said** he was going to be famous, that you mentioned here today that **he poured Bartles and Jaymes on Mrs. Smith**, and you said that he said he cut the telephone lines. **Would you be surprised that in none of your statements have you mentioned any of those items?**

A     **No, sir.**

Q     **You wouldn't be surprised or the fact that you did mention them?**

A     **I know I didn't mention them**.

(Add. 2, Vol. 11, pp. 62-64)(emphasis added)

The *Brady* doctrine covers only evidence that law enforcement and/or the prosecution knew or should have known was exculpatory. *United States v. Agurs*, 427 U.S. 97, 110 (1976). As shown

in the preceding exchange, Denning did not tell the authorities about the petitioner's admission before he testified at the 1988 trial. Having no knowledge of the petitioner's admission before the fact, neither law enforcement nor the prosecution had any reason to consider the alleged absence of such evidence in the TBI/TBIL reports, much less whether the evidence was exculpatory. The circumstances described above do not constitute suppression within the meaning of *Brady*. The next question is whether evidence related to Denning's wine-cooler testimony was suppressed prior to the 1995 resentencing hearing.

The petitioner asserts that the evidence at issue, or the absence of evidence in this case, was reflected in TBI/TBIL reports.[15] He does not allege, however, that either law enforcement or the prosecution had copies of the reports in their files, that they relied on these reports in preparing the State's case, or that Denning lied at the 1988 trial and that the prosecution knew he lied. As previously established, *supra* at p. 49, *Brady* does not impose an affirmative duty on the government to take action to discover information that it does not possess, nor does a *Brady* violation arise where, as here, the defendant knew or should have known of the essential facts related to the information at issue, or where the evidence is available from other sources.

The law in effect at the time of the 1988 trial, when the wine-cooler evidence was first raised, until the 1995 resentencing hearing was as follows: "All investigative records of the Tennessee [B]ureau of [I]nvestigation . . . shall be disclosed . . . with a subpoena or an order of a court of record . . . ." Tenn. Code Ann. 10–7-504(a)(2)(Supps. 1988-1995). Inasmuch as that the petitioner knew of the facts related to this issue in 1988 and, given that the records at issue were available to him under § 10-7-504(a)(2) for the seven (7) years between the 1988 trial and the 1995 resentencing hearing, the evidence at issue was not suppressed within the meaning of *Brady*.

---

[15] Although his motion for discovery was granted, the petitioner has not provided any proof that TBI/TBIL records are silent regarding the presence of wine coolers on Rosemary's body.

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 64 of 168 PageID #: 1984

As reasoned above, the petitioner has failed to establish that evidence relevant to Denning's wine-cooler testimony was suppressed. Concomitantly, the petitioner fails to establish "cause" to excuse the procedural default of this part of his *Brady* claim.

### b. Prejudice/Materiality

Because the petitioner has failed to establish "cause," the court is not required to reach the question of "prejudice," *i.e.*, whether the evidence was material. Once again, however, the court will do so for the sake of completeness.

Before addressing the question of "prejudice" on the merits, the court notes that the Sixth Circuit has held that, when *Brady* evidence goes solely to the impeachment of a witness, "prejudice" cannot be shown in the context of procedural default. *Hutchison*, 303 F.3d at 743-44. The petitioner couches his *Brady* claim solely in the context of its value to impeach Denning's wine-cooler evidence. Therefore, under *Hutchison*, the petitioner cannot establish "prejudice." *Id*. Nevertheless, the court will address the question of prejudice on the merits anyway.

To establish prejudice in the context of the 1988 trial, *i.e.*, that the hypothetically suppressed evidence was material, the petitioner must show that there is a reasonable probability that the jury would have reached a different verdict, had it known that there was no forensic evidence to corroborate Denning's wine-cooler testimony. The petitioner was convicted of felony murder at the 1988 trial, the underlying felony being first-degree burglary. The first-degree murder statute in effect at the time of the murders provided, in relevant part, that:

> Every murder perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb, is murder in the first degree.

Tenn. Code Ann. § 39-2-202(1986). The statute in effect at the time of the offense defined first-

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 65 of 168 PageID #: 1985

degree burglary as follows:

> Burglary is the breaking and entering into a dwelling house, or any other house, building, room or rooms therein used and occupied by any person or persons as a dwelling place or lodging either permanently or temporarily and whether as owner, renter, tenant, lessee or paying guest, by night, with intent to commit a felony.

Tenn. Code Ann. § 39-3-401(1986). The trial court charged the jury as follows with respect to finding the petitioner guilty of first-degree murder:

> For you to find the defendant guilty of murder in the first degree, the State must have proved beyond a reasonable doubt, (1) that the defendant unlawfully killed the alleged victim; (2) that the killing was committed during the alleged perpetration or attempt to perpetrate the alleged first degree burglary, that is, the killing was closely connected with the alleged first degree murder, and was not a separate, distinct and independent offense; and (3) that the defendant specifically intended to commit the alleged first degree burglary.

(Add. 2, Vol. 14, p. 8)

Denning's wine-cooler testimony was not required to establish any element of the charges of felony murder or first-degree burglary at the guilt/innocence phase of the 1988 trial. In other words, Denning's wine-cooler testimony was not relevant to the question of guilt/ innocence of either first-degree murder or first-degree burglary. Because the hypothetically suppressed evidence at issue was not relevant to the question of guilt/innocence at the 1988 trial, the evidence was not material. The next question is whether the hypothetically suppressed evidence was material in the context of the 1995 resentencing hearing, where only punishment was at issue.

The state relied on a single aggravating circumstance at the 1995 resentencing, *i.e.*, that the "murder[s] w[ere] especially heinous, atrocious, or cruel in that [they] involved torture or serious physical abuse beyond that necessary to produce death."[16] (Add. 5, Vol. 4, p. 472) The trial court

---

[16] The jury was charged with the HAC aggravator with respect to the murders of both Patrick and Rosemary.

defined the HAC aggravating circumstance to the jury as follows:

> 'Heinous' means grossly wicked or reprehensible, abominable; odious; or vile . . . 'Atrocious' means extremely evil or cruel; monstrous; exceptionally bad; abominable . . . 'Cruel' means disposed to inflict pain or suffering; causing suffering; painful . . . 'Torture' means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious.

(Add. 5, Vol. 4, p. 472)

The wine-cooler evidence at the 1995 resentencing hearing was limited to the following. Detective Crockarell testified that two Bartles and Jaymes wine cooler caps were found within six (6) feet of Rosemary's body and that two empty Bartles and Jaymes wine cooler bottles were found in the trash can in the kitchen. (Add. 5, Vol. 2, pp. 165-66) For his part, Denning testified that the petitioner told him that "he had raped the woman and poured Bartles and James [*sic*] all over her . . . ." (Add. 5, Vol. 3, p. 366)

Assuming for the sake of argument that the hypothetically suppressed evidence had been presented at the 1995 resentencing hearing, thereby totally discrediting Denning's wine-cooler testimony, the other evidence adduced at the 1995 resentencing hearing showed that: 1) Rosemary was dragged screaming from her bed in the middle of the night; 2) she was put in a closet in one bedroom while her husband Patrick was in a fight for his life in the adjacent bedroom; 3) she escaped from the closet only to be forced back into the bedroom when she was discovered in the hall; 4) her night clothes were torn from her body; 5) she was raped twice either while her husband was being murdered in the next room, or after he had been; 6) there was evidence that more than one attempt was made to strangle her; 7) she was finally garrotted, using a vase to tighten a scarf around her neck like a tourniquet; 8) the "great amount of force" used to strangle her left a .3 in. "groove depression" around her neck, crushing the thyroid cartilage, a degree of injury not normally found in cases of ligature strangulation; 9) there were "multiple small curvilinear abrasions" approximately

67

the length of a fingernail on her neck showing that she fought to escape the ligature; and 10) her death was a "protracted event," taking 3 to 6 minutes.  (Add. 5, Vol. 1, pp. 124-26, 135-49; Vol. 2, pp. 151-54, 167-68, 171, 178-85, 260, 262-63, 272, 278, 282-87)

As shown above, an abundance of other evidence was adduced at the 1995 resentencing hearing to prove that Rosemary's murder was a horrible, drawn-out affair, *i.e*., that the circumstances of her murder were heinous, atrocious, and cruel.  Based on the other evidence presented to the jury at the 1995 resentencing hearing, it cannot be said that Denning's twelve-word statement at the hearing – "he raped the woman and poured Bartles and James [*sic*] all over her" – made the difference between life and death.  Because the hypothetically suppressed evidence at issue was not material in the context of the 1995 resentencing hearing, the petitioner fails to establish the necessary prejudice.

### c.  Actual Innocence

For the reasons explained above, the petitioner has failed to establish cause and prejudice to excuse the procedural default of his *Brady* wine-cooler claim.  The court will address next whether failure to consider this claim would constitute a fundamental miscarriage of justice.

As previously established, *supra* at p. 58, a "fundamental miscarriage of justice" means that the alleged constitutional violation probably resulted in the conviction of one who actually is innocent.  The petitioner does not assert that he is actually innocent of felony  murder in the killing of the Smiths, nor as shown, *supra* at pp. 66-67, did Denning's wine-cooler testimony go to the question of the petitioner's guilt or innocence at his 1988 trial. Consequently, the petitioner cannot show that a fundamental miscarriage of justice would occur if this claim is not reviewed in the context of his conviction of felony murder in 1988.

The Supreme Court has extended the actual innocence exception to claims of capital sentencing error, limiting the exception "to cases in which the applicant could show 'by clear and

convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Dretke v. Haley*, 541 U.S. 386, 393 (2004)(quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)). As already shown, *supra*, there was no constitutional error under *Brady* with respect to Denning's wine-cooler testimony. Consequently, the petitioner cannot establish that he is innocent of the death sentence.

### d. Wine-Cooler Evidence – Conclusion

For the reasons explained *supra*, the petitioner has failed to show either cause or prejudice to excuse the procedural default of his *Brady* wine-cooler claim, or that he actually is innocent of the death penalty. Consequently, the petitioner's *Brady* wine-cooler claim is procedurally defaulted for the purposes of federal *habeas corpus* review. In any event, having been required to address this issue on the merits as part of its "cause and prejudice" analysis, the court finds that the petitioner's *Brady* wine-cooler claim also is without merit.

### 3. Materiality – Viewing the Petitioner's *Brady* Claims Collectively

For the reasons explained *supra*, the evidence at issue would not have resulted in a different sentence, either in terms of the petitioner's conviction of felony murder in 1988, or his sentence to death in 1995. Therefore, viewing the petitioner's *Brady* claims collectively, including the wine-cooler evidence, the court finds that the evidence at issue was not material.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Therefore, a COA will not issue on this claim.

### E. Ineffective Assistance of Counsel During the Mitigation Phase of the 1995 Resentencing Hearing (Fifth Claim)

The petitioner alleges that defense counsel provided ineffective assistance during the

69

mitigation phase of the 1995 resentencing hearing in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments.[17]  (DE # 16, ¶ 25, pp. 9-10)  The petitioner alleges specifically that defense counsel failed to: 1) present testimony from his step-siblings (DE # 16, ¶ 26, pp. 10-11); 2) present testimony from family friends and the petitioner's ex-wife (DE # 16, ¶ 27, pp. 11-12); 3) retain investigative and expert assistance and present expert testimony (DE # 16, ¶ 28, p. 12); 4) investigate Patterson's background (DE # 16, ¶ 29.a, pp. 13-14); 5) cross-examine Andrew adequately (DE # 16, ¶ 29.b, p. 14); 6) challenge Denning's testimony about the wine coolers when no physical evidence or expert testimony had been presented to support his testimony (DE # 16, ¶ 29.c, p. 14); 7); comply with the ABA standards for defense counsel in a capital case (DE # 16, ¶ 30, p. 14); 8) explain or present the petitioner's life history, character and background, or explain the crime, *i.e.*, present mitigating evidence persuasively, or object to the trial court's ruling that the jury could not consider Patterson's life sentence as mitigating evidence (DE # 16, ¶ 31, p. 14); and 9) present available mitigating evidence, thereby undermining the confidence in the integrity of the petitioner's death sentence (DE # 16, ¶ 32, p. 15).

        The respondent argued in his response to the petition that only claims 1) through 5) above "have been fairly presented to the Tennessee state courts and are properly before this Court for consideration."  (DE # 26, p. 20)  As to those claims, the respondent maintained that the determination of the state courts was neither contrary to, nor an unreasonable application of, clearly established law and that those determinations were reasonable in light of the evidence presented. (DE # 26, p. 25)  The respondent argued further that the remaining ineffective assistance claims should be dismissed as procedurally defaulted.  (DE # 26, p. 25)

        The petitioner replied in his traverse that the respondent's unsupported procedural-default

_____

[17] As discussed *infra* at pp. 154-59, the petitioner also addresses this issue in the context of his 1988 trial.

argument is insufficient.  (DE # 34, p. 8)  The petitioner argued further that the record "rebuts any allegation that a procedural default has occurred."  (DE # 34, p. 8)

The respondent raises this issue in his motion for summary judgment and, as shown *infra* at p. 89, the petitioner filed a cross-motion for summary judgment with respect to the claim as it pertains to defense counsel's failure to investigate Patterson's background.  (DE # 122, ¶ II.B, p. 6) In his motion for summary judgment, the respondent again argues that, of the "several claims of ineffective assistance of counsel related to the 1995 re-sentencing proceedings," the petitioner "raised only five of those claims in state post-conviction proceedings" and, as such, the others are procedurally defaulted.  (DE # 122, ¶ II.B, p. 6)  The respondent does not identify the specific claims that he contends are procedurally defaulted.  The petitioner does not respond to the respondent's procedural default argument, electing to address the merits of his claims instead.  (DE # 146, ¶ V.E, pp. 47-62)

Allegations of ineffective assistance of counsel in the sentencing phase of a capital case are analyzed under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Darden*, 477 U.S. at 184; *Lorraine v. Coyle*, 291 F.3d 416, 427 (6th Cir.), *amended on reh'g*, 307 F.3d 459 (6th Cir. 2002).  To prevail on a claim of ineffective assistance of counsel, a *habeas* petitioner must show deficient performance and prejudice.  *See Bell*, 535 U.S. at 694-95. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."  *Strickland*, 466 U.S. at  687.  Moreover, for cases governed by the AEDPA, only Supreme Court cases already issued at the time of the relevant state court decision can offer guidance regarding whether counsel's performance was ineffective.  *See Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003); *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001).

Defense counsel's performance is deficient when it falls below an objective standard of

reasonableness. *See Strickland*, 466 U.S. at 686-87; *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000). The *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* ("the ABA Guidelines") establishes the standards of performance for defense counsel in capital cases. *Strickland*, 466 U.S. at 668; *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003). To satisfy the prejudice half of the two-part test under *Strickland*, an ineffective assistance claimant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The determinative issue in a death penalty case "is whether there is a reasonable probability that, absent errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id*. 695.

### 1. Failure to Present Testimony from the Petitioner's Step-Siblings

The petitioner asserts that defense counsel were ineffective for not presenting mitigating evidence from his step-brother and sisters pertaining to his allegedly abusive, oppressive, and isolated home-life as a child.[18] (DE # 16, ¶¶ 25-26, pp. 9-11) The petitioner's step siblings, Melinda Allen (Melinda), Roy Cauthern, Jr. (Bud), and EveAnn Palmer (EveAnn) testified at the post-conviction evidentiary hearing on this issue. (Add. 8, Vol. 2, pp. 98-195; Vol. 3, pp. 213-357; Vol. 4, pp. 363-84)

The post-conviction court addressed this claim at length in its Order denying the petitioner's

---

[18] The petitioner uses expressions such as "including" and "not limited to" throughout his petition. Such vague expressions are inconsistent with Rule 2(c), Rules – Section 2254 Cases, which provides that "[t]he petition must . . . specify all the grounds for relief available to the petitioner . . . [and] state the facts supporting each ground . . . ." *Id*. at § (c)(1)-(2). The court will not conjure up un-pled factual allegations implied by such vague expressions, nor will it read into such open-ended assertions that additional claims exist.

request for post-conviction relief. The post-conviction court's analysis paralleled the two-part analysis set forth in *Strickland* and relied on the following evidence adduced at the evidentiary hearing in addressing first whether defense counsel's representation was deficient. (Add. 7, Vol. 3, pp. 000312-15, 000321-32)

Attorney Poland, lead defense counsel at both the 1988 trial and 1995 resentencing hearing, testified at the post-conviction evidentiary hearing that he did not contact the petitioner's step-siblings, but that the petitioner also did not bring anything to his attention that would have caused him to suspect that the petitioner's home life might be of value to the defense. (Add. 8, Vol. 9, pp. 60, 102) Attorney Poland also testified that he did seek family background information from the petitioner's adoptive parents but "wasn't too successful . . . " (Add. 8, Vol. 9, p. 60) Attorney Bateman, co-counsel at the 1995 resentencing hearing, testified that he "had some background from discussions with Mr. Poland and Mr. Cauthern . . . ," but admitted that he did not meet or speak with the petitioner's step-siblings. (Add. 8, Vol. 8, pp. 154-55)

The petitioner did not testify. Consequently, apart from attorney Poland's dated recollection, there was no proof presented at the post-conviction evidentiary hearing regarding what the petitioner told, did not tell, or might have told defense counsel about his family background.

The post-conviction court determined that defense counsel's representation was not deficient because they relied on the petitioner's "own . . . account of his childhood." (Add. 7, Vol. 3, pp. 000321-22) Assuming for the sake of argument that defense counsel "should have investigated this matter further," the post-conviction court went on to consider whether the petitioner was prejudiced because defense counsel failed to present the evidence at issue at the 1995 resentencing hearing. (Add. 7, Vol. 3, pp. 000322, 000332)

In addressing the question of prejudice, the post-conviction court noted that, of the three surviving step-siblings who appeared at the evidentiary hearing, Melinda and Bud both testified that

they would have cooperated on the issue of the petitioner's home background, but "only if doing so was acceptable to [their father]." (Add. 7, Vol. 3, p. 000322; Add. 8, Vol. 2, pp. 168-69, Vol. 3, p. 275) More particularly, Melinda testified that she would not have provided family background information to the defense while her father was alive because it would have "hurt him," but that she would have assisted if her siblings had come to her in her father's name. (Add. 8, Vol. 2, pp. 168-69) For his part, Bud testified that he would have assisted only if his father had said that it was alright to do so. (Add. 8, Vol. 3, p. 275)

The post-conviction court concluded from the evidence that Melinda and Bud's father, Roy Cauthern (Roy), was extremely loyal to his wife, Dagmar, and "would have done everything in his power to prevent witnesses from offering any testimony which did not cast Dagmar in a favorable light."[19] (Add. 7, Vol. 3, p. 000322; Add. 8, Vol. 2, p. 139, Vol. 3, p. 263) From this, the post-conviction court determined that Melinda and Bud would have acquiesced to their father's wishes and would not have testified at the 1995 resentencing hearing. (Add. 7, Vol. 3, p. 000322)

The post-conviction court went on to note that, even if Melinda and Bud had testified on the petitioner's behalf, "their testimony would not have been helpful . . . ." (Add. 7, Vol. 3, p. 000324) Melinda testified at the evidentiary hearing that, when she was living at home, the petitioner had a good relationship with Dagmar, was the "apple of [Dagmar's] eye. . . [and] could do no wrong." (Add. 8, Vol. 2, pp. 153, 176-78) Nowhere in her testimony did Melinda state that the petitioner was treated as she and her siblings had been.

In response to a question posed by the post-conviction judge, Melinda explained that she left home to join the Air Force in 1968, when the petitioner was a little more than one-year old, and, although she "saw him a lot" from 1968 to 1972 while she was on active duty, she saw him a total

_____

[19] As evidence of his loyalty, Melinda testified that "Daddy had disowned me. And told me that if I couldn't accept this woman as my mother he didn't want to have anything to do with me." (Add. 8, Vol. 2, p. 139)

74

of three (3) or four (4) days in the fourteen (14) years between 1973 and 1987 when the Smiths were murdered. (Add. 8, Vol. 2, pp. 189-91) Melinda offered no testimony that she and the petitioner communicated during this 14-year period or that she had other sources of information that gave her insight into the petitioner's upbringing and home life during that time.

Bud, who left home when the petitioner was approximately six months old, testified that he returned home several months later for about thirty days and found the petitioner being treated like a "golden child." (Add. 8, Vol. 3, pp. 254-56, 281) Bud testified that he also returned home for 60-90 days when the petitioner was about 16 years old, noting that the petitioner's situation had changed, *i.e.*, "at times [the petitioner] could do no wrong; other times he couldn't breathe to suit [Dagmar]." (Add. 8, Vol. 3, p. 289) Comparing his own background to the petitioner's, Bud testified on the one hand that the petitioner's life was "almost a photocopy" of his, but on the other hand, the petitioner was treated "[p]retty good," that he "had more freedoms than [Bud] did when [he] was a kid," and that "[m]ost of the time . . . he was pretty happy." (Add. 8, Vol. 3, pp. 285-91, 296)

The record shows that any testimony that Bud would have given at the 1995 resentencing hearing was based on having lived in the same household as the petitioner for ten (10) months during the petitioner's nineteen-plus-year life prior to the murders, the last time three (3) years before the murders. Bud also offered no testimony at the post-conviction evidentiary hearing that he and the petitioner kept in touch during the years that they did not see one another, or that Bud was privy to information from other sources regarding the petitioner's upbringing and home life.

The third step-sibling, EveAnn, testified without qualification that she would have testified on the petitioner's behalf if she had been asked. (Add. 8, Vol. 3, pp. 309-10) However, EveAnn also testified that the petitioner had been the "[f]avorite child" and "treated pretty normal" up to the time that she left home when she was 18 years old to join the Army when the petitioner was eight-

75

years old.  (Add. 8, Vol. 3, pp. 330-32; Vol. 4, pp. 369-70, 379-80)  Although EveAnn testified at length about the physical and mental abuse that she, her brother, and sisters suffered at Dagmar's hands, she provided only a single generalized observation of the petitioner's home life after she left home to join the Army, *i.e.*, that Dagmar "was doing [the petitioner] the same way that she did the rest of us . . . ."  (Add. 8, Vol. 3, p. 343)

EveAnn also testified that she got out of the Army on a hardship discharge to help take care of  Dagmar when the petitioner was eleven years old but left the Cauthern household six months later.  (Add. 8, Vol. 4, pp. 371-75)  The last time that EveAnn was in a position to observe the petitioner's relationship with Dagmar was approximately eight (8) years before the murders, at a time when Dagmar was ill with Parkinson's Disease.  Once again, EveAnn did not testify that she and the petitioner kept in touch during the years she was away from home, or that she was privy to other sources of information concerning the petitioner's upbringing and home life during those years.

Based on the testimony of the petitioner's step-siblings, the post-conviction court concluded that the petitioner had not been prejudiced because his step-siblings had not been called to testify on his behalf at the 1995 resentencing hearing, because their testimony: 1) would not have affected the jury's verdict; 2) likely would have caused more harm than good; and 3) was greatly outweighed by the heinous, atrocious, or cruel aggravating circumstances of the crime.  (Add. 7, Vol. 3, pp. 000322, 000325, 000328, 000331)

The Court of Criminal Appeals cited the following excerpt from *Strickland* as it began its analysis of whether defense counsel's representation was deficient:

> 'The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . . .  In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions.'

(Add. 10, Vol. 4, p. 28)(quoting *Strickland*, 466 U.S. at 691)  Relying on *Strickland* in its analysis, the Court of Criminal Appeals took note of the following in its *de novo* review of the issue: 1) the petitioner did not testify at the post-conviction evidentiary hearing; 2) the record "shed[] little light on trial counsel's perspective at the time"; 3) defense counsel sought information on the petitioner's home life from the petitioner's adoptive parents, Roy and Dagmar; 4) "post-conviction counsel did not delve into the particulars of trial counsel's conversations with the petitioner," Roy, and/or Dagmar; 5) post-conviction counsel did not challenge defense counsel's statement that he "felt comfortable" with his own investigation; 6) the presentence report (PSR) listed "Raymond Huhm"[20] and Christine Wilcox as the petitioner's biological parents; 7) the presentence report listed Wilcox as deceased; 8) the presentence report provided no information about Huhn; and 9) the petitioner told the presentence investigator that "he ha[d] been told only that his biological father was in prison in California at his birth."  (Add. 9, Vol. 40, p. 7; Add. 10, Vol. 4, pp. 28, 30)

The Court of Criminal Appeals concluded that, while post-conviction counsel "crafted a record . . . that enumerates what actions trial counsel did and did not take . . . ," "[m]erely reconstructing counsel's conduct is inadequate to demonstrate deficient performance."  (Add. 10, Vol. 4, p. 29)  The Court of Criminal Appeals ultimately determined that "trial counsel's performance passe[d] constitutional muster," and that "the petitioner ha[d] not shouldered his legal burden to prove deficient performance . . . ."  (Add. 10, Vol. 4, pp. 27-28, 31)

As to the question of prejudice, the Court of Criminal Appeals determined that the petitioner was not prejudiced because his step-siblings had not testified at the 1995 resentencing hearing.  As shown in the following excerpt from its opinion, the Court of Criminal Appeals' determination tracked the post-conviction court's:

---

[20]  The petitioner's biological father's last name is misspelled in the presentence report.  (Add. 9, Vol. 40, p. 7)  The proper spelling is "Huhn."

> Even though the petitioner's step-siblings undoubtedly endured abusive, isolated childhoods, it is by no means obvious from the proof that the petitioner's childhood rivaled theirs. The evidence does not preponderate against the post-conviction court's assessment that the petitioner led 'a charmed life in comparison to his siblings . . . . To be sure, evidence about life in the Cauthern household would have been admissible during the penalty retrial; however, the test for prejudice in the post-conviction, ineffective assistance context is more exacting. '[T]he quality of the proposed testimony rather than the quantity of witnesses' determines whether prejudice has been established.
>
> In our opinion, the family-history evidence is, at best, marginal in terms of illuminating the case in such a way as to undermine confidence in the jury's sentencing decision. At worst, the evidence is reminiscent of the adage . . . that 'while many people have unhappy childhoods, [few commit brutal murders].' Inasmuch as the petitioner's step siblings do not manifest obvious antisocial traits or violent tendencies, a jury reasonably could reject, or be insulted by, any suggestion that the petitioner's criminal actions were attributable to a disadvantaged background.

(Add. 10, Vol. 4, pp. 33-34)(internal citations omitted)

The petitioner has not shown that the decisions of the Tennessee courts on this issue were contrary to, or involved an unreasonable application of, clearly established federal law with respect to defense counsel's failure to call the petitioner's step-siblings to testify at the 1995 resentencing hearing. Neither has he shown that the decisions of the Tennessee courts amounted to unreasonable determinations of the facts in light of the evidence. This claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### 2. Failure to Present Testimony from Family Friends and the Petitioner's Ex-Wife

The petitioner asserts that defense counsel were ineffective for failing to provide mitigating evidence from friends of the family and his former wife regarding verbal and mental abuse to which

78

he claims to have been subjected in his home life, personality traits that allegedly made him a follower rather than a leader, his inability to maintain relationships or friendships, and his reaction when he learned of his adoption. (DE # 16, ¶ 27, pp. 11-12) This claim pertains to two family acquaintances, William and Brigette Pope (Mr. and Mrs. Pope), and the petitioner's ex-wife, Lucinda Miracle (Lucinda), who testified at the post-conviction evidentiary hearing. (Add. 7, Vol. 3, pp. 000315-17, 000321-25; Add. 8, Vol. 4, pp. 390-491; Vol. 6, pp. 5-30)

This claim is a variation of the petitioner's previous ineffective assistance claim, in that it pertains to the alleged effects of the petitioner's upbringing and home life on his mental health. The only substantive difference is that the testimony of the Popes and Lucinda is at issue. Because this claim pertains to defense counsel's reliance on the petitioner for information on his upbringing and homelife, the petitioner's claim that defense counsel's representation was deficient in the context of the Popes and Miracle is deemed to be without merit for the reasons previously explained, *supra* at p. 74. Given that the petitioner cannot establish the first half of the two-part test under *Strickland* for the reasons previously explained, there is no need to address the prejudice half of the *Strickland* test. Nevertheless, the court will do so for the sake of completeness.

In addressing the issue of prejudice, the post-conviction court determined that, even if the Popes and Lucinda had testified at the 1995 resentencing hearing, their testimony would not have been helpful. Specifically, the post-conviction court observed that their testimony would have established that:

> Dagmar was ill and weak during at least a portion of his childhood, thereby limiting her ability to harm him; that he appeared to be a relatively happy, well-rounded individual; and that he was routinely unfaithful, often absent, and sometimes violent during his marriage.

(Add. 7, Vol. 3, pp. 000324-25) As in the previous part of this ineffective assistance claim pertaining to the petitioner's step-siblings, the post-conviction court determined that the testimony

of the Popes and Lucinda: 1) would not have affected the jury's verdict; 2) likely would have caused more harm than good; and 3) was greatly outweighed by the heinous, atrocious, or cruel aggravating circumstances of the crime.  (Add. 7, Vol. 3, pp. 000322, 000325, 000328, 000331)

The Court of Criminal Appeals, once again citing *Strickland*, concurred in the post-conviction court's determination on this issue as it pertains to the Popes and Lucinda.  (Add. 10, Vol. 4, pp. 26-28, 31-34)  As shown below, the record supports the determination of the state courts on the question of prejudice with respect to this part of the petitioner's ineffective assistance claim.

Mr. Pope testified at the post-conviction evidentiary hearing that, when he first met Dagmar, she already was wheelchair-bound and that Roy would bring her with him to work in their RV and care for her throughout the day.  (Add. 8, Vol. 6, pp. 10-11)  Although Mr. Pope testified that he had seen Dagmar scream and yell in her own home, *i.e.*, "have . . . little fits because she had Parkinson's Disease," he also testified that he did not visit the Cauthern home until after the petitioner "had gotten into trouble," and that his prior contact with the petitioner was "[p]retty much" limited to the hobby shop.  (Add. 8, Vol. 6, pp. 12, 17, 22)  Mr. Pope testified further that the petitioner "was very likeable," that he was fun to be around, occasionally funny, a "nice – average kid," and not violent. (Add. 8, Vol. 6, pp. 22-23, 26-27)  He also opined that the petitioner "was starving for attention . . .," but admitted that he had known "plenty" of kids who were starved for attention.   (Add. 8, Vol. 6, pp. 9, 26)  Apart from his unsupported observation that the petitioner appeared to be "starving for attention," and his description of a sick woman with an irascible disposition, the record shows that Mr. Pope could not have provided the jury with any insight into the petitioner's upbringing or home life, had he been called to testify at the 1995 resentencing hearing.

Mrs. Pope testified at the post-conviction evidentiary hearing that when she first met her, Dagmar was wheelchair-bound and in the advanced stages of Parkinson's Disease.  (Add. 8, Vol. 4, p. 465)  She also testified that, although Dagmar did not speak well of the petitioner, she had

never been around Dagmar when Dagmar was raising the petitioner and that she first met the petitioner after he already was in jail. (Add. 8, Vol. 4, pp. 465-67, 483) The transcript of Mrs. Pope's testimony at the post-evidentiary hearing shows that, had she testified at the 1995 resentencing hearing, she would not have been able to shed any light on the petitioner's childhood, life in the Cauthern household, or the petitioner's upbringing.

Lucinda, who knew the petitioner approximately one year before they married in December 1985, lived in the Cauthern household "off-and-on" during their marriage. (Add. 8, Vol. 4, pp. 391, 396-97; Add. 9, Vol. 6) Lucinda testified that Dagmar "loved [the petitioner] one day . . . and hated the sight of him the next," describing her own relationship with Dagmar as, "some days she loved me a lot and other days she couldn't stand the sight of me." (Add. 8, Vol. 4, pp. 397-98) Describing her as a "sick old woman," Lucinda testified that Dagmar's Parkinson's Disease was severe, that she screamed and yelled constantly, that she needed help getting in and out of her wheelchair, that she managed to walk under her own power only with great difficulty, and that she needed help to change her clothes, eat and drink. (Add. 8, Vol. 4, pp. 399-400, 420, 446-48) According to Lucinda, although Dagmar yelled at the petitioner and was "cruel to him," she never saw Dagmar hit him. (Add. 8, Vol. 4, pp. 398, 420, 425, 431)

In addition to the foregoing, Lucinda testified that the petitioner had difficulty in his relationship with her, that he had "a lot of relationships" with other women while they were married, that he actively sought acceptance from other guys, that he "was a follower" who tried to impress his male friends, and that he frequently disappeared with his male friends "for weeks." (Add. 8, Vol. 4, pp. 404-11, 438) In her testimony, Lucinda agreed with the State's characterization of the petitioner as an adulterer, a deserter, and a liar, and admitted that she filed for divorce in April 1986 after the petitioner had become violent during an argument. (Add. 8, Vol. 4, pp. 403-04, 451, 454-58) Although Lucinda testified that she and the petitioner got back together after she filed for

divorce, she also testified that they stopped living together "shortly after [their son] was born" on September 3, 1986, that she did not know with whom he was associating, or even where he was living at the time of the murders. (Add. 8, Vol. 4, pp. 402-05, 407, 435) Lucinda also testified that she believed the petitioner's judgment was affected when he learned in August 1986 that his biological mother was dying of cancer.[21] (Add. 8, Vol. 4, pp. 453-54)

A plain reading of the record shows that Lucinda's testimony would not have benefitted the petitioner at the 1995 resentencing hearing for the following reasons. First, her testimony showed that Dagmar was not just cruel to the petitioner. Extremely ill, and in the advanced stages of Parkinson's Disease, Dagmar vented her wrath on all who lived in the Cauthern household.

Second, Lucinda, had known the petitioner for a little more than two (2) years prior to the murders. She had no first-hand knowledge of the petitioner's childhood, his upbringing, or his home life prior to meeting him. Nor would she have been able to testify that Dagmar's demeanor was anything more than just the manifestation of her Parkinson's Disease. Third, Lucinda's testimony that the petitioner was a follower could easily have been interpreted by the jurors as evidence that he was a carouser and ne're-do-well, *i.e.*, an adulterer, deserter, liar, and violent spouse, traits that clearly would have cast the petitioner in an even more unfavorable light in the eyes of the jury.

Finally, as to her testimony that the petitioner's judgment was somehow affected when he learned that his biological mother was terminally ill, Lucinda offered only her personal opinion on that point. That Lucinda had little if any first-hand knowledge of the petitioner's judgment in the months prior to the murders is supported by the fact that the petitioner and Lucinda had ceased living together shortly after their son was born, that she and the petitioner were not spending any time together at the time of the murders, and that she did not even know where he lived.

---

[21] Although the petitioner knew Wilcox, he did not realize until mid-1986 that she was his biological mother. (Add. 2, Vol. 15, pp. 101-02; Add. 8, Vol. 4, pp. 452-54) Wilcox died in October 1986. (Add. 2, Vol. 15, p. 102)

The petitioner has not shown that the decisions of the Tennessee courts on this issue were contrary to, or that they involved an unreasonable application of, clearly established federal law with respect to his ineffective assistance claim pertaining to the Popes and Lucinda. Neither has he shown that those decisions amounted to unreasonable determinations of the facts in light of the evidence. This claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### 3. Failure to Present Expert Testimony

The petitioner alleges that defense counsel were ineffective for not presenting expert testimony at the 1995 resentencing hearing regarding: a) the effect of posttraumatic stress disorder (PTSD) on the petitioner resulting from his home life (DE # 16, ¶ 28.a.i, p. 12); b) the petitioner's background *vis-a-vis* his relationship with Patterson (DE # 16, ¶ 28.a.ii, p. 12); and c) the effect of growing up in an allegedly "toxic home environment" (DE # 16, ¶ 28.a.iii), p. 12).

This claim is a variation on the petitioner's previous two factual predicates underlying this ineffective assistance claim. The only substantive difference here is that the petitioner couches this part of his claim in terms of defense counsel's failure to retain an expert to testify as to the effects alleged. Because this claim again pertains to defense counsel's reliance on the petitioner for information on his upbringing and homelife, the claim that defense counsel's representation was deficient in the context of this claim is without merit for the reasons previously explained, *supra* at p. 74.

Given that the petitioner cannot establish the first half of the two-part test under *Strickland* in the context of this claim, there is no need to address the prejudice half of the two-part *Strickland* test. Once again, however, the court will do so for the sake of completeness.

83

The petitioner asserts that defense counsel were ineffective for not presenting expert testimony that the petitioner suffered from PTSD as a result of his upbringing and/or home life. The petitioner relies on the testimony of Dr. Keith Caruso, M.D. (Dr. Caruso) who testified at the post-conviction evidentiary hearing. (Add. 8, Vol. 10, pp. 6-137; Add. 9, Vol. 56)

The post-conviction court considered the petitioner's overarching claim that defense counsel did not retain a mental health expert to assist in the preparation of mitigation evidence. (Add. 7, Vol. 3, pp. 000317-31) In its review, the post-conviction court determined that:

> [T]he "petitioner and many of his post-conviction witnesses would have declined to testify and/or speak with a mental health expert about the alleged abuse, th[e] petitioner's account of the Smiths murders would not have been consistent with the account that he gave Dr. Caruso even if he would have agreed to speak with a mental health expert prior to his trial or re-sentencing hearing, th[e] . . . proposed testimony, even if presented, was not particularly favorable to petitioner, and, finally, . . . the absence of the proposed testimony did not affect the jury's verdict.

(Add. 7, Vol. 3, p. 000322)

In support of its determination that many of the post-conviction witnesses would not have cooperated with a mental health expert, the post-conviction court concluded that neither Dagmar nor Roy were likely to have cooperated because the matter at issue pertained to them. (Add. 7, Vol. 3, pp. 000321-22) Noting that Roy was devoted to Dagmar, the post-conviction court concluded reasonably that Roy would have "done everything in his power to prevent witnesses from offering any testimony which did not cast Dagmar in a favorable light." (Add. 7, Vol. 3, p. 000322)

The post-conviction court also concluded that the fact that the petitioner was permitting evidence of his home life to be raised at the post-conviction evidentiary hearing did not establish that he would have cooperated with a mental health expert prior to the 1995 re-sentencing hearing, or that he would have permitted/encouraged others to do so. In that regard, the post-conviction court noted that: 1) Roy and Dagmar had died since the 1995 resentencing hearing; 2) the petitioner's

84

maturity level and decision making process had changed in the intervening years; 3) the petitioner's direct appeal had been unsuccessful, and he "was facing a death sentence, a fate which was not a certainty prior to the conclusion of his re-sentencing hearing." (Add. 7, Vol. 3, p. 000324)

Doctor Caruso's testimony supports the post-conviction court's determination that the petitioner would not have cooperated with a mental health expert. Doctor Caruso, who conducted a 19-hour psychiatric evaluation of the petitioner over several days (Add. 8, Vol. 10, p. 20), testified that the petitioner "held back about the nature of some of the abuse that he had suffered," that his home life "was difficult for him to get into discussing," and that "these were topics that he preferred to avoid." (Add. 8, Vol. 10, pp. 22-23) Doctor Caruso's own observations were supported by the fact that the petitioner waived his right to be present at the post-conviction evidentiary hearing when testimony about his family background was introduced into evidence because, in the words of post-conviction counsel, it was "going to be painful to hear a psychiatrist talk about his life." (Add. 8, Vol. 9, pp. 117-22; Vol. 11, pp. 3-9)

The record also supports the post-conviction court's conclusion that, even if the post-conviction witnesses would have cooperated with a mental health expert, their assistance would not have been helpful. As previously discussed, *supra* at pp. 75-76, Melinda and Bud had no real knowledge of the petitioner's upbringing and/or home life. Although EveAnn said that she would have cooperated, for reasons previously explained, *supra* at p. 76, she too had no real knowledge of the petitioner's upbringing or home life.

As to the petitioner's specific claim about PTSD, the post-conviction court addressed the issue as follows.

> The Court . . . finds little proof to support petitioner's theory that he fell at the top of the stairs, possibly suffered a blow to the head, had a flashback to his childhood, and raped and attempted to kill Mrs. Smith in a confused state and/or uncontrollable rage. Although petitioner made multiple statements to the police and to his

85

acquaintances and testified during the 1988 trial, none of petitioner's versions of the events are consistent with this version.

. . .

Petitioner's claim that he 'only saw black and felt rage' when he raped Mrs. Smith is inconsistent with all of his previous accounts of this incident, including his statements to the police, to his acquaintances, and under oath to the jury during the penalty phase of the 1988 trial. It is also contrary to his statements to Dr. Spencer that he felt sorry for Mrs. Smith, that he wanted to help her, and that he was acting under the direction of Patterson.

. . .

Petitioner's flashback/rage/lack of control theory is . . . belied by petitioner's post-offense behavior. Assuming petitioner's drug use, flashback to childhood abuse, external stressors, etc., caused him to commit a horrible crime, one would expect him to be appalled by his behavior when he sobered up/emerged from the flashback/regained control and learned what he had done. Instead, he bragged about it, inquired about the possibility of using the victims' credit cards, sold the victims' VCR, gave Mrs. Smith's jewelry to his ex-girlfriend, and seemed very happy – hardly the actions of a man filled with remorse.

The Court is convinced that the State would have cross-examined Dr. Caruso regarding these and other inconsistencies if he had testified during the re-sentencing hearing. The State was precluded from using petitioner's 1988 penalty-phase testimony to impeach him during the re-sentencing hearing because he did not testify about the murders. However, if Dr. Caruso had testified and relied upon petitioner's version of the events as a basis for his various diagnoses, the State would have been permitted to challenge the reliability of the petitioner's statements. With little effort, the State could have convinced . . . the jury that petitioner simply chooses not to be truthful about the true nature of his involvement in this incident.

In addition to questioning the persuasiveness of Dr. Caruso's testimony given his reliance upon petitioner's statements, the Court also finds that Dr. Caruso's testimony, even if based upon an accurate account of the Smiths' murders, would not have affected the jury's verdict. On the contrary, this testimony would have angered the jurors and diminished the effectiveness of other mitigation proof presented by Poland and Bateman.

86

(Add. 7, Vol. 3, pp. 000325-27) Based on the facts presented at the evidentiary hearing, the post-conviction court concluded that the petitioner was not prejudiced because expert assistance was not obtained to formulate mitigating evidence at resentencing based on his childhood.

In a lengthy analysis of the law and the facts, the Court of Criminal Appeals concurred. (Add. 10, Vol. 4, pp. 31-38) Noting that the question is whether "the evidence not presented undermines the confidence in the death sentence," the Court of Criminal Appeals determined the following: 1) the "petitioner has failed to demonstrate that the evidence preponderates against the[] factual findings" of the post-conviction court; 2) the petitioner "argues in a conclusory fashion" that the post-conviction court erred on this issue; 3) the petitioner's arguments "ignore that he has the burden of his factual allegations by clear and convincing evidence, which may well require that he give testimony about disputed matters"; 4) "the family-history evidence is, at best, marginal in terms of illuminating the case in such a way as to undermine confidence in the jury's sentencing decision"; 5) "a jury reasonably could reject, or be insulted by, any suggestion that the petitioner's criminal actions were attributable to a disadvantaged background"; 6) "Dr. Caruso's psychiatric profile is fundamentally incompatible with the existing testimony and evidence"; 7) "had Dr. Caruso's information been presented to the jury during the 1995 resentencing trial, the petitioner's sworn testimony from the penalty phase of his 1988 trial would have become a legitimate and proper subject of inquiry," *i.e.*, it would have "opened up what trial counsel successfully suppressed in 1995: the petitioner's self-destructive cross-examination testimony from 1988"; 8) "Dr. Caruso's explanation for the petitioner's actions . . . relies on the petitioner's account to Dr. Caruso . . . which is inconsistent in many important respects with his confessions and earlier testimony"; 9) [t]he petitioner's newest version of events, related to Dr. Caruso, serves foremost to showcase the petitioner's untruthfulness and manipulative tendencies, which have not been ameliorated by his prolonged incarceration"; 10) "none of the mitigating evidence that might have been presented

87

would have detracted substantially from the disturbing and gruesome circumstances of Mrs. Smith's murder"; and 11) "[a]t best, such evidence would have . . . . le[ft] the jury with a morass of conflicting lies that the petitioner had been telling since 1987 and various, tenuous excuses for his actions." (Add. 10, Vol. 4, pp. 31-38) The record, and these reasons, support the Court of Criminal Appeals no-prejudice determination.

The petitioner has not shown that the decisions of the Tennessee courts on this claim were contrary to, or involved an unreasonable application of, clearly established federal law. Neither has he shown that those decisions amounted to unreasonable determinations of the facts in light of the evidence. This claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### 4. Failure to Present Evidence of Patterson's Background

The petitioner alleges that defense counsel failed to present evidence of Patterson's more dominant role in the Smith murders because of his military training, that defense counsel failed to investigate and pursue information pertaining to Patterson's prior military training, and that defense counsel failed to investigate the fact that Patterson was a suspect in the 1981 rape-murder of Tania Meissner in Los Alamos, New Mexico, in which the victim was strangled to death. (DE # 16, ¶ 29.a, pp. 13-14) The petitioner's theory is that, had defense counsel presented the evidence at issue, the jury would have viewed Patterson as more culpable than the petitioner, and the petitioner would not have received the death sentence.

The petitioner and the respondent filed cross-motions for summary judgment on this issue

88

as it pertains to Patterson's link to the Los Alamos murder. (DE # 122, pp. 19-25; DE # 123, ¶ E, pp. 10-24) The crux of the petitioner's argument in his motion for summary judgment is that defense counsel did not learn of Patterson's link to the Los Alamos murder, because he did not obtain investigative assistance. (DE # 123, ¶ E, pp. 10-24) In both his motion for summary judgment and his response to the petitioner's motion for summary judgment, the respondent argues that the determination of the state courts on this issue was neither contrary to nor an unreasonable application of clearly established federal law and that the decision was not an unreasonable determination of the facts in light of the evidence presented.[22] (DE # 122, pp. 24-25; DE # 145, pp. 6-19)

Attorneys Poland and Bateman first testified on this issue at the post-conviction evidentiary hearing. (Add. 8, Vol. 8, pp. 160-61, 164-67, 176, 187-88, 192-97, 231; Vol. 9, pp. 67-75, 89-92, 110) Los Alamos Municipal Judge Alan Kirk, formerly the Chief of Police of the Los Alamos Police Department (LAPD) (former Chief Kirk), and Professor George Talley, a former police officer with the LAPD (former Officer Talley), testified as well. (Add. 8, Vol. 9, pp. 5-33)

Attorney Poland testified as follows at the post-conviction evidentiary hearing on the subject of the Los Alamos murder: 1) he did not investigate Patterson's background prior to trial; 2) he was unaware of the Los Alamos murder until "way into the trial . . . ."; 3) he did not learn about the Los Alamos murder until he met officers from the LAPD on a break during the trial; 4) he likely learned of Patterson's juvenile convictions in New Mexico on March 18, 1988, at the non-capital sentencing hearing; 5) he read that Patterson was a suspect in the Los Alamos murder in the March 19, 1988 edition of the local newspaper; 6) he had not seen a note in the DA's file dated February 26, 1988, in which former Chief Kirk is reputed to have described Patterson as a pathological liar and a

---

[22] The cross-motions for summary judgment as they pertain to the 1988 trial are analyzed *infra* at pp. 154-59 to be consistent with the order in which the claims are presented in the petition.

suspect in the Los Alamos murder and in which one of Patterson's friends, Tony Mayes (*sic*), told the Los Alamos police that Patterson admitted having murdered Tania Meissner; and 7) he had not seen a memorandum from the probation officer to Judge Peay, in which Patterson was identified as a suspect in the Los Alamos murder.  (Add. 8, Vol. 9, pp. 67-75, Add. 9, Vol. 41-44)

Attorney Bateman testified as follows on the issue at the post-conviction evidentiary hearing: 1) although he did not believe that he was aware at the time of the 1995 resentencing hearing that Patterson was a suspect in the Los Alamos murder, he could not recall for certain; 2) it would have been important at the 1995 resentencing hearing to present evidence that Patterson was a suspect in the Los Alamos murder if it would have been admissible; 3) Patterson had been subpoenaed by the State and was in the courthouse during the resentencing hearing; 4) the defense did not want to call Patterson as a witness because the defense did not know what he would say; 5) the defense did not interview Patterson because his case was pending on post-conviction; and 6) he recalled that "there may have been some indication that [Patterson] had contacted the state wanting to deal on his post-conviction for his testimony."  (Add. 8, Vol. 8, pp. 165-67, 176, 195-97, 231)

Former Chief Kirk testified as follows at the post-conviction evidentiary hearing: 1) he investigated Tania Meissner's murder; 2) Patterson was a suspect; 3) Patterson's "alibi was very time oriented and the Department was able to track it very meticulously"; 4) although Patterson had a partial alibi, he was never eliminated as a suspect; 5) he "believe[d] if [his] memory [wa]s correct, that . . . one individual . . . said that [Patterson] told him" he murdered Tania Meissner; and 6) he and another Los Alamos police officer, Capt. Dean Merritt, traveled to Tennessee in 1988 to interview the petitioner, at which time they met attorney Poland.[23]  (Add. 8, Vol. 9, pp. 22-23, 30-32)

Former Officer Talley testified at the post-conviction evidentiary hearing that: 1) he was a

---

[23]  Captain Merritt's testimony at the March 18, 1988 sentencing hearing pertained solely to Patterson's juvenile record, not Tania Meissner's murder.  (Add. 2, Vol. 18, pp. 85-97)

detective when Tania Meissner was murdered; 2) Patterson was the primary suspect; 3) he did not recall defense counsel contacting the LAPD for information pertaining to Patterson; 4) Tania Meissner's murder had never been solved; 5) Patterson had a reputation for being manipulative and not liked by others; 6) Patterson was never charged or indicted in Tania Meissner's murder; and 7) an "investigative grand jury" that inquired into the possibility of wrongdoing on Patterson's part was unproductive. (Add. 8, Vol. 9, pp. 8, 10-13, 15-18)

In a lengthy analysis of this claim, the post-conviction court determined that defense counsel's representation was neither deficient nor resulted in prejudice to the petitioner. (Add. 7, Vol. 3, pp. 000349-53) The post-conviction court determined further that: 1) neither party was aware of the Los Alamos murder prior to the guilt-innocence phase of the 1988 trial; 2) the testimony of the Los Alamos authorities, and exhibits related thereto, was insufficient for the petitioner to meet his burden of proof on post-conviction; 3) Patterson had a partial alibi; 4) Patterson had never been indicted for the crime; 5) although "someone alleged" that Patterson confessed to Tania Meissner's murder, no proof was offered to that end at the post-conviction evidentiary hearing; 5) assuming that the proof was admissible for some non-propensity purpose under Rule 404(b), Tenn. R. Evid., the petitioner failed to present by clear and convincing evidence that Patterson committed the crime; 6) although a "lie detector test indicated that Patterson was a pathological liar, lie detector tests are not admissible in Tennessee"; and 7) even if the jury had heard testimony about Patterson's alleged involvement in the 1981 murder of Tania Meissner, the overwhelming evidence of the petitioner's involvement in the Smith murders would not have affected the outcome of the trial. (Add. 7, Vol. 3, p. 000352)

The post-conviction court determined the following with respect to the 1995 resentencing hearing: 1) Patterson was under subpoena and in the courthouse during the 1995 resentencing hearing, but defense counsel were uncertain how he might testify if called as a witness; 2) it was

91

unlikely that Patterson would have testified because his own case was pending on post-conviction; 3) defense strategy was to put as much blame on Patterson as possible; 4) if Patterson had testified at the resentencing hearing, and if his testimony were the same as it was during the 1988 penalty phase, "the result would have been disastrous"; 5) the decision not to call Patterson to testify at the resentencing hearing was a tactical one; 6) because defense counsel did not investigate Patterson after the 1988 trial, their decision not to present Patterson's testimony did not constitute an informed judgment; 7) because the petitioner "presented no proof regarding whether Patterson would have agreed to testify if called . . . . he . . . failed to establish that trial counsel failure to call Patterson as a witness during the re-sentencing hearing resulted in prejudice"; 8) even if Patterson had testified, his testimony would have had "very little, if any, evidentiary value and that any such value [wa]s greatly outweighed by the possibility that the evidence could confuse the issues and mislead the jury" and would, therefore, have been inadmissible; and 9) testimony concerning the Los Alamos murder would not have affected the outcome of the hearing.  (Add. 7, Vol. 3, pp. 000351-54)  Based on the foregoing, the post-conviction court concluded that, while failure to investigate the Los Alamos murder prior to the 1995 resentencing hearing may have constituted deficient representation, there was no prejudice.  (Add. 7, Vol. 3, p. 000352)

Following its own lengthy analysis, the Court of Criminal Appeals concurred in the post-conviction court's ruling.  (Add. 10, Vol. 4, pp. 26-27, 29, 31, 39-40)  The Court of Criminal Appeals determined with respect to the 1988 trial that the petitioner "fails to explain why trial counsel should have set out on such a course of investigation [of Patterson] prior to the 1988 trial or even how such information relating to an unsolved homicide would have been uncovered." (Add. 10, Vol. 4, p. 39)  The Court of Criminal Appeals also observed that, "assuming . . . the evidence could be categorized as relevant for some non-propensity purpose, the petitioner has not shown by clear and convincing evidence that Patterson actually committed the offense.  The failure to establish

92

a proper foundation would have resulted in the exclusion of the evidence." (Add. 10, Vol. 4, p. 39) The Court of Criminal Appeals also determined that the petitioner's speculation about what defense counsel could have, or should have, done at the 1995 resentencing hearing is "precisely the type of second guessing that Strickland soundly condemns." (Add. 10, Vol. 4, p. 39) Finally, the Court of Criminal Appeals determined that the "petitioner is not entitled to relief on this ground because Patterson was not called to testify at the post-conviction evidentiary hearing regarding how he would have testified." (Add. 10, Vol. 4, pp. 39-40)

This court granted the petitioner's request for discovery in the instant proceeding. The petitioner deposed the following individuals during the course of that discovery: 1) attorney Poland (DE # 134); 2) attorney Bateman (DE # 135); 3) Capt. Randy Foster of the LAPD (DE # 136); and 4) Lt. Reggie Briggle of the LAPD (DE # 138). Captain Foster and Lt. Briggle re-opened the 1981 case of Tania Meissner's murder in 2005. (DE # 136, p. 6; DE # 138, pp. 5-6, 28-29)

Attorney Poland testified in his deposition that: 1) he did not seek co-counsel or investigative assistance prior to the 1988 trial (DE # 134, pp. 11-12); 2) he sought to portray Patterson as more culpable at the 1995 resentencing hearing after learning of his link to the Los Alamos murder (DE # 134, pp. 25-26); 3) the prosecutor apparently became aware of Patterson's link to the Los Alamos murder sometime following the conclusion of the penalty phase of the 1988 trial (DE # 134, pp. 36-38; Ex. 6); 4) the probation officer in the petitioner's case spoke with Capt. Marrett of the LAPD on March 1, 1988, and subsequently requested that the trial judge subpoena Patterson's juvenile record from Los Alamos authorities (DE # 134, pp. 38-40, Ex. 7); 5) an Order entered on March 14, 1988 issued a subpoena *duces tecum* to Capt. Marrett to produce Patterson's juvenile records (DE # 134, pp. 40-41); 6) he had not seen the subpoena before the deposition (DE # 134, pp. 40-41); 7) he learned of the link between Patterson and the murder of Tania Meissner during the petitioner's sentencing hearing on March 18, 1988 (DE # 134, pp. 29, 32-33, 39; Ex. 4-5); 8) the circumstances

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 93 of 168 PageID #: 2013

described in the Report of Death in Tania Meissner's case appeared similar to the circumstances in the Smith murders[24] (DE # 134, pp. 42-43; Ex. 9); 9) he concurred that Patterson appeared uncooperative in a March 20, 1988 letter in which Patterson wrote that he was "not going to cooperate in any form, shape, or fashion with the New Mexico authorities regarding anything in his past" (DE # 134, p. 44; Ex. 10); 10) he agreed with *habeas* counsel that signing the guest book at Tania Meissner's memorial service made Patterson "look pretty cold" (DE # 134, pp. 45-46; Ex. 11); 11) he admitted that the DNA testing conducted in 2005 was not available at any time that the petitioner's case was pending in state court (DE # 134, pp. 46-47; Ex. 12); 12) the prosecution did not provide exhibits 6-9 above to him (DE # 134, p. 48); and 13) neither he nor attorney Bateman tried to contact Los Alamos authorities for Patterson's records (DE # 134, p. 48).

Attorney Bateman testified at his deposition that: 1) one of the objectives at the 1995 hearing was to portray Patterson as more culpable than the petitioner (DE # 135, pp. 17-18, 24); 2) there was no investigation prior to the 1995 resentencing hearing beyond what had been developed in connection with the 1988 trial (DE # 135, pp. 18-19); 3) he did not investigate Patterson's link with the 1981 murder of Tania Meissner (DE # 135, pp. 21-22); 4) he did not recall whether Patterson had been implicated in an earlier homicide (DE # 135, pp. 25-30); 5) he did not recall whether the District Attorney had subpoenaed Patterson's juvenile records from New Mexico (DE # 135, pp. 31, 39); 6) he agreed that the link between Patterson and Tania Meissner's murder would have been relevant information in support of the theory that Patterson was more culpable than the petitioner (DE # 135, pp. 38-39); and 7) the evidence that the defense presented in the 1995 resentencing hearing was that Patterson actually murdered both of the Smiths (DE # 135, pp. 62-63).

The testimony of Capt. Foster and Lt. Briggle revealed the following: 1) Patterson was one

---

[24] The July 31, 1981 Report of Death in Tania Meissner's case showed that her death was "[c]onsistent with manual strangulation," and that there had been "[s]exual penetration [of the] vagina and rectum." (DE # 134, Ex. 9)

of three suspects in the murder, the others being the victim's brother, John Meissner, and a person named Tony Maes (DE # 136, pp. 24, 26-27, 40; DE # 138, p. 9); 2) the victim was murdered by "manual strangulation," *i.e.*, a ligature was not used (DE # 136, p. 25; DE # 138, pp. 8, 23); 3) there was no indication of forced entry into the victim's home, or signs of a struggle (DE # 138, p. 23); 4) the victim had vaginal and anal intercourse with someone before she was murdered (DE # 136, pp. 26-27; DE # 138, pp. 9-10); 5) the victim's brother was a suspect because he could not account for his whereabouts at the time of the murder, and because of evasive statements that he made to the police (DE # 136, pp. 27-28; DE # 138, p. 13); 6) there were reports that John Meissner had fondled the victim, his sister, and some suspected that he was involved in her death (DE # 138, p. 24); 7) Tony Maes gave a statement to Los Alamos police in 1981 that Patterson asked him to tell police that Patterson was with him at the time of the murder (DE # 136, pp. 28-29, 40-41; DE # 138, pp. 10-12); 8) Patterson's alibi that he was with Tony Maes did not stand up (DE # 136, pp. 28-29, 40-41; DE # 138, p. 14); 9) Patterson told Billy Hathaway (Hathaway) that he had raped and killed Tania Meissner (DE # 136, pp. 29-30, 41-42; DE # 138, pp. 13, 31); 10) Patterson made the alleged admission to Hathaway after the two men had been drinking, and after the details of the murder were common knowledge (DE # 136, pp. 29-30, 41-42; DE # 138, p. 25); 11) Patterson, the victim, and her brother were acquaintances and frequented the victim's residence (DE # 136, p. 30; DE # 138, p. 19); 12) there was no evidence in the LAPD investigation that Patterson had a prior sexual relationship with the victim (DE # 136, pp. 30-31; DE # 138, pp. 14, 16); 13) when interviewed by the LAPD, Patterson denied involvement and directed attention to someone else (DE # 136, pp. 31, 41); 14) DNA tests conducted in 2005 showed "to a reasonable scientific certainty" that Patterson had sexual intercourse with Tania Meissner prior to her death (DE # 135, Ex. 9; DE # 136, pp. 33-34; DE # 138, p. 26); 15) the DA's office in Clarksville subpoenaed Patterson's juvenile records from the LAPD in 1988 (DE # 136, p. 38; DE # 138, pp. 20-22; DE # 160, Ex. 4); Patterson did not

have a record of violence prior to becoming a suspect in Tania Meissner's murder (DE # 136, pp. 42-43; DE # 138, pp. 24-25); 17) Patterson was never charged in Tania Meissner's murder (DE # 136, p. 44; DE # 138, pp. 20, 28); 18) there was nothing from the National Crime Information Center (NCIC) or in Patterson's juvenile records that would have indicated that he was a suspect in Tania Meissner's murder (DE # 136, pp. 44-45; DE # 138, p. 28); and 19) Patterson had not been charged since the DNA evidence was produced in 2005 because he was serving two life sentences in Tennessee (DE # 136, pp. 46-47; DE # 138, pp. 20-21).

The court assumes, without deciding, that the representation of defense counsel at the 1995 resentencing hearing was deficient because counsel failed to investigate Patterson's possible involvement in the 1981 murder of Tania Meissner which, as the evidence shows, attorney Poland became aware of in 1988. The court, therefore, limits its review to the prejudice half of the two-part *Strickland* test in analyzing the petitioner's motion for summary judgment on this claim.

As an initial matter, the petitioner has failed to establish that the evidence of Patterson's involvement in the 1981 murder of Tania Meissner would have been admissible at the 1995 resentencing hearing. Matters of state evidentiary rules normally are not within the domain of federal *habeas corpus.* In not showing that the evidence at issue would have been admissible at the 1995 resentencing hearing, the petitioner has failed to show that this claim is cognizable in federal *habeas corps*.

Assuming for the sake of argument that the evidence of Patterson's link to the 1981 murder of Tania Meissner would have been admissible, to demonstrate prejudice, the petitioner must show that the evidence at issue would have cast Patterson in the light of having been more culpable than the petitioner. For the petitioner to succeed on this claim, he must establish sufficient similarity in the *modus operandi* between the 1981 rape-murder of Tania Meissner and the Smith murders so that at least one juror would have drawn the inference.

96

The petitioner argues first that Capt. Foster's testimony "demonstrates that the 'immediate cause of Ms. Meissner's death was 'consistent with ***manual strangulation***' . . . ," and the fact that Tania Meissner was strangled "helps establish similarities between the New Mexico and the Tennessee strangulations." (DE # 123, pp. 17-18)(emphasis added) However, Dr. Harlan testified at the 1995 resentencing hearing that the Smiths were murdered by ligature strangulation. (Add. 5, Vol. 1, pp. 140, 146-47)

Manual strangulation, such as that in the 1981 Murder of Tania Meissner, is accomplished with the hands, forearms, other limbs, or objects pressed against the neck. Dominick DiMaio, *et al., Forensic Pathology* (*Practical Aspects of Criminal & Forensic Investigations*) 262 (2nd ed. 2001). Ligature strangulation, as in the case of the Smith murders, is accomplished by the use of "a constricting band [around the neck] that is tightened by a force other than the body weight," *e.g.*, "electrical cords, neckties, telephone cords, stockings, etc. *Id.* at 257. Manual strangulation and ligature strangulation do not constitute the same *modus operandi.*.

The petitioner argues next that Capt. Foster's testimony "documents incidents of 'sexual penetration, vagina and rectum,'" and that this fact also "helps establish similarities between the New Mexico and the Tennessee strangulations.'" (DE # 123, p. 18) There was no evidence adduced at the 1995 resentencing hearing that Rosemary had been penetrated both vaginally and anally. The only evidence presented was that Rosemary had been sexually assaulted. Thus, even if the evidence from the 1981 rape-murder of Tania Meissner had been presented at the 1995 resentencing hearing, there was no way for the jury to connect the manner in which Tania Meissner had been raped and the manner in which Rosemary had been raped.

The petitioner argues next that Patterson's juvenile record revealed that he had been involved in three break-ins in Los Alamos in which glass had been broken to gain entry to the premises. (DE # 123, p. 18) However, none of those break-ins led to crimes of violence. On the other hand,

97

although Tania Meissner's murder obviously was a crime of violence, there was no break-in associated with her murder.

The petitioner argues that Patterson initially denied involvement in the break-ins described above, attempted to fake an alibi, and tried to shift the blame to someone else before ultimately confessing. (DE # 123, pp. 18-19) This pattern of denial, evasion, and shifting the blame does not strike the court as particularly unusual where a crime has been committed, especially one involving a murder. Indeed, the evidence adduced at the 1995 resentencing hearing shows that that is precisely what the petitioner attempted to do in the conflicting statements that he gave to the police. (Add. 5, Vol. 2, pp. 234-40, 242-46, 256-88; Vol. 3, pp. 334-42; Vol. 4, Ex. 24-25, 29)

The petitioner argues that Patterson admitted to Hathaway that he raped and murdered Tania Meissner. (DE # 123, p. 19) Assuming that Hathaway's statement is entitled to the presumption of truthfulness, the alleged confession occurred while the two men were drinking, and after the details of Tania Meissner's murder had become common knowledge. (DE # 136, pp. 29-30, 41-42; DE # 138, p. 25) Furthermore, even if Patterson admitted his guilt to Hathaway, the fact remained at the time of the 1995 resentencing hearing that Patterson had never been charged with the murder, and there still were two other suspects.

Finally, the petitioner claims that Patterson's signature in the guest book at Tania Meissner's memorial service made him "look pretty cold." (DE # 123, p. 19) The inference that the petitioner asks the court to draw from the fact of Patterson's attendance is that, absent an indictment after fourteen (14) years, at least one juror at the 1995 resentencing hearing would have viewed Patterson's attendance as proof of his cold-bloodedness, and evidence that he was the dominant influence in the Smith murders. The court disagrees. Without more, a reasonable juror at the 1995 resentencing hearing would have viewed Patterson's signature – 14 years after the fact – as nothing more than proof that he attended the memorial service for his friend's sister.

In assessing the potential effect of the evidence above, the court weighs that evidence against the following testimony that was offered at the 1995 resentencing hearing that went to the issue of the petitioner's culpability: 1) it was the petitioner who approached Denning about obtaining a handgun; 2) it was the petitioner who asked Denning to get the .45 semi-automatic that Denning had traded to McManness; 3) it was the petitioner who gave Denning $50.00 to obtain the .45 semi-automatic; 4) it was the petitioner who drove Denning to Nashville on January 8, 1987 to get the .45 semi-automatic; 5) it was the petitioner to whom Denning gave the .45 semi-automatic after getting it from McManness; 6) it was the petitioner who had control over much of the property stolen from the Smith residence; 7) it was the petitioner who showed Denning the stolen credit cards and asked him if he knew how to use them; 8) it was the petitioner who gave Rosemary's rings and her watch to Lambert; 9) it was the petitioner who told Denning that he "was going to be famous" because of the murders; 10) it was the petitioner who told Denning that "he tied a scarf" around Rosemary's neck, but did not have enough strength to kill her, so he used a vase as a tourniquet; 11) it was the petitioner who told Denning that he raped Rosemary and poured a wine cooler on her; 12) it was the petitioner who told Denning that he cut the phone lines and that he broke the window in the back door; and 13) it was the petitioner who threatened to kill Andrew if he told anyone. (Add. 5, Vol. 3, pp. 314-15, 351-70, 388, 390-92)

The evidence that linked Patterson to the 1981 murder of Tania Meissner would not have caused a reasonable juror at the 1995 resentencing hearing to conclude that Patterson was more culpable than the petitioner, especially in view of the evidence of the petitioner's independent actions before and after the murders. Therefore, the petitioner was not prejudiced because defense counsel did not present evidence in 1995 that Patterson was a suspect in Tania Meissner's murder.

The petitioner has not shown that the decisions of the Tennessee courts on this claim were

contrary to, or that they involved an unreasonable application of, clearly established federal law. Neither has he shown that those decisions amounted to unreasonable determinations of the facts in light of the evidence. This claim is without merit.[25]

**Certificate of Appealability**

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

**5. Failure to Cross-Examine Andrew Adequately During the 1995 Resentencing Hearing**

The petitioner incorporates paragraphs 20 through 24 of his petition and amended petition by reference into this claim, asserting that defense counsel failed to cross-examine Andrew adequately at the 1995 resentencing hearing. (DE # 16, ¶ 29.b, p. 14) Absent any indication to the contrary in paragraph 29.b), the paragraphs incorporated by reference limit this claim to defense counsel's alleged failure at the 1995 resentencing hearing to cross-examine Andrew about the information in Detective DiFiore's report and compensation that he received.

In addressing this issue, the post-conviction court considered the following with respect to the information in Detective DiFiore's report: 1) attorney Poland testified that he did not want to ask Andrew too many questions because Andrew was "odd and unpredictable" (Add. 7, Vol. 3, pp. 000347, 000349); 2) contrary to the parties' written stipulation that defense counsel did not interview Andrew prior to the 1988 trial or 1995 resentencing hearing, a memorandum produced from defense counsel's file showed that attorney Poland interviewed Andrew on February 11, 1988 (Add. 7, Vol. 3, p. 000347; Add. 9, Vol. 45); and 3) the post-conviction court "had no opportunity

---

[25] Although the petitioner also raises this issue in the context of Patterson's military background, he provides no argument with respect to this aspect of his claim. Accordingly, for the reasons previously explained, *supra* at p. 46, this factual predicate is conclusory.

to assess Andrew's credibility," because he did not testify, and "found Poland to be a very credible witness" (Add. 7, Vol. 3, p. 000347). Based on the foregoing, the post-conviction court concluded that defense counsel's decision not to cross-examine Andrew about Detective DiFiore's report "was a trial tactic" that it would "not second guess." (Add. 7, Vol. 3, p. 000349)

The post-conviction court also addressed the issue of compensation paid to Andrew. Noting that attorney Poland testified that "he would have asked Andrew about the compensation had he known about it," the post-conviction court determined that defense counsel "should have known about the compensation because it was discussed in a newspaper article in his possession." (Add. 7, Vol. 3, p. 000349) Although not entirely clear from the Order denying the petitioner's request for post-conviction relief, it appears that the post-conviction court determined that defense counsel's failure to cross-examine Andrew on the issue of compensation amounted to deficient representation, because the failure was due to defense counsel's oversight, not to any professional determination of the matter. (Add. 7, Vol. 3, p. 000349)

The post-conviction court also addressed the question of prejudice in the context of these two claims. In so doing, the post-conviction court determined that the petitioner was not prejudiced in either instance, because "the sentence imposed during the 1995 trial was strongly supported by the record even in the absence of Andrew's testimony." (Add. 7, Vol. 3, p. 000349)

The Court of Criminal Appeals concurred in the post-conviction court's determination as to defense counsel's representation, noting that it found "no basis for disturbing the post-conviction court's assessment of counsel's performance," including its apparently adverse finding as to the compensation issue. (Add. No. 10, Vol. 4, p. 40) The Court of Criminal Appeals also wrote that it did not "discern any basis to displace the post-conviction court's conclusion that even if counsel's cross-examination was deficient, the petitioner ha[d] not demonstrated . . . prejudice." (Add. No. 10, Vol. 4, p. 40) The Court of Criminal Appeals based its no-prejudice determination on Andrew's

"halting and somewhat vague" testimony at the 1995 resentencing hearing, the fact that Andrew's testimony about Rosemary's murder was "even less specific" than his testimony about the circumstances of Patrick's murder, and the fact that the jury did not find Andrew's "testimony adequate to support the death penalty for Mr. Smith's homicide." (Add. 10, Vol. 4, pp. 40-41)

The record supports the determinations of the state courts that failure to cross-examine Andrew on the contents of Detective DiFiore's report was a tactical decision. First, attorney Poland testified as follows with respect to cross-examining Andrew in general:

> I didn't know what he was going to say . . . . I went out to his trailer and I think that's when I first run across him and he was dressed kind of weird and never looked the same from day to day. Sometimes you weren't sure, seriously, that you were talking to the same guy. But he was very difficult to talk to and I was just afraid to go there on some things.

(Add. 8, Vol. 9, p. 88) Second, that Poland interviewed Andrew is supported by a memorandum dated February 11, 1988 that was found in attorney Poland's files. (Add. 9, Ex. 45) Finally, the record shows that Andrew did not testify at the post-conviction evidentiary hearing and that the written stipulation that defense counsel did not interview Andrew was inconsistent with the memorandum in defense counsel's record that showed he did. The court will not second-guess defense counsel's tactical decision not to cross-examine Andrew about Detective DiFiore's report. *See Strickland*, 466 U.S. at 698; *see also Wiggins*, 539 U.S. at 527.

The record supports the determination of the state courts that defense counsel's representation was deficient for not cross-examining Andrew about compensation that he received. Therefore, the court turns its attention to the question of prejudice. The analysis that follows applies to both defense counsel's failure to cross-examine Andrew about the compensation that he received and counsel's tactical decision not to cross-examine Andrew about Detective DiFiore's report.

Both of these issues were discussed previously, *supra* at pp. 48, 50-56, 69-70, in the context

of the petitioner's *Brady* claim. The prejudice analysis under *Strickland* is "essentially identical to the *Brady* materiality determination." *Byrd*, 209 F.3d at 549. Indeed, in *Strickland*, the United States Supreme Court determined that its "test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution." *Strickland*, 466 U.S. at 649 (citing *Agurs*, 427 U.S. at 104). Thus, when it is determined that exculpatory evidence that was not disclosed to defense counsel is not material in the context of *Brady*, then there is no prejudice under *Strickland* when defense counsel fails to make use of that evidence if it is available. In other words, because the information in Detective DiFiore's report and evidence of compensation paid to Andrew were not material in the context of *Brady* in 1995, then failure to cross-examine Andrew on that same evidence at the 1995 resentencing hearing did not prejudice the petitioner in the context of this ineffective assistance claim.

The petitioner has not shown that the decisions of the Tennessee courts on this claim were contrary to, or that they involved an unreasonable application of, clearly established federal law. Neither has he shown that those decisions amounted to unreasonable determinations of the facts in light of the evidence. This claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### 6. Failure to Challenge Denning's Testimony About the Wine Coolers

The petitioner asserts that defense counsel failed to challenge Denning's wine-cooler testimony in the absence of any physical evidence or expert testimony. (DE # 16, ¶ 29.c, p. 14) As previously noted, *supra* at pp. 70-71, the respondent argues that this claim is procedurally defaulted.

A review of the record shows that the petitioner did not raise this claim in his *pro se* petition

for post-conviction relief (Add. 7, Vol. 1, pp. 000001-13), his amended petition for post-conviction relief (Add. 7, Vol. 1, pp. 000037-93), or his amended first amended petition for post-conviction relief (Add. 7, Vol. 2, pp. 000098-169). A review of the record also shows that the facts underlying this claim were not raised at the post-conviction evidentiary hearing. (Add. 8, Vol. 2–12) Although the post-conviction court mentioned Denning's wine-cooler testimony in its Order denying the petitioner's request for post-conviction relief, it did so only in the facts pertaining to Rosemary's murder (Add. 7, Vol. 3, pp. 0000303, 000327, 000329), not in its analysis of the petitioner's ineffective assistance of counsel or *Brady* claims (Add. 7, Vol. 3, pp. 000303-12, 000341-46).

The record shows that the first time the petitioner raised this issue was in his brief on appeal from the judgment of the post-conviction court. (Add. 10, Vol. 1, ¶ I.I(3), pp. 51-54) The Court of Criminal Appeals addressed this claim on appeal as follows:

> The petitioner registers a separate complaint in his appellate brief that there was no forensic support for the notion that a wine cooler was poured over the body of Rosemary Smith. As framed, this complaint does not merit post-conviction consideration, and absent an explanation why this ground was not previously presented in any earlier proceeding, we regard it as waived. *See* Tenn. Code Ann. § 40-30-104(e) (2003). Furthermore, to the extent that the petitioner is attempting to assert an ineffective assistance of counsel claim, his cursory statement that counsel abandoned their duty to challenge the state's case is wholly insufficient to merit post-conviction relief.

(Add. 10, Vol. 4, p. 41)(underline in the original) As shown above, the Court of Criminal Appeals determined that this claim was both waived and conclusory.

Tennessee's waiver rule in effect at the time that Court of Criminal Appeals decided this issue provided the following:

> (g)  A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

104

     (1)    The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

     (2)    The failure to present the ground was the result of state action in violation of the federal or state constitution.

Tenn. Code. Ann. § 40-30-106(g). It is clear from the record that the petitioner did not raise this claim during post-conviction proceedings when he could/should have, and that the petitioner's ineffective assistance claim does not amount to a new constitutional right. Neither does the petitioner allege that he was unable to raise this ineffective assistance claim because of any state action that prevented him from doing so. Accordingly, this claim is waived under state law. The next question is whether the claim is waived for purposes of federal *habeas corpus* review.

The Sixth Circuit uses a four-part analysis when a federal *habeas corpus* claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). First, the court must ascertain whether there is an applicable state procedural rule. *Id.* Second, the court must determine whether the state courts actually enforce the rule. *Id.* Third, the court must decide whether the rule constitutes an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the criminal defendant did not comply with the rule, the defendant must demonstrate that, under the standard set forth in *Wainwright v. Sykes*, 433 U.S. 72 (1977), there was cause for him not to follow the rule and that he was actually prejudiced by the constitutional error alleged. *Maupin*, 785 F.2d at 138.

As to the first three parts of this four-part test, the Sixth Circuit has previously determined that Tennessee has an applicable waiver rule, that the rule constitutes an adequate and independent rule established by state law precluding federal *habeas corpus* relief, and that the rule is regularly applied. *See Hutchison*, 303 F.3d at 738 (citing *Cone v. Bell*, 243 F.3d 961, 969 (6th Cir. 2001),

105

*rev'd on other grounds*, 535 U.S. 685 (2002)).  Because the first three parts of the Sixth Circuit's four-part analysis have been determined previously, the court turns to the fourth part of the inquiry.

To establish "cause" to excuse waiver, a petitioner must show that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule. *Murray*, 477 U.S. at 488; *see also Broom v. Mitchell*, 441 F.3d 392, 401 (6th Cir. 2006).  A showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, constitutes "cause" under this standard. *Id*.

As previously noted, *supra* at p. 71, the petitioner chose to address this claim on the merits in his response to the respondent's motion for summary judgment.  Apart from challenging the sufficiency of the respondent's waiver argument, the petitioner made no effort to establish "cause" to excuse the waiver.[26]  Because the petitioner has failed to establish "cause," he cannot establish both parts of the two-part cause-and-prejudice test.

Because the petitioner has failed to establish "cause," the court is not required to address the question of "prejudice."  However, the court will do so anyway out of an abundance of precaution.

The court has already addressed Denning's wine-cooler testimony in the context of the petitioner's *Brady* claim, *supra* at pp. 48, 56-70, finding that the lack of evidence of wine-coolers on Rosemary's body was not material.  As previously discussed, *supra* at p. 103, when evidence is not material under *Brady*, it also is not prejudicial under *Strickland*.  Therefore, the petitioner cannot establish that he was prejudiced because defense counsel failed to challenge Denning's wine-cooler testimony at the 1995 resentencing hearing.

---

[26]  Denning's wine-cooler testimony was recorded in the transcripts of the 1988 trial and the 1995 resentencing hearing and, as previously established, *supra* at pp. 59-60 n. 14, his wine-cooler testimony was often referred to in the several proceedings that followed.  Any argument that the petitioner might seek to advance this claim merely would be an effort to rationalize why post-conviction counsel overlooked the issue.

The petitioner has failed to establish cause and prejudice to excuse the waiver of this claim. Accordingly, this claim is procedurally defaulted for purposes of federal *habeas corpus* review. For the reasons also explained herein, the claim is without merit.

### Certificate of Appealability

When, as here, the district court denies *habeas corpus* relief on procedural grounds without reaching the merits of the petitioner's underlying constitutional claims, a COA will issue only under the following conditions: 1) "that jurists of reason would find it debatable whether the motion states a valid claim of the denial of a constitutional right"; <u>and</u> 2) "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Jurists of reason would not debate the court's procedural ruling. The petitioner also has not made a substantial showing of a denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### 7. Failure to Follow the ABA Standards for Defense Counsel in a Capital Case

The petitioner asserts that defense counsel's representation amounted to a violation of ABA standards for defense counsel in a capital case. (DE # 16, ¶ 30, p. 14) As previously noted, *supra* at pp. 70-71, the respondent argues that this claim is waived.

The record shows that the petitioner referred to the ABA standards for defense counsel in capital cases on at least the following occasions: 1) in his first amended petition for post-conviction relief (Add. 7, Vol. 1, ¶¶ I.1-7, pp. 000044-52; ¶ II, p. 000054; ¶¶ III.1-8, pp. 000058-69); 2) in his amended first amended post-conviction petition (Add. 7, Vol. 2, ¶¶ I. 1-8, pp. 000106-14; ¶ II, p. 0121; ¶¶ III.1-5, 7, pp. 000130-32, 000141); 3) during the post-conviction evidentiary hearing when post-conviction counsel asked attorney Bateman if he was familiar with the ABA guidelines for defense counsel in capital cases (Add. 8, Vol. 8, p. 138), and 4) in his closing brief on post-

conviction (Add. 7, Vol. 3, p. 000276). On the other hand, the petitioner did not raise an ineffective-assistance claim in the context of the ABA guidelines in his brief on appeal from the judgment of the post-conviction court (Add. 10, Vol. 1, ¶ I, pp. 1-60; ¶ VII, pp. 102-06), nor did the Court of Criminal Appeals reach the issue *sua sponte* (Add. 10, Vol. 4).

As previously established, *supra* at pp. 58-59, "the habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim." Because the petitioner did not raise his ineffective assistance of counsel claim in the context of the governing ABA standards on appeal from the judgment of the post-conviction court, no Tennessee appellate court has addressed the issue. Therefore, for the reasons previously explained, *supra* at pp. 57-62, this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

Even if the petitioner's ABA claim were not procedurally defaulted for the purpose of federal *habeas corpus*, apart from his claim that "[c]ounsel's omissions in this regard violate[d] the ABA standards for defense counsel in a capital case," the petitioner has provided no facts in support of his claim. As previously established, *supra* at p. 46, conclusory claims do not constitute grounds for *habeas corpus* relief. Assuming for the sake of further argument that the petitioner's ABA claim is intended to refer to those specific allegations of ineffective assistance already addressed herein, the court already has determined that the petitioner was not prejudiced by any of the alleged actions/inactions of counsel. Therefore, the petitioner fails to satisfy the second part of the two-part *Strickland* test with respect to his ABA claim as well.

As reasoned herein, this claim is procedurally defaulted for the purposes of federal *habeas corpus* review. The petitioner's claim also is without merit for the reasons explained above.

## Certificate of Appealability

Jurists of reason would not debate the court's procedural ruling. The petitioner also has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not

issue on this claim.

### 8. Failure to Explain and Present Adequately the Petitioner's Life History, His Character, His Background, and the Circumstances of the Crime

The petitioner asserts that defense counsel was ineffective for not fairly and accurately explaining and presenting the petitioner's life history, his character and background, or explaining the circumstances of the crime. (DE # 16, ¶ 31.a, p. 14) Additionally, the petitioner alleges that defense counsel was ineffective for not objecting when the trial court instructed the jury that it could not consider Patterson's life sentence as mitigation. (DE # 16, ¶ 31.b, p. 14) A review of the record shows that the petitioner raised this claim in his brief on appeal from the judgment of the post-conviction court and that the Court of Criminal Appeals addressed the issue. (Add. 10, Vol. 1, ¶¶ I.G-I, pp. 23-54; Vol. 4, ¶¶ A-D, pp. 26-41)

### a. Failure to Establish or Present Mitigating Evidence Adequately and Effectively

The Court of Criminal Appeals considered the petitioner's claim that "the evidence was presented in an abbreviated, cursory form with no elaboration about the evidence affecting the petitioner's behavior at the crime scene and in the following days." (Add. 10, Vol. 4, pp. 30-39) The Court of Criminal Appeals determined that "the petitioner ha[d] not shouldered his legal burden to prove deficient performance," but even if the evidence had been presented differently, the petitioner had "not shown a reasonable probability that the result of the 1995 trial would have been different." (Add. 10, Vol. 4, pp. 28-39)

The petitioner has not provided any facts in support of this claim and, as such, it is conclusory. As previously established, *supra* at p. 46, conclusory claims do not constitute grounds for federal *habeas corpus* relief. To the extent that this claim is intended to pertain to defense counsel's failure to present more adequately/effectively the testimony/evidence discussed *supra* at

109

pp. 72-100, as already shown, each of those individual claims is without merit. On the other hand, if the petitioner is attempting to raise a "cumulative" ineffective assistance claim based on those grounds, the record shows that no such claim has been raised previously in any state court. For the reasons previously explained, *supra* at pp. 57-62, such a "cumulative" ineffective assistance claim is procedurally defaulted for purposes of federal *habeas corpus* review.

The petitioner has not shown that the Court of Criminal Appeals' decision was contrary to, or involved an unreasonable application of clearly established federal law. Neither has he shown that the decision amounted to an unreasonable determination of the facts in light of the evidence. Accordingly, this claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Jurists of reason also would not debate the court's procedural ruling with respect to the petitioner's "cumulative" ineffective assistance claim. Accordingly, a COA will not issue on this claim.

### b. Failure to Object When the Trial Court Instructed the Jury That it Could Not Consider Patterson's Life Sentence in Mitigation

Both the post-conviction court and the Court of Criminal Appeals considered this claim. (Add. 7, Vol. 3, p. 000284; Add. 10, Vol. 4, p. 30) On appeal, the Court of Criminal Appeals determined that failure to object when the trial court instructed the jury that it could not consider Patterson's life sentences as mitigation evidence did not constitute deficient representation, nor did it result in prejudice. (Add. 10, Vol. 4, pp. 30-39)

For reasons previously explained, *supra* at p. 45, the trial court did not err in its instruction to the jury concerning Patterson's life sentences. Given that the trial court's instruction was correct, defense counsel cannot be said to have provided deficient representation, nor can the petitioner show that he was prejudiced because defense counsel did not object.

110

The petitioner has not shown that the decision of the Court of Criminal Appeals was contrary to, or involved an unreasonable application of, clearly established federal law. Neither has he shown that its decision amounted to an unreasonable determination of the facts in light of the evidence. This claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Therefore, a COA will not issue on this claim.

### 9.  Counsel's Alleged Failures Undermined the Confidence in Petitioner's Death Sentence

The petitioner asserts that defense counsel's failures to investigate and present available mitigating evidence "undermine the confidence in the integrity of the petitioner's death sentence." (DE # 16, ¶ 32, p. 15)  Although the petitioner does not say so specifically, it appears that this claim constitutes another effort to raise a "cumulative" ineffective assistance claim.  For the reasons previously explained, *supra* at pp. 57-62, this claim is procedurally defaulted for purposes of federal *habeas corpus* review.  This claim also is without merit for the reasons previously discussed, *supra* at pp. 72-100.

### Certificate of Appealability

Reasonable jurists would not debate the court's procedural ruling.  The petitioner also has not made a substantial showing of the denial of a constitutional right.  Accordingly, a COA will not issue on this claim.

### F.  Claims Under the Vienna Convention on on Consular Relations (Sixth Claim)

The petitioner asserts that his rights under the Vienna Convention on Consular Relations (the Vienna Convention) were violated.  (DE # 16, ¶ 33, p. 15)  More particularly, the petitioner

asserts that: 1) the State failed to inform him of his rights under Article 36 of the Vienna Convention; 2) the State failed to inform German Consular officials of his arrest; and 3) defense counsel was ineffective in representing a foreign national. (DE # 16, ¶¶ 34-35, p. 15)

Noting that this claim was raised for the first time on post-conviction, the respondent argued in his response to the petition that the state courts properly determined that the petitioner did not have any privately enforceable rights under the Vienna Convention. (DE # 26, 26) The respondent argued further that the state courts properly determined that the claim was waived because it was not raised on direct appeal and, for that reason, it is procedurally defaulted for purposes of federal *habeas corpus* review. (DE # 26, p. 26) The respondent also maintained that the ruling of the state courts on this issue was:

> [n]either contrary to nor an unreasonable application of clearly established federal law . . . " [and] "to grant petitioner relief [on these grounds] would . . . constitute the use of federal habeas corpus to announce a new rule of constitutional criminal law/procedure, which is prohibited . . . .

(DE # 26, p. 27) Finally, the respondent argued that, to the extent that this claim is construed to allege a claim of ineffective assistance of counsel, the petitioner failed to establish that he was prejudiced. (DE # 26, p. 27)

The petitioner made the following arguments in his traverse. First, because the Vienna Convention has been in effect since 1969, consideration of this claim cannot be barred from consideration by *Teague*. (DE # 34, p. 10) Second, the claim is not procedurally defaulted for purposes of federal *habeas corpus* review, and it was appropriate to have raised this claim for the first time on post-conviction. (DE # 34, p. 11) Finally, the petitioner challenged the respondent's argument that the state court's determination on this issue was neither contrary to, nor an unreasonable application of, clearly established federal law. (DE # 34, p. 11)

The respondent raises the following arguments in support of his motion for summary

112

judgment on this claim: 1) the Vienna Convention creates no privately enforceable rights; 2) the claim is procedurally defaulted for purposes of federal *habeas corpus* review; 3) the state court's determination on this issue is neither contrary to nor an unreasonable application of clearly established federal law; 4) granting relief to the petitioner on this issue would announce a new rule of constitutional criminal law/procedure, which is prohibited by *Teague* and *Saffle*, *supra* at pp. 41-42; and 5), the petitioner has not shown that he would have obtained material assistance from the German government had Consular officials been notified. (DE # 122, II.B, pp. 6-8)

In his response to the respondent's motion for summary judgment, the petitioner counters that: 1) Congress expressly empowered the federal district courts to grant *habeas corpus* relief when a treaty has been violated; 2) the Supremacy Clause of Article VI of the U.S. Constitution makes such treaties the law in Tennessee; 3) case law supports the petitioner's claim; 4) prejudice need not be shown; 5) *LaGrand* (F.R.G. v. U.S.), 2001 I.C.J. (June 27) is binding on this court; and 6) neither the United States nor the individual states may apply procedural rules to deprive a foreign national of *habeas corpus* relief. (DE # 146, ¶ V.F, pp. 62-75)

### 1. The State's Alleged Failure to Inform the Petitioner of His Rights Under Article 36 of the Vienna Convention, and to Notify German Consular Officials

Extensive testimony was adduced on this issue at the post-conviction evidentiary hearing. (Add. 8, Vol. 6, pp. 49-127; Vol. 7, pp. 19-103; Add. 9, Vol. 8-23, 57-59) The post-conviction court addressed these issues in detail in its Order denying post-conviction relief. (Add. 7, Vol. 3, pp. 000332-35) The post-conviction court made two specific findings: first, the "petitioner waived this issue by failing to raise it during his first trial, his re-sentencing hearing, or his direct appeals from those proceedings" (Add. 7, Vol. 3, p. 000335); and second, the issues pertaining to the Vienna Convention were "not constitutional in nature" (Add. 7, Vol. 3, p. 000335).

113

The Court of Criminal Appeals conducted a detailed analysis of this claim on appeal from the judgment of the post-conviction court. (Add. 10, Vol. 4, pp. 46-50) In its review, the Court of Criminal Appeals also determined that the petitioner had waived this claim. (Add. 10, Vol. 4, p. 49) In addressing the issues on the merits anyway, the Court of Criminal Appeals made three specific additional findings: 1), the Vienna Convention does not create privately enforceable rights; 2) the petitioner has – at best – dual nationality and, as such, it was permissible to treat him as a U.S. citizen, without any requirement for consular notification; and 3), the petitioner did not show how failure to notify the German Consul of his arrest prejudiced his trial. (Add. 10, Vol. 4, pp. 46-50)

The record shows that these claims were not raised until post-conviction. Because these claims were not raised on direct appeal when they should have been, they are procedurally defaulted for purposes of federal *habeas corpus* review for the reasons previously explained, *supra* at pp. 57-62. *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 360 (6th Cir. 2006); *Beard v. Greene*, 523 U.S. 371, 375-77 (1998)(both cases establishing that Article 36 does not trump a state's procedural default rule).

Even if it were deemed that these claims were not waived, the petitioner still is not entitled to *habeas corpus* relief. First, "the 'only remedies for failures of consular notification under the Vienna Convention are diplomatic, political, or exist between states under international law.'" *United States v. Emuegbunam*, 268 F.3d 377, 392 (6th Cir. 2001)(quoting *United Sates v. Li*, 206 F.3d 56, 63 (1st Cir. 2000)). "[T]he Vienna Convention does not create a right for a detained foreign national to consult with the diplomatic representatives of his nation that the federal courts can enforce." *Emuegbunam*, 268 F.3d at 394 (citing *Federal Republic of Germany v. United States*, 526 U.S. 11 (1999); *Breard*, 523 U.S. at 377.

Second, were the court to determine that Article 36 does provide an individual right, for the reasons explained *supra* at pp. 41-42, such a ruling would amount to a new rule of law. The United

114

States Supreme Court defined a "new rule of law" as a "rule that 'breaks new ground,' 'imposes a new obligation on the States or the Federal Government,' or was not dictated by precedent existing at the time the defendant's conviction became final." *Saffle*, 494 U.S. at 484 (quoting *Teague*, 489 U.S. at 301)(italics in the original). Granting *habeas corpus* relief on this ground clearly would impose obligations on state and federal governments that do not exist presently. Consequently, this claim is barred by *Saffle* and *Teague*.

The petitioner has not shown that the decisions of the Tennessee courts on this claim were contrary to, or involved an unreasonable application of, clearly established federal law. Neither has he shown that those decisions amounted to unreasonable determinations of the facts in light of the evidence. This claim is without merit.

### Certificate of Appealability

Reasonable jurists would not debate the court's procedural ruling. The petitioner also has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### 2. Alleged Ineffective Assistance of Counsel in Representing a Foreign National

The post-conviction court addressed this aspect of this claim at length in its Order denying the petitioner's petition for post-conviction relief. (Add. 7, Vol. 3, pp. 000335-37) The post-conviction court relied on the following in concluding that this claim was without merit: 1) "many competent attorneys and/or judges are currently unaware of the [Vienna Convention] and the general nature of its provisions"; 2) the petitioner failed to offer proof that defense counsel should have been aware of the Convention at the time of the 1988 trial and 1995 resentencing hearing; 3) there was nothing discernable about the petitioner that would have alerted defense counsel to question his citizenship; 4) had defense counsel investigated the issue and determined that the petitioner was

115

covered by the Vienna Convention, because the petitioner was – at best – a dual national, he would not have been covered by the Vienna Convention under the State Department's interpretation; 5) the petitioner presented no proof that the result would have been different in the early 1980s or 1990s, before the State Department published its interpretation of the provision; 6) defense counsel would not have been ineffective for relying on the State Department's interpretation of Article 36 rather than that of the government of Germany; and 7) testimony adduced at the post-conviction evidentiary hearing established that Germany was not a mandatory-notification nation.

In reviewing the issue on appeal from the judgment of the post-conviction court, the Court of Criminal Appeals relied on the following in determining that "counsel's failure . . . to ferret out the petitioner's German nationality – which was not officially recognized by Germany until 2000 – was objectively unreasonable": 1) the petitioner had "not demonstrated that 'prevailing professional norms' in 1988 or 1995 included an intimate familiarity with the Vienna Convention on Consular Relations"; and 2) "the petitioner's German nationality was by no means obvious and was unknown at that time." (Add. 10, Vol. 4, p. 50) The Court of Criminal Appeals concluded that, owing to the speculative nature of the assistance that he would have received, had the German Consul been notified, he "cannot surmount the prejudice hurdle . . . ." (Add. 10, Vol. 4, p. 50)

A review of the evidence adduced during the post-conviction proceedings supports the findings of fact and conclusions of law of the state courts. (Add. 8, Vol. 6, pp. 49-127; Vol. 7, pp. 19-103; Add. 9, Vol. 8-23, 57-59) Moreover, as previously discussed, *supra* at pp. 71-72, a claim of ineffective assistance of council will not lie where, as here, there has been no violation of a right.

The petitioner has not shown that the decisions of the Tennessee courts on this claim were contrary to, or that they involved an unreasonable application of, clearly established federal law. Neither has he shown that those decisions amounted to unreasonable determinations of the facts in light of the evidence. This claim is without merit.

116

The petitioner has not made a substantial showing of a constitutional right. Accordingly, a COA will not issue on this claim.

### G. Whether the HAC Aggravator Weighed by the Jury Was Unconstitutional (Seventh Claim)

The petitioner asserts that the HAC aggravator applied in his case was unconstitutional, because: 1) it was vague on the face in violation of his rights under the Sixth, Eighth and Fourteenth Amendments; 2) the trial court instructed the jury that it could "impose the death sentence if it found that the offense was 'heinous, atrocious or cruel in that it involved torture or serious abuse beyond that necessary to produce death,'" the HAC aggravator in effect at the time the petitioner was re-sentenced and not at the time of the murders; and 3) the trial court provided additional instructions defining the terms "heinous," "atrocious," "cruel," and "torture." (DE # 16, ¶¶ 37-42, pp. 15-16)

The respondent argued in his response to the petition that this claim was raised on direct appeal from resentencing and that, although it determined that the trial court erred in instructing the jury with the version of the HAC statute in effect at the time of resentencing, rather than the version in effect at the time when the offenses were committed, the Tennessee Supreme Court determined that the trial court's error was harmless beyond a reasonable doubt. (DE # 26, pp. 28-29) The respondent also noted that the Tennessee Supreme Court determined that the additional instructions about which the petitioner complains were proper. (DE # 26, pp. 28-30) Citing *Maynard v. Cartwright*, 486 U.S. 356, 364-65 (1988) and *Walton v. Arizona*, 497 U.S. 639, 654 (1990), *overruled in part on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002), the respondent also maintained that the decision of the Tennessee Supreme Court was neither contrary to nor an unreasonable application of clearly established federal law, and that it was based on a reasonable determination of the facts in light of the evidence presented at the resentencing hearing. (DE # 26,

pp. 30-31)

In his traverse, the petitioner countered that the state court's determination of this issue was "contrary to and unreasonable pursuant to *Houston v. Dutton*, 50 F.3d 381 (6th Cir. 1995) and *Rickman v. Dutton*, 854 F.Supp. 1305 (M.D. Tenn. 1994)."[27]  (DE # 34, p. 11)  Arguing that his case presents a "unique challenge to the HAC factor," the petitioner claimed that he is entitled to federal *habeas corpus* relief because the state court: 1) "relied heavily upon the HAC aggravator to conclude that Petitioner's case did not present constitutional problems"; 2) "looked to felonies to support the HAC aggravator when Petitioner challenged the specific facts regarding the . . . torture"; 3) "addressed the existence of the HAC aggravator in terms of Petitioner's conduct and the actions of his co-defendants . . . ."; and 4) "allowed Petitioner to receive a sentence of death premised upon an aggravating factor that was not applicable to him."  (DE # 34, pp. 11-12)

In his motion for summary judgment, the respondent argues again that the decision of the Tennessee Supreme Court on this issue was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the facts presented.  (DE # 122, pp. 25-29)  The petitioner disagrees, also arguing again that this issue presents a unique challenge to the HAC aggravator.  (DE # 146, ¶ V.G, pp. 75-81)

The HAC instruction provided to the jury at the 1995 resentencing hearing was as follows:

> The State has only alleged one aggravating circumstance.  Our statute
> lists several but the State only relies on one, and for you to impose

---

[27]  In *Houston*, the Sixth Circuit held that the HAC instruction, "[T]he murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind," the instruction in effect at the time of the Smith murders, was constitutionally deficient because, in *Richmond v. Lewis*, 506 U.S. 40 (1992), the Supreme Court found that a similar Arizona instruction was constitutionally infirm.  *Houston*, 50 F.3d at 387.  *Houston* is inapposite to this case for the following reasons.  First, the trial court in *Houston* did not narrow the instruction by defining the relevant terms, as the resentencing court did in the petitioner's case.  Second, the decision in *Houston* was prior to *Bell v. Cone*, 543 U.S. 447 (2005) – discussed *infra* at pp. 122-23 – in which the Supreme Court determined that the specific instruction at issue was constitutionally sufficient where "narrowing" occurred.  *Rickman* was decided well before the Supreme Court determined in *Walton v. Arizona*, discussed *infra* at pp. 122-23, that the state appellate courts may determine whether the evidence warranted the application of a particular aggravating circumstance.

118

the death penalty you must find that the State has proven that aggravating circumstance beyond a reasonable doubt. The circumstance on which they rely is:

(A)     The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.

You are instructed that the word:

'Heinous means grossly wicked or reprehensible, abominable; odious; or vile.

'Atrocious' means extremely evil or cruel; monstrous; exceptionally bad; abominable.

'Cruel' means disposed to inflict pain or suffering; causing suffering; painful.

'Torture' means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious.

Members of the jury, the Court has read to you the aggravating circumstance which the law requires you to consider if you find beyond a reasonable doubt that the evidence was established. You shall not take account of any other facts or circumstances as the basis for deciding whether the death penalty or imprisonment for life would be appropriate punishment in this case.

(Add. 5, Vol. 4, pp. 472-73)

The petitioner raised this issue in the Court of Criminal Appeals on appeal from the 1995 resentencing hearing, arguing that the HAC aggravator was unconstitutionally vague and that the definitions of the terms "heinous," "atrocious," and "cruel" provided to the jury were vague as well. (Add. 11, Attach. Brief of Appellant, pp. 13-14) Citing *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996), the Court of Criminal Appeals noted that the Tennessee Supreme Court had previously upheld the validity of the HAC aggravator. (Add. 6, Vol. 1, Attach. Opinion, p. 23)

The petitioner raised this issue in his initial brief on appeal in the Tennessee Supreme Court from the 1995 resentencing hearing, arguing again that the HAC instruction was unconstitutionally

119

vague, as were the resentencing court's efforts to define "heinous," "atrocious," and "cruel." (Add. 6, Vol. 1, pp. 15-17) The petitioner raised the issue again in his supplemental brief in which he alleged for the first time that the trial court at the 1995 resentencing hearing charged the jury with the 1989 version of the statute, Tenn. Code Ann. 39-13-204(i)(5)(1991), rather than the statute as it existed at the time of the crimes, Tenn. Code Ann. 39-2-203(i)(5)(1982).[28] (Add. 6, Vol. 4, pp. 10-13)

On appeal from the 1995 resentencing hearing, the Tennessee Supreme Court determined that the resentencing court charged the wrong HAC aggravator, *i.e.*, the later 1989 version rather than the version in effect at the time of the crimes. (Add. 11, Attach. Opinion, pp. 12-13) The Tennessee Supreme Court then went on to consider whether the death sentence would have been warranted had the proper HAC aggravator been charged, concluding as follows:

> [W]e find that there is sufficient evidence in this record to establish the torture factor under Tenn. Code Ann. § 39-2-203 (i)(5) or Tenn. Code Ann. § 39-13-204(i)(5), independent of the depravity or serious physical abuse prongs of the aggravating circumstances. The victim, Rosemary Smith, was placed in a closet, first enduring the mental anguish of her husband's murder in the next room. She then was raped twice, ridiculed, suffered through a bungled attempt at strangulation and strangled to death with a tourniquet device placed around her neck that caused massive damage to her throat and larynx. There was evidence that the victim struggled to save herself while still alive and conscious by attempting to release the pressure which was applied to her neck. After the blood supply was finally cut off at the end of the struggle, she may have lost consciousness in thirty seconds but remained alive for three to six minutes. Thus we conclude that the proof of torture establishes beyond a reasonable doubt that the jury would have sentenced the defendant to death, even had no weight been given to the invalid criteria of 'serious physical abuse.'

> The evidence outlined above [also] is sufficient to conclude in this

---

[28] The HAC aggravator at the time of the crime was: "The murder was especially heinous, atrocious, or cruel in that it involved torture or <u>depravity of the mind</u>," the underlined portion having been replaced with "serious abuse beyond that necessary to produce death."

case that had the jury been properly instructed regarding depravity of mind, it would have found the evidence sufficient to establish this factor.

(Add. 11, Attach. Opinion, p. 13)  The Tennessee Supreme Court ultimately determined that the trial court's error in charging the wrong HAC aggravator was harmless beyond a reasonable doubt. (Add. 11, Attach. Opinion, p. 13)

In the first part of the claim, the petitioner asserts that the HAC aggravator weighed by the jury, *i.e.*, that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," was unconstitutionally vague.[29]  The law requires that a HAC aggravator adequately inform the jury what they are required to find to impose the death penalty.  *See Maynard*, 486 U.S. at 361-62.

The United States Supreme Court has previously opined that "a heinous, atrocious or cruel aggravator would be constitutionally acceptable if construed to require torture or serious physical abuse."  *Id.* at 364-65.  Inasmuch as the HAC aggravator weighed by the jury during the 1995 resentencing hearing comports with what the United States Supreme Court has said "would be constitutionally acceptable," the court finds that the HAC aggravator weighed by the jury in 1995 was not unconstitutionally vague.  Even if it were later determined that the HAC aggravator provided to the jury was unconstitutionally vague, the narrowing construction conducted by the Tennessee Supreme Court, discussed *infra*, was sufficient to cure any defect.  *See Bell*, 543 U.S. at 453-461.

The second part of this claim is that the resentencing court charged the jury with the incorrect version of the HAC aggravator.  The United States Supreme Court has held that "[a] state appellate court may itself determine whether the evidence supports the existence of the aggravating

---

[29]  The Sixth Circuit has not yet passed on the constitutionality of the specific instruction charged to the jury at the 1995 resentencing hearing.  *See Abdur'Rahman v. Bell*, 226 F.3d 696, 700 (6th Cir. 2000).

121

circumstances . . . or the court may eliminate consideration of the factor altogether and determine whether any remaining aggravating circumstances are sufficient to warrant the death penalty." *Walton*, 497 U.S. at 654. Under *Walton*, it was constitutionally permissible for the Tennessee Supreme Court to reconcile the proper version of the HAC aggravator with the HAC aggravator charged. Moreover, the narrowing construction that the Tennessee Supreme Court applied in reviewing this issue was consistent with the central tenet of *Proffitt v. Florida*, 428 U.S. 242 (1976), that the inquiry be "directed at 'the conscienceless or pitiless crime which is unnecessarily torturous to the victim,'" *Id*. at p. 255, a tenet adopted years ago by the Tennessee Supreme Court in *State v. Dicks*, 615 S.W.2d 126, 131-32 (Tenn. 1981).

The third part of this claim pertains to the additional instructions provided by the trial court to clarify the HAC aggravator. Although the petitioner does not say so specifically, it appears that his claim is that the additional instructions did not cure the alleged vagueness of the HAC aggravator weighed by the jury or, in the alternative, that the added instructions confused the jury.

Assuming for the sake of argument that the HAC instruction at issue was unconstitutionally vague, "a limiting instruction can be used to give content to a statutory factor that 'is itself too vague to provide any guidance to the sentencer' only if the limiting instruction's own 'definitions are constitutionally sufficient, that is, only if the limiting instruction itself 'provide[s] some guidance to the sentencer.'" *Shell v. Mississippi*, 498 U.S. 1, 3 (1990)(quoting *Walton*, 497 U.S. at 654)). In *Bell v. Cone, supra* at p. 121 n. 29, the United States Supreme Court addressed Tennessee's HAC aggravator, reversing the Sixth Circuit's ruling that the Tennessee Supreme Court failed to cure any constitutional defect when it considered the issue on appeal. In that case, the state trial court defined the relevant terms in the HAC aggravator as follows: "'Heinous' means extremely wicked or shockingly evil . . . 'Atrocious' means outrageously wicked and vile . . . 'Cruel' means designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the suffering of others, pitiless.'"

*Bell*, 543 U.S. 452.  Although the trial court did not define the term "torture," in its opinion, the United States Supreme Court characterized the term "torture" as follows: "[T]heir deaths were not instantaneous, that the respondent's actions toward them were 'unspeakably brutal,' and that they endured "terror, fright before being killed," *Cone*, 543 U.S. at 456.  This squares with the characterization of "torture"at the 1995 resentencing hearing that "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious."

Although the Supreme Court concluded in *Cone* that the Sixth Circuit "was correct to conclude that the State's statutory aggravating circumstance was facially vague," the Court also concluded that the Sixth Circuit "erred in presuming that the State Supreme Court failed to cure this vagueness by applying a narrowing construction on direct appeal." *Id.* at 459.  The explanation of the terms at issue here were at least as instructive as the explanation of those same terms in *Cone*.

Finally, as previously noted, the petitioner argued in his traverse that the State "relied heavily upon the HAC aggravator to conclude that Petitioner's case did not present constitutional problems," "looked to felonies to support the HAC aggravator when Petitioner challenged the specific facts regarding the . . . torture," "addressed the existence of HAC in terms of Petitioner's conduct and the actions of his co-defendants . . . ," and "allowed Petitioner to receive a sentence of death premised upon an aggravating factor that was not applicable to him."  (DE # 34, p. 12)  To the extent that these additional arguments constitute new factual predicates, they were not raised in state court prior to being raised in the instant action.  Consequently, for reasons previously explained, *supra* at pp. 57-62, they are procedurally defaulted for purposes of federal *habeas corpus* review.

The petitioner has not shown that the Tennessee Supreme Court's determination of these claims was contrary to, or involved an unreasonable application of, clearly established federal law. Nor has he shown that those decisions amounted to an unreasonable determination of the facts in light of the evidence.  This claim is without merit.

**Certificate of Appealability**

The petitioner has not made a substantial showing of the denial of a constitutional right. Reasonable jurists also would not debate the court's procedural ruling. Accordingly, a COA will not issue on this claim.

**H. Whether Application of the HAC
Aggravator was Proper
(Eighth Claim)**

The petitioner alleges that: 1) the HAC aggravating circumstance was not presented to the Grand Jury, nor was it returned as part of the indictment in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring*, 536 U.S. at 584; 2) the Tennessee Supreme Court cannot substitute its judgment for the jury's; and 3) the trial court did not instruct the jury on the HAC aggravating circumstance using the version in effect at the time of the crime in violation of *Apprendi* and *Ring*. (DE # 16, ¶¶ 43-45, p. 17)

The respondent argued in his response to the petition that the United States Supreme Court "has never announced a federal constitutional requirement that States charge in an indictment aggravating factors to be relied upon during sentencing in a first-degree murder prosecution," and that to grant the petitioner relief on these grounds would "constitute the use of federal habeas corpus to announce a new rule of constitutional criminal law/procedure . . . ." which is prohibited by *Teague* and *Saffle*, *supra* at 41-42. (DE # 26, p. 31) Citing *Hurtado v. California*, 110 U.S. 516 (1884), the respondent argued further that "the federal right to presentment or indictment by a Grand Jury does not extend to the States through the Fourteenth Amendment. (DE # 26, p. 31) Finally, the respondent argued that the decision of the Tennessee Court of Appeals on this claim was neither contrary to nor an unreasonable application of clearly established federal law, and that the Tennessee Court of Criminal Appeals' decision was based on a reasonable determination of the facts in light of the evidence presented. (DE # 26, p. 31)

124

In his traverse, the petitioner countered that the state courts addressed the merits of this claim and, because they did, they "applied and considered" the authority in *Ring* and *Apprendi*. Therefore, according to the petitioner, the state court's "determination of the reasonableness of that determination [*sic*] subsumes the *Teague* Question." (DE # 34, p. 12) The petitioner argued in the alternative that "the date that the state court considered Petitioner's *Ring* challenge becomes the finality date under the AEDPA" and that otherwise the petitioner's right to "federal review of the reasonableness would be suspended." (DE # 34, p. 13)

In his motion for summary judgment, the respondent argues again that the decision of the state courts on this issue was neither an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented. (DE # 122, p. 29) The petitioner responds again that he is entitled to *habeas corpus* relief because the aggravating circumstance was not pled in the indictment and, as such, the state court's determination of this issue was contrary to clearly established federal law. (DE # 146, ¶ V.I, pp. 81-82)

### 1. Whether the Court is Prohibited by *Teague* from Considering this Claim

The petitioner does not cite any authority, binding or otherwise, to support his argument that the State was required to present to the grand jury the aggravating circumstance used to impose the death penalty and to set forth that aggravating circumstance in the indictment. His conclusory argument that such an inference should be drawn from the "principles" announced in *Apprendi* and *Ring* does not satisfy his burden of persuasion.

The petitioner's argument that the court must consider this claim because the Tennessee Supreme Court addressed it is equally unpersuasive. The district court is not bound by what the Tennessee Supreme Court does. On the other hand, *Teague* establishes quite clearly what the district court may not do – the district court may not permit "habeas corpus [to] be used as a vehicle to

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 125 of 168 PageID #: 2045

create new constitutional rules of criminal procedure . . . ." *Teague*, 489 U.S. at 290-91 (italics in the original). Because the petitioner's claim does not pertain to an existing constitutional right, were the district court to rule in his favor, such a ruling would violate *Teague*.

The petitioner's argument that failure of the district court to address this issue would deny him his right to review also fails. The petitioner does not have the right of unfettered federal *habeas corpus* review. More particularly, the district court may not review state court decisions unless there is an underlying federal constitutional issue. *Estelle*, 502 U.S. at 67-68; s*ee also Lewis*, 497 U.S. at 780; *Smith*, 455 U.S. at 221; *Cooey*, 289 F.3d at 902. Because the petitioner's claim does not involve a violation of a federal constitutional right, he is not entitled to federal review of this issue.

For the reasons previously explained above, and *supra* at pp. 41-42, this part of the petitioner's claim is not cognizable in federal *habeas corpus*.

## Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

## 2. Whether the Tennessee Supreme Court Substituted Its Judgment for the Jury's

The petitioner argues next that the "Tennessee Supreme Court, on appeal, cannot constitutionally substitute its judgment for the jury." The petitioner does not explain what he means by this statement; however, it appears that his legal theory is that the Tennessee Supreme Court – not the jury – found the petitioner guilty of the HAC aggravator when it reconciled the version that was charged to the jury and the version that should have been. For the reasons previously explained, *supra* at pp. 120-22, this claim is without merit, and a COA will not issue.

## 3. Whether the Trial Court Erred in Instructing the Jury With the Incorrect Version of the HAC Aggravator

The petitioner once again argues that the version of HAC aggravating circumstance charged

126

to the jury was improper.  This issue already has been addressed, *supra* at pp. 120-22.  For the reasons previously explained, this part of the petitioner's claim is without merit, and a COA will not issue.

### I.  Whether the Evidence Was Sufficient to Support a Conviction of the HAC Aggravating Circumstance, and Whether the HAC Aggravating Circumstances Outweighed the Factors in Mitigation (Ninth Claim)

The petitioner asserts that there was insufficient evidence to support his conviction of the HAC aggravating circumstance and/or to support the finding that the HAC aggravating circumstance outweighed mitigating evidence presented at resentencing, thereby violating his rights under the Fourteenth Amendment.  (DE # 16, ¶ 46, p. 18)

The respondent argued in his response to the petition that the Tennessee Supreme Court's decision on this issue was neither contrary to, nor involved an unreasonable application of, established federal law.  (DE # 26, pp. 32-33)  In his traverse, the petitioner challenged the respondent's argument that the state court's determination on this issue was neither contrary to, nor an unreasonable application of, clearly established federal law.  (DE # 34, p. 13)  Although he does not say so specifically, in citing *Brown v. Palmer*, 441 F.3d 347 (6th Cir. 2006), the petitioner's argument appeared to be that the HAC aggravating circumstance was based on speculation rather than evidentiary sufficiency.

In his motion for summary judgment, the respondent argues, once again, that the state court's determination of this issue was neither contrary to, nor an unreasonable application of, clearly established federal law.  (DE # 122, pp. 30-31)  In his response, the petitioner argues that the evidence was insufficient to support conviction of the HAC aggravating circumstance and, as such, the state court's determination of this issue was an unreasonable application of clearly established federal law.  (DE # 146, ¶ V.I, pp. 82-84)

127

On federal *habeas corpus* review, evidence is deemed sufficient to support a verdict if, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 324 (1979); *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008); *Zuern v. Tate,* 336 F.3d 478, 482 (6th Cir. 2003). The petitioner is entitled to federal habeas corpus relief only if the state court's denial of relief was "based on an unreasonable application of clearly established federal law regarding the sufficiency of the evidence." *Getsy v. Mitchell*, 495 F.3d 295, 315-16 (6th Cir. 2007)(*en banc*)(*Getsy II*).

The record shows that the Tennessee Supreme Court did not cite the applicable federal standard when addressing this issue on appeal from the 1995 resentencing hearing. (Add. 11, Attach. Opinion, pp. 13-15) However, a review of its opinion shows that the Tennessee Supreme Court conducted a detailed review of the evidence supporting the application of the HAC aggravating circumstance and compared that evidence to the eight (8) statutory and nonstatutory mitigating factors charged to, and considered by, the jury. In comparing the evidence, the Tennessee Supreme Court determined that "the evidence was sufficient to support" the jury's finding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. (Add. 11, Attach. Opinion, p. 15) The Tennessee Supreme Court's determination is supported by the record, as noted repeatedly throughout this memorandum.

The Tennessee Supreme Court's decision on this issue was not unreasonable application of clearly established Federal law. This claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim. Accordingly, a COA will not issue on this claim.

### J. Whether Narrowing Occurred

128

The petitioner asserts that the narrowing process did not occur in his case as required under the Eighth and Fourteenth Amendments.  (DE # 16, ¶ 47, p. 18)  The petitioner also argues that, because the "more culpable and more active co-defendant received a life sentence," his death sentence was "arbitrary, excessive and disproportional."  (DE # 16, ¶¶ 47-49, p. 18)

The respondent responded to the petition that Tennessee's "[c]omparative proportionality review of death sentences . . . is a creature of state statute and not constitutionally required" and, as such, the petitioner is not entitled to *habeas corpus* relief on this ground.  (DE # 26, p. 33)  The respondent also argues that granting relief to the petitioner on this claim would violate *Teague* and *Saffle*.  (DE # 26, p. 34)

In his traverse, the petitioner replied that the respondent mis-characterized this claim.  (DE # 34, p. 13)  The petitioner argued further that "none" of the required constitutional narrowing occurred in his case as required by *Furman v. Georgia*, 408 U.S. 238 (1972).  (DE # 34, p. 13)  Finally, the petitioner argued that, because his claim does not challenge the application of state law, *Teague* does not foreclose the court's ability to consider this claim.  (DE # 34, pp. 13-14)

The petitioner repeats his *Teague-Saffle* argument in his motion for summary judgment.  (DE # 122, pp. 31-32)  Admitting that he has "a difficult task" on this issue, given the Sixth Circuit's decision in *Getsy II*, *supra* at p. 128, the petitioner nevertheless argues in his response that the state court's determination of this issue was an unreasonable application of clearly established federal law.  (DE # 146, ¶ V.J, pp. 84-85)

The court notes first that the Tennessee Supreme Court did, in fact, conduct a proportionality review of the petitioner's death sentence on appeal from the 1995 resentencing hearing.  (Add. No. 11, pp. 20-23)  A review of that opinion shows that the Tennessee Supreme Court considered the fact that Patterson received a life sentence.  The Tennessee Supreme Court ultimately concluded,

129

however, that the petitioner's "death penalty [wa]s neither arbitrary nor disproportionate as applied in this case." (Add. No. 11, p. 23) The petitioner's claim that "none" of the required narrowing occurred is without any basis in fact.

The crux of the second part of the petitioner's argument appears to be that his death sentence is *per se* disproportional because Patterson was not sentenced to death. The petitioner cites *Enmund v. Florida*, 458 U.S. 782 (1982) in support of this part of his argument. (DE # 34, p. 13)

In *Enmund*, the petitioner and a co-defendant were both convicted of first-degree robbery and murder, and both were sentenced to death. In its opinion in *Enmund*, the Supreme Court focused on the appellant's culpability, noting that:

> [T]he only evidence of the degree of [Enmund's] participation [wa]s the jury's likely inference that he was the person in the car by the side of the road near the scene of the crimes. The jury could have concluded that he was there, a few hundred feet away, waiting to help the robbers escape . . . . The evidence, therefore, was sufficient to find that [Enmund] was a principal of the second degree, constructively present aiding and abetting the commission of the crime of robbery.

*Enmund*, 458 U.S. at 786. The Supreme Court reversed and remanded *Enmund*, explaining its decision as follows:

> For purposes of imposing the death penalty, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt. Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts.

*Id*.

The facts in *Enmund* are distinguishable from the facts in the petitioner's case. In *Enmund*, there were two defendants, one whose participation in the crimes clearly warranted the death penalty, and Enmund, whose degree of participation clearly did not. Unlike in *Enmund*, both the

130

petitioner and Patterson were willing participants in the double-murder of Patrick and Rosemary, and both engaged in criminal activity that would have justified the imposition of the death penalty. The facts in *Enmund* are inapposite to the facts in the petitioner's case.

Next, the petitioner cites to *Getsy v. Mitchell*, 456 F.3d 575 (6th Cir. 2006)(*Getsy I*) in support of the second part of his argument.  (DE # 34, p. 13)  In *Getsy I*, the Sixth Circuit held that:

> sentencing Getsy to death, while the arguably more culpable Santine received a life sentence for the very same crime, violates the Eighth Amendment, as construed by the Supreme Court in *Furman* and *Enmund*, and its prohibition of arbitrary and disproportionate death sentences.

*Id*. at 587.  *Getsy I* appears to be on point with the petitioner's *per se* disproportional argument. However, *Getsy I* was vacated on November 22, 2006 by *Getsy II*, *supra* at p. 128.

Citing *Pulley v. Harris*, 465 U.S. 37, 42-43 (1984), the Sixth Circuit in *Getsy II* held that comparative proportionality that "purports to inquire . . . whether a punishment is 'disproportionate to the punishment imposed on others for the same crime" is not required by the Constitution.  *Id*. at 305 (collecting Supreme Court cases).  More particularly, the Sixth Circuit in *Getsy II* held that "[p]roportionality as defined by the Supreme Court evaluates a particular defendant's culpability for his crime in relation to the punishment that he has received," not the punishment received by others in the same or similar crimes  *Id*. at p. 305 (collecting Supreme Court cases).  That is precisely what the Tennessee Supreme Court did in the petitioner's case.

The petitioner has not shown that the Tennessee Supreme Court's determination of these claims was contrary to, or involved an unreasonable application of, clearly established federal law. This claim is without merit.

## Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

## K.  Trial Court Error for Not Instructing the Jury
## on Life-Without-Parole
## (Eleventh Claim)

The petitioner asserts that the trial court failed to instruct the resentencing jury regarding the option of sentencing the petitioner to life imprisonment without the possibility of parole in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments.  (DE # 16, ¶¶ 50-53, p. 19)  The petitioner has withdrawn this claim.  (DE # 146, ¶ V.K, p. 85)

## L.  Trial Court Error in Admitting Improper
## Evidence at Resentencing
## (Twelfth Claim)

The petitioner alleges that the trial court erred in admitting irrelevant and prejudicial evidence at resentencing in violation of his rights under the Eighth and Fourteenth Amendments.  (DE # 16, ¶ 54, p. 19)  Specifically, the petitioner alleges that the trial court: 1)  erred in allowing a video into evidence "depicting post-mortem changes to the bodies"; 2) committed reversible error in admitting evidence of the petitioner's involvement in "a different armed robbery, despite a previous ruling prohibiting the state from introducing such evidence"; and 3) committed reversible error when it allowed a "redacted transcript of the Petitioner's taped statement into evidence . . . when the state could not produce the original tape."  (DE # 16, ¶¶ 55-57, pp. 20-21)

The respondent argued in response to the petition that, because this claim was raised in the state courts only in the context of state law, the federal aspect of this claim is procedurally defaulted for purposes of federal *habeas corpus* review.  (DE # 26, pp. 35-36)

The petitioner replied in his traverse that he "'previously presented this claim as three separate allegations of error to the Tennessee Supreme Court."  (DE # 34, p. 15)  With respect to the part of this claim pertaining to the redacted statement, the petitioner asserted that his "reliance on *Bruton v. United States*" in his brief on appeal "properly presented the federal principles to the court."  (DE # 34, p. 15)  Finally, the petitioner argued in the alternative that, if the court finds the

respondent's procedural default argument persuasive, then his exhausted ineffective assistance of appellate counsel claim established "cause" to excuse the default, and discovery and/or an evidentiary hearing is/are warranted to decide the question of prejudice.  (DE # 34, pp. 15-16)

The respondent repeats his procedural default argument in his motion for summary judgment. (DE # 122, p. 10)  The petitioner argues, in turn, that this claim is not procedurally defaulted for the reasons previously set forth in his traverse.  (DE # 146, ¶ V.L, pp. 86-87)  The petitioner also asks that "additional briefings" be set "to consider any arguments Respondent may have in opposition to the merits."  (DE # 146, ¶ V.L, p. 87)

A review of the record shows that the petitioner did, in fact, raise this claim as three separate issues on appeal from the 1995 resentencing hearing.  (Add. 6, Vol. 1, pp. 23-29)  The record also shows that the petitioner raised these issues on appeal solely in the context of state law.  (Add. 6, Vol. 1, pp. 23-29)

As previously established, *supra* at 58-59, for a claim to be considered exhausted, the habeas petitioner must have fairly presented to the state courts the substance of his federal *habeas corpus* claim.  Because the petitioner did not raise these three issues in the context of federal law in the Tennessee courts, for the reasons previously explained, *supra* at pp. 57-62, these issues are now procedurally defaulted under state law.[30]  The question remains, however, whether this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

The petitioner relies on a claim of ineffective assistance of appellate counsel to establish "cause" to excuse the procedural default.  Before "cause" can be fairly attributable to ineffective assistance of counsel, the ineffective assistance of counsel claim must itself have been exhausted in the state courts.  *Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000); *Lancaster v. Adams*, 324

---

[30]  Despite the petitioner's opinion to the contrary, his passing reference to *Bruton* in his brief on appeal did not, as he argues in his traverse, "properly present[] the federal issues to the court."

133

F.3d 423, 437-38 (6th Cir. 2003); *Clifford v. Chandler*, 333 F.3d 724, 729 (6th Cir. 2003), *overruled in part on other grounds by Wiggins*, 539 U.S. at 510; *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir. 2001), *cert. denied*, 534 U.S. 977 (2001) and 534 U.S. 1012 (2002).

A review of the record reveals that the petitioner did not raise any of the three elements that comprise this claim in the context of ineffective assistance of appellate counsel. As noted *infra* at pp. 159-60, 163-64, both the post-conviction court and the Court of Criminal Appeals deemed the petitioner's ineffective assistance of appellate counsel claims to have been waived. Thus, for the reasons previously explained, *supra* at pp. 57-62, the ineffective appellate counsel claim is itself procedurally defaulted for the purposes of federal *habeas corpus* review. Because the ineffective assistance of appellate counsel claim on which the petitioner relies is procedurally defaulted, it cannot be used to establish "cause" to excuse procedural default of the underlying claim. Consequently, the underlying claim is procedurally defaulted for purposes of federal *habeas corpus* review.

### Certificate of Appealability

Reasonable jurists would not debate the court's procedural ruling. Accordingly, a COA will not issue on this claim.

### M. The Trial Court Erred in Not Suppressing the Petitioner's Statements to Law Enforcement Officials (Thirteenth Claim)

The petitioner asserts that the trial court erred in not suppressing his statements to law enforcement officials in violation of his rights under the Fourth, Fifth, Sixth, and Eighth Amendments. (DE # 16, ¶ 58, p. 21) In particular, the petitioner alleges that law enforcement officials continued "to have contact" with the petitioner, even though he was represented by counsel,

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 134 of 168 PageID #: 2054

and even though counsel had instructed him not to speak with law enforcement officials.[31] (DE # 16, ¶ 59, p. 21) The petitioner also alleges that he rescinded his waiver of his Fifth Amendment rights by turning off the tape recorder that the officers were using during his third statement, unaware that another recorder was being used to record his statements secretly. (DE # 16, ¶ 60, p. 22)

The respondent argued in his amended response to the petition that the: 1) claim fails to satisfy the requirements of Rule 2(c), Rules – Section 2254 Proceedings, because the petitioner did not specify which of the three statements he made to the police is the subject of this claim; 2) the petitioner's claims under the Fourth and Eighth Amendments are procedurally defaulted for purposes of federal *habeas corpus* review; 3) the Tennessee Supreme Court's determination of this issue in the context of the Sixth Amendment was "squarely in line with established federal precedent and was a reasonable determination of the facts in light of the evidence . . . ."; and 4) although "not specifically raised . . . in state courts," the Tennessee Supreme Court's determination of this issue under the Fifth Amendment was neither contrary to nor an unreasonable application of clearly established federal law. (DE # 29, pp. 1-2)

In his traverse, the petitioner replied that, even though the Tennessee Supreme Court "did find error to merit the granting of a resentencing hearing . . . the court also denied Petitioner a new trial." (DE # 34, p. 16) Because the Tennessee Supreme Court declined to grant him a new trial, the petitioner maintained that this "allegation of constitutional error as it relates to the culpability phase is properly before this Court." (DE # 34, p. 16) Based on this last statement, the court concludes that this claim pertains to the statements at issue solely in the context of the guilt-

---

[31] In his initial petition, the petitioner alleged that law enforcement officials used their "friendship" with him, *i.e.*, the petitioner allegedly had been "an informer and undercover man" for about a year prior to the murders XXXXX," to obtain a statement against him. (DE # 12, ¶ 59.a), pp. 20-21) However, the petitioner does not repeat this allegation in his amended petition. Consequently, the court concludes that the petitioner no longer is basing his claim on this factual predicate.

135

innocence phase of the trial in 1988.

The parties filed cross-motions for summary judgment on this issue. (DE # 122, pp. 32-36; DE # 123, ¶ F, pp. 24-27) The gist of petitioner's argument in his motion is that, "[i]f the unconstitutional statement was prejudicial at the sentencing trial, then it is just as likely that it was prejudicial at the guilt/innocence trial." (DE # 123, ¶ F, p. 27) The petitioner contends that "[t]here can be no statement more prejudicial at a guilty/innocence trial . . . than 'it was my fault.'" (DE # 123, ¶ F, p. 27) The respondent counters in his response that "[t]he Court's determination that these statements were harmless as to the guilty verdict was proper and reasonable." (DE # 145, pp. 19-21)

In his motion for summary judgment, the respondent argues that the petitioner has not established that the state court's determination on this issue was contrary to or involved an unreasonable application of clearly established federal law. (DE # 122, pp. 32-36) In his response, the petitioner incorporates by reference the argument that he set forth in his own motion for summary judgment. (DE # 146, ¶ V.M, p. 87)

As previously discussed, *supra* at pp. 6-10, the petitioner gave three statements to law enforcement officials. Inasmuch as the petitioner denied any knowledge of the Smith murders in his first statement, the court concludes that this claim pertains to the petitioner's unrecorded second statement to Officer Griffy on January 12, 1987, and his recorded third statement to Officers Griffy and Denton on January 13, 1987.

A review of the petitioner's brief on direct appeal shows that he did not raise this claim on direct appeal from the 1988 trial in the context of the Fourth and Eighth Amendments, although he did raise this claim in the context of the Fifth and Sixth Amendments. (Add. 3, Vol. 1, pp. 16-22, 27) For the reasons previously explained, *supra* at pp. 57-62, the Fourth and Eighth Amendment components of this claim are procedurally defaulted for purposes of federal *habeas corpus* review.

The Tennessee Supreme Court relied on *Miranda v. Arizona*, 384 U.S. 436 (1966) in

136

considering the petitioner's Fifth Amendment claim. (Add. 3, Vol. 3, p. 7) *Miranda* controls where it is alleged that a criminal defendant's statement violated his right against self-incrimination.

Although the Tennessee Supreme Court made no determination regarding the second statement,[32] the Court did conclude regarding the third statement that the petitioner "initiated the interview, was given full *Miranda* warnings and freely, knowingly and voluntarily executed a written waiver of his right to remain silent and his right to counsel." (Add. 3, Vol. 3, p. 7) The Tennessee Supreme Court's determination that there was no *Miranda* violation in initiating the third statement is fully supported by the record. (Add. 2, Vol. 26, p. 2)

Notwithstanding the foregoing, the Tennessee Supreme Court nevertheless concluded that the "problem with the admissibility of the ***entire*** third statement arises with the defendant's efforts to rescind his waiver of the Fifth Amendment Right to remain silent." (Add. 3, Vol. 3, p. 7)(emphasis added) Although noting that "[d]efense counsel did not focus on that aspect of the statement in the trial court or in this Court," the Tennessee Supreme Court nevertheless felt "compelled to find that the admission of the contents of the [third] statement, as and after defendant's first attempt to turn off the tape recorder was plain error, in violation of the teachings of *Miranda*." (Add. 3, Vol. 3, p. 8)

Citing *Chapman v. California, supra* at p. 39, the Tennessee Supreme Court correctly determined that the standard in such instances is whether the alleged trial court error was "harmless beyond a reasonable doubt." Applying *Chapman*, Tennessee Supreme Court wrote the following:

> We can say without hesitation that the contents of the statement that
> should have been excluded from the jury's consideration, although
> constitutional in scope, did not contribute to the verdict that

---

[32] The Tennessee Supreme Court discussed "[t]he so-called second oral statement" but did not make a determination regarding whether that statement did, or did not, violate either the Fifth or Sixth Amendment. (Add. 3, Vol. 3, p. 5) Officer Griffy testified at trial, however, that he advised the petitioner of his rights when he first arrived at the detective division following his arrest, and again while being fingerprinted. (Add. 2, Vol. 12, pp. 40, 43) According to Officer Griffy's testimony, both warnings were given before the second statement.

> defendant was guilty of murder in the first degree, and was harmless
> beyond a reasonable doubt on that issue. However, the determination
> of its effect on the verdict of death as punishment presents a more
> difficult issue.

(Add. 3, Vol. 3, p. 8)

Because neither fault nor *mens rea* are elements of the offense of felony murder, the court finds that the Tennessee Supreme Court's "harmless error" determination regarding the third statement at the guilt-innocence phase of the 1988 trial was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Consequently, the petitioner is not entitled to *habeas corpus* relief under the Fifth Amendment as to his third statement.

As noted *supra* at p. 137 & n. 32, the Tennessee Supreme Court did not determine whether the second statement violated *Miranda*. This court concludes, however, that the second statement – introduced through the testimony of Officer Griffy – was merely duplicative of, and clearly overshadowed by, the petitioner's much more damaging third statement. Thus, even if the second statement was admitted into evidence in violation of *Miranda*, it too would have been harmless under the circumstances. Accordingly, the petitioner is not entitled to *habeas corpus* relief under the Fifth Amendment as to his second statement.

Next, the petitioner alleges that failure to suppress the statements at issue violated his right to counsel under the Sixth Amendment. The Tennessee Supreme Court wrote the following with respect to the petitioner's Sixth Amendment claim:

> We find that defendant initiated the interview, was given full
> *Miranda* warnings and freely, knowingly and voluntarily executed a
> written waiver of his right to remain silent and his right to counsel.
> The U.S. Supreme Court has clearly sanctioned the admissibility as
> a statement given after the appointment of counsel and even after
> defendant has 'expressed his desire to deal with police only through
> counsel,' where defendant initiates further communication, electing
> 'to face the state's officers and go it alone,' and knowingly and
> intelligently waives his Sixth Amendment right to counsel.

138

(Add. 3, Vol. 3, p. 7)  Although it does not say so specifically, it appears from the foregoing that the Tennessee Supreme Court's position is that the petitioner's rights under the Sixth Amendment were not violated, at least with respect to the third statement.  The Tennessee Supreme Court did not make a determination regarding the petitioner's Sixth Amendment claim and his second statement.

In analyzing this issue, the court assumes without deciding that the petitioner's Sixth Amendment right to counsel was violated when he gave both his second and third statements.  However, harmless error analysis also applies in those instances where statements are obtained and introduced into evidence under circumstances that violate the Sixth Amendment right to counsel.  *See Milton v. Wainwright*, 407 U.S. 371 (1972).

As repeatedly established throughout this memorandum, the other proof of the petitioner's guilt introduced at the 1988 trial was overwhelming.  Consequently, even if the statements at issue should have been suppressed, the result would have been the same and, as such, the error in admitting those statements into evidence was harmless beyond a reasonable doubt.  For these reasons, the petitioner's Sixth Amendment claim also is without merit.

Finally, the court turns to the petitioner's argument in his motion for summary judgment. The petitioner was convicted at the 1988 trial of two counts of felony murder.  Felony murder was defined at the time the Smiths were murdered as "murder . . . committed in the perpetration of, or attempt to perpetrate . . . rape, robbery, burglary, larceny . . . ."  Tenn. Code Ann. 39-2-202(a) (1987).  As previously noted, *supra* at pp. 65-66, the jury found the petitioner guilty of first-degree burglary and aggravated rape.  As shown above, fault and/or *mens rea* are not elements of the offense of felony murder.  Because the petitioner's admissions in his statements were not required to establish the elements of the offense of felony murder, and because the evidence of the petitioner's guilt at the 1988 trial was overwhelming that the petitioner perpetrated the crimes of rape and first-degree burglary, the petitioner's argument in his motion for summary judgment is

139

without merit.

## Certificate of Appealability

Reasonable jurists would not debate the court's procedural ruling with respect to the petitioner's Fourth and Eighth Amendment claims. The petitioner also has not made a substantial showing of the denial of a constitutional right with respect to his claims under the Fifth and Sixth Amendment. Accordingly, a COA will not issue on this claim.

### N.  The Trial Court Erred in Not Granting a New Sentencing Hearing Because the Jury Foreperson Was Incompetent (Fourteenth Claim)

The petitioner asserts that the trial court erred in not granting a new sentencing hearing when it was learned that the jury foreperson at the 1995 resentencing hearing was unable to read the verdict forms without the trial court's assistance in violation of the petitioner's rights under the Sixth and Fourteenth Amendments.  (DE # 16, ¶¶ 61-63, p. 22)

Noting in his response to the petition that this claim was raised on direct appeal and that the Tennessee Supreme Court had previously dealt with this specific issue in another death penalty case, *i.e.*, *Kirkendoll v. State*, 281 S.W.2d 243 (Tenn. 1955), the respondent argued that the decision of the state court was neither "contrary to nor an unreasonable application of established federal law . . . ."  (DE # 26, pp. 36-37)  The petitioner in his traverse argued that he is challenging the "factual basis upon which the state court relied."  (DE # 34, p. 16)

In his motion for summary judgment, the respondent repeats his argument that the state court's decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law.  (DE # 122, pp. 36-37)  In his response, the petitioner once again disagrees. (DE # 146, ¶ V.N, pp. 87-88)

The record shows that the jury foreperson had difficulty reading the verdict forms and that

140

the trial court had to assist her in reading/pronouncing several words. (Add. 5, Vol. 4, pp. 481-84) The petitioner raised this claim on direct appeal from his 1995 resentencing hearing in the context of the Sixth and Fourteenth Amendments. Citing *Kirkendoll*, 281 S.W.2d at 243, the Court of Criminal Appeals wrote:

> We think that other jurors if necessary could read this to that juror who could not read while in the jury room. . . . It seems to us that as long as this written charge is in the jury room that there are others there who can read that this would satisfy that question.

(Add. 6, Vol. 1, Attach. Opinion, p. 45) The Tennessee Supreme Court did not address this issue on the merits, rather it affirmed the "thorough and well-reasoned decision of the Court of Criminal Appeals" without further discussion. (Add. 11, Attach. Opinion, pp. 23, 30-32)

A plain reading of the transcript reveals that, although the jury foreman had trouble with certain words on the forms, she was able to read. (Add. 5, Vol. 4, pp. 481-84) Moreover, the petitioner has provided no authority, binding or otherwise, that supports the proposition that empaneling a juror who can read, but requires assistance, violates his rights under the Sixth or Fourteenth Amendment.

Although neither the United States Supreme Court nor the Sixth Circuit Court of Appeals appear to have addressed this specific issue, at least one Circuit has. *See United States v. Bahena-Cardenas*, 411 F.3d 1067, 1076 (9th Cir. 2005)(jury foreman who "attempted to read the verdict in open court . . . stumbled and stammered . . . and ultimately a different juror read the verdict" did not constitute a due process violation). Other federal courts have ruled similarly. *See United States v. Silverman*, 449 F.2d 1341, 1343-44 (2nd Cir. 1971)(no constitutional violation where a juror, who could speak and understand English, could not read or write it); *Haymon v. Easterling*, 2008 WL 4695030 * 23 (W.D. Tenn.)(no reason to believe that an illiterate juror did not receive assistance from other jurors or grasped the issues by listening to the discussion).

The petitioner has not shown that the Tennessee Supreme Court's determination of this issue was contrary to, or involved an unreasonable application of, clearly established federal law. Neither has he shown that the Court's determination of this issue was unreasonable in light of the evidence presented. This claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### O. The Trial Court Erred in Denying the Petitioner's Request for Individual, Sequestered *Voir Dire* at Resentencing (Fifteenth Claim)

The petitioner asserts that the trial court erred in denying his request for individual, sequestered *voir dire* when the potential jurors at resentencing were informed of the petitioner's guilt and incarceration. (DE # 16, ¶¶ 64-66, p. 23) According to the petitioner, the trial court's refusal to grant the motion tainted the "entire jury venire." (DE # 16, ¶ 65, p. 18)

The respondent argued in his response to the petition that this claim is procedurally defaulted for purposes of federal *habeas corpus* review because the issue was raised in state court solely in terms of state law. (DE # 26, p. 26) In his traverse, the petitioner replied that he presented this claim to the Tennessee Supreme Court. (DE # 34, p. 16) Arguing that he "may not have best presented the federal basis, [he] relied on a [state case] decidedly addressed on the basis of the Sixth and Fourteenth Amendments." (DE # 34, p. 17)

In his motion for summary judgment, the respondent repeats his earlier argument that this claim is procedurally defaulted for purposes of federal *habeas corpus* review. (DE # 122, II.B, p. 10) Referring to his traverse, the petitioner responds that this claim is not procedurally defaulted

and that the court should "either grant relief . . . or set additional briefing to consider any arguments Respondent may have in opposition to the merits." (DE # 146, ¶ V.O, p. 88)

The record shows that the petitioner raised this issue in the Court of Criminal Appeals on appeal from the 1995 resentencing hearing solely in the context of state law. (Add. 11, Attach. Brief of Appellant, pp. 32-33) The Court of Criminal Appeals addressed this issue solely in the context of state law. (Add. 6, Vol. 1, Attach. Opinion, pp. 46-47)

The record shows that the petitioner raised this issue in his brief in the Tennessee Supreme Court on direct appeal from his 1995 sentencing hearing, once again solely in the context of state law. (Add. 6, Vol. 1, p. 35) Although the Tennessee Supreme Court did not address the issue directly in its opinion, it affirmed the thorough and well-reasoned decision of the Court of Criminal Appeals on the issue without further discussion. (Add. 11, Attach. Opinion, pp. 23, 32-33)

As shown above, the petitioner never raised this issue in state court in the context of an alleged federal constitutional violation, nor did either the Court of Criminal Appeals or the Tennessee Supreme Court address the claim as such. The petitioner's argument that he "relied on a case decidedly addressed on the basis of the Sixth and Fourteenth Amendments" is insufficient to cure the defect. Accordingly, for the reasons previously explained, *supra* at pp. 57-62, this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

## Certificate of Appealability

Reasonable jurists would not debate the court's procedural ruling. Accordingly, a COA will not issue on this claim.

### P. The Trial Court Erred in Admitting the Petitioner's Prior Conviction for Rape and Burglary into Evidence at Resentencing (Sixteenth Claim)

The petitioner asserts that the trial court erred in admitting his prior convictions for rape and

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 143 of 168 PageID #: 2063

burglary into evidence at the 1995 resentencing hearing in violation of his rights under the Sixth and Fourteenth Amendments. (DE # 16, ¶¶ 67-69, p. 23) According to the petitioner, the evidence did not relate to the HAC aggravating circumstance. (DE # 16, ¶ 68, p. 23) The petitioner claims that, even if his prior convictions related to the HAC aggravating circumstance, "the state . . . implicitly us[ed] [the] evidence to avoid application of *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992)." (DE # 16, ¶ 69, p. 23)

The respondent argued in his response to the petition that this claim is procedurally defaulted for purposes of federal *habeas corpus* review because the issue was raised in state court solely in terms of state law. (DE # 26, p. 38) The petitioner argued in his traverse that he presented this claim to the Tennessee Supreme Court, citing to *Middlebrooks* in his brief. (DE # 34, p. 17) Admitting that he "may not have best presented the federal basis of the claim, [he] relied on a case decidedly addressed on the basis of [] federal constitutional principles and the state courts considered those principles in denying the claim." (DE # 34, p. 17) The petitioner maintained, therefore, that he "did not fail to fairly present the federal aspects of this claim." (DE # 34, p. 18)

The respondent argues once again in his motion for summary judgment that this claim is procedurally defaulted. (DE # 122, p. 11) Referring to his traverse, the petitioner asserts in his response that this claim is not procedurally defaulted and that the court should "either grant relief . . . or set additional briefing to consider any arguments Respondent may have in opposition to the merits." (DE # 146, ¶ V.P, pp. 88-89)

The record shows that the petitioner raised this issue in the Court of Criminal Appeals on appeal from the 1995 resentencing hearing solely in the context of state law. (Add. 11, Attach. Brief of Appellant, pp. 32-33) The Court of Criminal Appeals also addressed this issue solely in the context of state law. (Add. 6, Vol. 1, Attach. Opinion, pp. 36-37)

The record shows that the petitioner raised this issue in his brief in the Tennessee Supreme

Court on direct appeal from his 1995 sentencing hearing solely in the context of state law. (Add. 6, Vol. 1, pp. 37-38) Although the Tennessee Supreme Court did not address the issue in its opinion, it once again affirmed the thorough and well-reasoned decision of the Court of Criminal Appeals on the issue, without further discussion. (Add. 11, Attach. Opinion, pp. 23, 33-34)

As shown above, the petitioner never raised this claim in state court in the context of an alleged constitutional violation, nor did either the Court of Criminal Appeals or the Tennessee Supreme Court address the claim as such. Because the petitioner makes no effort to establish cause and prejudice to excuse the default, for the reasons previously explained, *supra* at pp. 57-62, this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

### Certificate of Appealability

Reasonable jurists would not debate the court's procedural ruling. Accordingly, a COA will not issue on this claim.

### Q. The Trial Court Erred in Dismissing a Juror on Religious Grounds (Seventeenth Claim)

The petitioner asserts that the trial court erred in dismissing a juror named William Morris because he could not vote to impose the death penalty on religious grounds. (DE # 16, ¶¶ 70-71, p. 23) The petitioner alleges that: 1) the trial court's actions violated his rights under the Sixth and Fourteenth Amendments; 2) excusing a juror on religious grounds did not satisfy the requirements of *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); and 3) Morris's statement that resulted in his dismissal did not satisfy the requirements of *Wainright*. (DE # 16, ¶¶ 70-71, p. 23)

Noting that this claim was raised on direct appeal, the respondent argued in his response to the petition that the state court's determination on this issue was neither contrary to, nor involved an unreasonable application of, clearly established federal law. (DE # 26, pp. 38-39) In his traverse, the petitioner replied that the "decision of the state court is contrary to and unreasonable pursuant

145

to *White v. Mitchell*, 431 F.3d 517 (6th Cir. 2005) and *Gall v. Scroggy*, 231 F.3d 265, 331-32 (6th Cir. 2000)." (DE # 34, p. 18)

In his motion for summary judgement, the respondent repeats his argument that the decision of the state courts was neither contrary to, nor involved an unreasonable application of, clearly established federal law. (DE # 122, pp. 37-39) The petitioner repeats the argument in his traverse in his response to the respondent's motion for summary judgment. (DE # 146, ¶ V.Q, pp. 89-93)

The record shows that Morris was "struck" by a statement made by General Garrett to another juror concerning the other juror's feelings about the death penalty. (Add. 5, Vol. 1, p. 56) The following exchange transpired:

> GENERAL GARRETT: Mr. Morris, apparently, I said something that struck a cord with you. would you relate to us –
>
> MR. WILLIAM MORRIS: I don't think really I could live with it.
>
> GENERAL GARRETT: You don't feel like you could live with it?
>
> MR. WILLIAM MORRIS: No, sir.
>
> GENERAL GARRETT: I understand that, and I appreciate your saying that.
>
> MR. WILLIAM MORRIS: I'd like to help all I can –
>
> GENERAL GARRETT: I'm sorry.
>
> MR WILLIAM MORRIS: I'd like to help with the trial and all, you know, but I don't know that I could live with it.
>
> GENERAL GARRETT: You're like Mr. Dabbs. You'd like to follow the law, but you want to look closely at what your personal convictions are. Is that correct?
>
> MR. WILLIAM MORRIS: Yes, sir.
>
> GENERAL GARRETT: You want to be fair to the state and fair to the defendant?

MR. WILLIAM MORRIS: Yes.

GENERAL GARRETT: Now let me see if I understand. You just don't feel like you could live with it. Is that correct?

MR. WILLIAM MORRIS: I'm afraid I couldn't.

GENERAL GARRETT: Your Honor, if it's appropriate at this time, the Sate would ask the Court to rule on the juror's responses.

THE COURT: (To Mr. William Morris) That's Mr. Morris, is that right?

MR. WILLIAM MORRIS: Yes, sir.

THE COURT: You're the only person in the world that knows whether or not you can follow the law and abide by it as it's written and I, like everyone else, appreciate what you have to say. I expect it to be most difficult for you and for anybody else. It's just like the others have told you. If you could do this without batting an eye, then there's something wrong with you. . . . If you can't do that, I've got to let you go. If you tell me that you can and that you will consider both punishments as instructed to you by the Court, then I need to leave you there.

MR. WILLIAM MORRIS: Well, if it should come up, I believe it's the Lord's – the Lord's – the Lord makes the decision on death.

THE COURT: Well, I respect that. I don't – and, it's my belief that the Lord doesn't decide when you die. He decides what to do with you after you're gone, and it's going to be yours and twelve other decisions, if ultimately you're selected, as to whether or not this man should receive the death penalty or receive life imprisonment, and if you tell me that you can't do that then I need to let you go.

MR. WILLIAM MORRIS: I don't believe I can.

THE COURT: All right, sir. I'm going to excuse you at this time.

(Add. 5, Vol. 1, pp. 56-59)

A death sentence is improperly imposed if the jury was chosen by excluding potential

members for cause merely because they voiced general objections to the death penalty or expressed

147

conscientious or religious principles against its infliction. *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). However, the state retains a legitimate interest in obtaining jurors who can follow the court's instructions. *Wainwright*, 469 U.S. at 420; *Adams v. Texas*, 448 U.S. 38, 44 (1980). Therefore, a potential juror is properly excused for cause when his or her views would prevent or substantially impair the performance of his or her duties as a juror in accordance with the court's instructions and juror oaths. *Wainwright*, 469 U.S. at 424; *White*, 431 F.3d at 538; *Williams v. Bagley*, 380 F.3d 932, 953 (6th Cir. 2004); *Dennis v. Mitchell*, 354 F.3d 511, 522 (6th Cir. 2003).

Citing *Wainwright*, the Court of Criminal Appeals determined that Mr. Morris' answers suggesting that he could not impose the death penalty would "'prevent or substantially impair the performance of his duties as a juror in accordance with his oath.'" (Add. 6. Vol. 1, Attach. Opinion, p. 50) Again citing *Wainwright*, the Court of Criminal Appeals noted further that the trial judge is to be accorded "great deference" when determining whether a potential juror "'would be unable to faithfully and impartially apply the law,'" and that the trial judge's determination need "not be 'unmistakably clear'" on the point. (Add. 6, Vol. 1, Attach. Opinion, p. 50) The Court of Criminal Appeals concluded that "Mr. Williams' opposition to the death penalty, though possibly based on religion, appropriately rendered him unfit as a juror." (Add. 6, Vol. 1, Attach. Opinion, p. 51) Once again, the Tennessee Supreme Court did not address the issue, but instead affirm the "thorough and well-reasoned" decision of the Court of Criminal Appeals on this issue, without discussing the issue further. (Add. 11, Attach. Opinion, pp. 23, 34-35)

The petitioner has not shown that the determination of the Tennessee courts on this issue was contrary to, or involved an unreasonable application of, clearly established federal law. Neither has he shown that the state courts' determination of this issue was unreasonable in light of the evidence presented. This claim is without merit.

## Certificate of Appealability

148

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

## R.  The Constitutionality of Tennessee's Death Penalty Statute (Eighteenth Claim)

The petitioner asserts that the Tennessee death penalty statute is unconstitutional in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments.  (DE # 16, ¶ 72, p. 20)  The petitioner incorporates by reference the variations on this issue as he argued it in his brief on direct appeal from his 1988 trial (Add. 3, Vol. 1, ¶¶ V-VI, pp. 29-31), his brief on direct appeal from the resentencing hearing (Add. 6, Vol. 1, pp. 39-40; Add. 11, Attach. Brief of Appellant, pp. 35-36), and his brief on appeal from the judgment of the post-conviction court (Add. 10, Vol. 1, pp. 81-102). (DE # 16, ¶ 72, p. 24)

In his response to the petition, the respondent argued that the petitioner failed to establish that the decision of the state courts was contrary to, or involved an unreasonable application of, clearly established federal law.  (DE # 26, pp. 39-40)  In his traverse, the petitioner disagreed, arguing that the decision of the state courts on this issue was contrary to and/or involved an unreasonable application of federal law.  (DE # 34, p. 18)

The respondent repeats his argument on this issue in his motion for summary judgment.  (DE # 122, pp. 39-41)  In his response, the petitioner repeats that argument that he set forth in his traverse.  (DE # 146, ¶ V.R, pp. 93-102)

## 1.  The Claim as Presented on Appeal from the 1988 Trial

The petitioner couched this claim on direct appeal from his 1988 trial as follows: 1) Tennessee's death penalty statute creates a presumption of death, thereby making the death sentence mandatory under certain conditions; and 2) the death penalty constitutes cruel and unusual

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 149 of 168 PageID #: 2069

punishment. (Add. 3, Vol. 1, ¶¶ V-VI, pp. 29-31) The Tennessee Supreme Court determined with little elaboration that neither part of the petitioner's claim had any merit. (Add. 3, Vol. 3, p. 9)

Relying in part on *Godfrey v. Georgia*, 446 U.S. 420 (1980), the petitioner argued in the first part of this claim that Tennessee's death penalty sentencing scheme violated his due process rights. (Add. 3, Vol. 1, ¶ V, pp. 29-30) Although the United States Supreme Court has not addressed the constitutionality of Tennessee's death penalty scheme, the Sixth Circuit addressed the substance of the petitioner's claim in *Workman v. Bell*, 178 F.3d 759, 775-76 (6th Cir. 1998). Workman was sentenced under the same capital sentencing scheme as the petitioner. The Sixth Circuit held in *Workman* that the death penalty sentencing scheme passed constitutional muster. The petitioner has not shown that *Workman* was wrongly decided. Because the petitioner has not shown that the state court's decision on this part of his claim was not contrary to, or an unreasonable application of, clearly established federal law, this part of his claim is without merit.

The petitioner raised the second part of this claim on appeal from his 1988 trial solely in the context of state law. (Add. 3, Vol. 1, ¶ VI, p. 31) The petitioner has not amended his prior argument to account for the necessity for raising his federal *habeas corpus* claims in the context of federal law. For reasons previously explained, *supra* at pp. 57-62, this part of the petitioner's claim is procedurally defaulted for purposes of federal *habeas corpus* review.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right with respect to the first part of this claim. Reasonable jurists would not debate the court's procedural ruling with respect to the second part of this claim. Accordingly, a COA will not issue on this claim.

### 2. The Claim as Presented on Appeal from
### 1995 Resentencing Hearing

In his brief on appeal from the 1995 resentencing hearing, the petitioner presented this claim

as follows:

> The death penalty, as applied in Tennessee, is cruel and unusual
> punishment under both the 8th and 14th Amendments of the United
> States Constitution . . . . Therefore, this Court should vacate the
> death sentence ordered in Count II of the indictment and sentence
> Cauthern to life in prison.[33]

(Add. 6, Attach. Brief of Appellant, pp. 39-40; Add. 11, Attach. Brief of Appellant, pp. 35-36)(internal citations omitted)  The Court of Criminal Appeals, having addressed "similar challenges" previously, determined that the petitioner's argument was without merit.  (Add. 6, Vol. 1, Attach. Opinion, p. 52)  The petitioner raised the same claim – verbatim – in his application for permission to appeal in the Tennessee Supreme Court.  (Add. 6, Vol. 1, pp. 39-40)  The Tennessee Supreme Court did not address this issue, rather it again affirmed the "thorough and well-reasoned" decision of the Court of Criminals on the issue without further discussion.  (Add. 11, Attach. Opinion, pp. 23, 35)

The petitioner's argument on appeal from the 1995 resentencing, as set forth in his briefs, is conclusory.  The petitioner has provided no additional argument in this proceeding.  Therefore, his claim remains conclusory.  For the reasons previously explained, *supra* at p. 46, conclusory claims do not provide a basis for *habeas corpus* relief.  Therefore, this part of the petitioner's claim is without merit.

### Certificate of Appealability

Reasonable jurists would not debate the court's procedural ruling.  Accordingly, a COA will not issue on this claim.

### 3.  The Claim as Presented on Post-Conviction

---

[33] On appeal, the petitioner cited Justice Brennan's dissenting opinion in *Walton*, 497 U.S. at 639.  First, Justice Brennan's dissenting opinion was not the holding of the Court.  Indeed, the Court upheld Arizona's sentencing scheme. Second, apart from citing *Walton*, the petitioner made no effort to explain how *Walton* was applicable to the claim that he had raised.  Consequently, it cannot be determined from his reference to *Walton*  what the petitioner's argument is.

The three specific claims set forth in the amended petition comprise the three claims raised on post-conviction. (Add. 10, Vol. 1, pp. 81-102; Vol. 5, pp. 81-101) Although the Court of Criminal Appeals alluded to the fact that the claims were waived, the Court addressed the claims on the merits anyway. (Add. 10, Vol. 4, p. 51) When a claim is considered on the merits notwithstanding a procedural error, "the state court's determination does not rest on a procedural ground that bars federal review." *Haliym v. Mitchell*, 492 F.3d 680, 691 (6th Cir. 2007).

### a. Violation of the Fundamental Right to Life

The petitioner asserts that his death sentence violates his fundamental right to life in violation of the Sixth, Eighth, and Fourteenth Amendments. (DE # 16, ¶ 72.a, pp. 24-25) The Court of Criminal Appeals determined that the petitioner's claim was "contrary to settled precedent . . . ." (Add. 10, Vol. 4, p. 51)

The petitioner does not cite to any federal statute or decision by the United States Supreme Court to support his claim that a person's "fundamental right to life" renders the death penalty *per se* unconstitutional. He does not do so in his briefs on appeal from the judgment of the post-conviction court, nor does he do so in the pleadings in this action. Consequently, he has failed to show that the state court's determination of this issue was contrary to, or an unreasonable application of, clearly established federal law. This part of the petitioner's claim is without merit.

### b. Violation of Rights Under International Law

The petitioner asserts that his death sentence violates international law under numerous conventions and declarations. (DE # 16, ¶ 72.b, p. 25) The Court of Criminal Appeals does not appear to have addressed this aspect of the petitioner's claim on appeal from the judgment of the post-conviction court. (Add. 10, Vol. 4, p. 51)

The United States Supreme Court has not decided this question. However, in a near-treatise on the subject, the Sixth Circuit has held that the body of customary international law to which the

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 152 of 168 PageID #: 2072

petitioner refers does not render the death penalty unconstitutional.  *Buell v. Mitchell*, 274 F.3d 337, 370-76 (6th Cir. 2001).  This part of the petitioner's claim is without merit.

### c.  Violation of Rights Under *Furman v. Georgia*, 408 U.S. 238 (1972)

The petitioner presents several arguments in support of his claim that the Tennessee death penalty statute is arbitrary and capricious in violation of *Furman*.  (DE # 16, ¶¶ 72.c.i – viii, pp. 25-27)  The Court of Criminal Appeals determined that none of the petitioner's arguments had any merit.  (Add. 10, Vol. 4, p. 51)

The Sixth Circuit has previously addressed the constitutionality of Tennessee's death penalty statute in the context of *Furman*.  *See Workman*, 178 F.3d at 759.  In *Workman*, the Sixth Circuit held that Tennessee's death penalty statute is constitutional.  *Id*. at 778.  The petitioner has not provided any authority to the contrary, binding or otherwise.

The petitioner has not shown that the state court's decision on this issue was contrary to, or an unreasonable application of, clearly established federal law.  This part of the petitioner's claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right.  Accordingly, a COA will not issue on this claim.

### S.  Failure to Instruct the Jury Properly on Weighing Aggravating and Mitigating Circumstances (Nineteenth Claim)

The petitioner alleges that the trial court erred in not properly instructing the jury regarding the appropriate sentencing determination or the result if the jury determined that the aggravating circumstance was proved beyond a reasonable doubt but that aggravating circumstance did not outweigh the mitigating circumstances.  (DE # 16, ¶ 73, p. 27)  The petitioner also asserts that

153

counsel's representation at resentencing was deficient because counsel failed to object to the trial court's "erroneous jury instructions" in violation of his rights under the Sixth and Fourteenth Amendments. (DE # 16, ¶ 74, p. 27) The petitioner withdrew this ground for relief in his response to the respondent's motion for summary judgment. (DE # 146, ¶ V.S, p. 102)

## T. Allegations of Ineffective Assistance
## of Counsel at the 1988 Trial
## (Twentieth Claim)

The petitioner alleges that he received ineffective assistance of counsel at the guilt-innocence phase of his 1988 trial in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments. (DE # 16, ¶¶ 75-80, pp. 28-37) The petitioner incorporates by reference all claims raised in his *pro se* post-conviction petition (Add. 7, Vol. 1, pp. 000001-10), his first amended post-conviction petition (Add. 7, Vol. 1, pp. 000037-93), and his amended first amended post-conviction petition (Add. 7, Vol. 2, pp. 000098-170). (DE # 16, ¶ 75, p. 28)

The respondent argued in his response to the petition that, of the numerous grounds for ineffective assistance the petitioner raises in his amended petition, the petitioner exhausted only a single ground for relief in state courts in the context of the 1988 trial, *i.e.*, that defense counsel "failed to secure the necessary experts and investigative assistance to adequately investigate and prepare to attack the prosecution's proof." (DE # 26, p. 42) The respondent argued that the remaining grounds for relief are procedurally defaulted for purposes of federal *habeas corpus* review. (DE # 26, p. 42) With respect to the single claim that was raised, noting that the state courts determined that the petitioner was not prejudiced by the alleged deficient performance, the respondent concluded that the petitioner had not established that the state court's decision was contrary to, or involved an unreasonable application of, established federal law. (DE # 26, p. 43)

In his traverse, the petitioner disputed the respondent's argument that all but one of the claims in his amended petition are procedurally defaulted for the purposes of federal *habeas corpus*

review. (DE # 34, p. 19) Instead, he argued without elaboration that he "presented th[e]se claims in state court," and that the decision on the claim that the respondent identifies as not procedurally defaulted was contrary to and/or an unreasonable application of clearly federal law. (DE # 34, 19)

In his motion for summary judgment, the respondent argues again that, of the several factual predicates that comprise this claim, only his claim that counsel failed to obtain expert and investigative assistance was fairly presented to the state courts. (DE # 122, pp. 43-45) The petitioner responds again that none of the factual predicates is procedurally defaulted, that the court should set additional briefing that the respondent may have regarding the merits of those factual predicates, and that further proceedings are required. (DE # 146, ¶ V.T, pp. 102-04)

The court turns first to the petitioner's stated intent to incorporate by reference in this action the ineffective assistance claims set forth in the three versions of his post-conviction petition. The claims in those petitions are, of course, governed by the AEDPA's exhaustion requirement. In other words, the court may address only those claims that the petitioner raised on appeal from the judgment of the post-conviction court, *i.e.*, those claims that have been exhausted.[34]

A review of his brief on appeal from the judgment of the post-conviction court shows that the petitioner arguably raised the following ineffective assistance claims in the context of the 1988 trial: 1) defense counsel presented mitigation evidence at the guilt phase with "virtually no supporting live witnesses and no expert testimony" (Add. 10, Vol. 1, ¶ I, p. 1); 2) defense counsel failed to investigate or present the petitioner's family background through the testimony of his step-siblings, friends of the family, and his ex-wife (Add. 10, Vol. 1, ¶¶ I.D-E, pp. 15-18); 3) defense counsel failed to request investigative help or expert assistance to assist in developing and presenting mental health mitigation (Add. 10, Vol. 1, ¶ I.F, pp. 18-23); 4) defense counsel failed to move to

---

[34] The Court of Criminal Appeals noted that "[t]he petitioner ha[d] abandoned on appeal many of his original allegations of counsel's ineffectiveness in connection with his 1988 trial." (Add. 10, Vol. 4, p. 20 n. 3)

sever the petitioner's trial from Patterson's (Add. 10, Vol. 1, ¶ I.(1), p. 45); 5) defense counsel failed to develop the evidence/testimony to portray Patterson as the primary actor (Add. 10, Vol. 1, ¶ I.(1), p. 45); 6) defense counsel failed to investigate allegations involving Patterson in the 1981 murder of Tania Meissner (Add. 10, Vol. 1, ¶ I.(1), 46); 7) defense counsel failed to cross-examine Andrew regarding whether he was sober at the time the petitioner told him that he had murdered the Smiths, and whether he was compensated for his testimony (Add. 10, Vol. 1, ¶ I.(2), pp. 48-50); 8) defense counsel failed to investigate the petitioner's background pertaining to the petiitoner's citizenship (Add. 10, Vol. 1, ¶ J, p. 54)  The Court of Criminal Appeals addressed each of the foregoing claims, plus the additional claim that defense counsel failed to seek any birth, adoption, juvenile, or school records (Add. 10, Vol. 4, pp. 28-29).

Based on its analysis of the record, the court deems that the claims enumerated above were exhausted in the state courts and, for reasons previously explained, *supra* at pp. 57-62, the remainder of the claims pertaining to counsel's representation at the 1988 trial are procedurally defaulted for the purposes of federal *habeas corpus* review.  Claims 1-3 below are those that were set forth in the petitioner's amended petition in this action.  Claims 4-9 are those claims deemed to have been incorporated in this action by reference.

### 1.  Failure to File a Motion to Sever the Trials
### (DE # 16, ¶ 80.d.i, p. 31)

The petitioner raised this claim in his first-amended and amended-first-amended petition for post-conviction relief.  (Add. 7, Vol. 1, p. 000047; Vol. 2, p. 000109)  The petitioner argued that his non-redacted statement to law enforcement, which contained exculpatory information, could not be presented in a joint trial.  (Add. 7, Vol. 1, p. 000047, Vol. 2, p. 000109)  The petitioner stated in his "closing brief" following the post-conviction evidentiary hearing only that defense counsel "never asked for a severance of the defendants . . . ."  (Add. 7, Vol. 3, p. 000283)

156

In its Order denying the petitioner's request for post conviction relief, the post-conviction court determined that defense counsel's decision not to move to sever was "a well-informed strategic decision . . . ." (Add. 7, Vol. 3, pp. 000349-50) The post-conviction court also determined that the petitioner had not established that he was prejudiced. (Add. 7, Vol. 3, p. 000350)

The petitioner repeated this claim in his brief on appeal from the judgment of the post-conviction court, asserting once again only that defense counsel "never asked for a severance of the defendants . . . ." (Add. 10, Vol. 1, p. 45) In its opinion, the Court of Criminal Appeals wrote that the post-conviction court "dealt at length with the petitioner's complaint that trial counsel was ineffective for failing to seek a severance . . . ," that "severance is mentioned briefly and only in passing . . . ." on appeal and, as such, there was "no reason to belabor the severance question . . . ." (Add. 10, Vol. 4, p. 39 n. 6)

The petitioner asserts in this action once again that defense counsel was ineffective, because he did not "file a pre-trial motion for severance." (DE 16 # 16, ¶ 80)d)ii), p. 13) However, the petitioner provides no supporting facts. Therefore, his claim is conclusory. As previously noted, *supra* at p. 46, the petitioner is not entitled to *habeas corpus* relief based on conclusory claims.

The petitioner has failed to establish that the state courts' determination on this issue was contrary to, or an unreasonable application of, clearly established federal law. Neither has he established that the decision of the Tennessee Courts on this issue was unreasonable in light of the evidence presented in those proceedings. This claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### 2. Failure to Seek Investigative Assistance and Mental Health Experts (DE # 16, ¶ 80.f, p. 32)

157

**3. Failure to Develop a Defense Theory Based on
Mental Illness Stemming From
Childhood Abuse
(DE # 16, ¶ 80.k, p. 33)**

**4. Failure to Provide Live Witnesses and Expert Testimony
(Add. 10, Vol. 1, ¶ I, p. 1)**

**5. Failure to Present the Petitioner's Family Background Through
the Testimony of His Siblings, Family Friends,
and His Former Wife
(Add. 10, Vol. 1, ¶¶ I.D-E, pp. 15-18)**

**6. Failure to Develop Evidence Portraying
Patterson as the Primary Actor
(Add. 10, Vol. 1, ¶ I.(1), p. 45)**

**7. Failure to Cross-examine James Andrew about Whether He Was
Sober When the Petitioner Admitted to the Murders,
and Whether He Had a Motive to Lie About
the Petitioner's Admissions
(Add. 10, Vol. 1, ¶ I.(2), pp. 48-50)**

**8. Failure to Investigate the Petitioner's Citizenship
(Add. 10, Vol. 1, ¶ J, pp. 54-61)**

The court has already addressed the issues enumerated 2 through 8 above in the context of the 1995 resentencing hearing, *supra* at pp. 70-104, 109-10. The court's analysis of these claims in the context of the 1995 resentencing hearing applies to the 1988 guilt-innocence phase of his trial as well. For the reasons previously explained, these claims are without merit, and a COA will not issue.

**U. Ineffective Assistance of Counsel on
Appeal from the 1988 Trial
(Twenty-first Claim)**

The petitioner makes numerous allegations of ineffective assistance of counsel on appeal from the 1988 trial. (DE # 16, ¶¶ 81-83, pp. 37-41) The petitioner once again incorporates by

reference each of the claims set forth in his *pro se* petition for post-conviction relief, his first amended petition for post-conviction relief, and his amended first amended post-conviction petition. (DE # 16, ¶ 81, pp. 37-38)

The respondent argued in his response to the petition that none of these claims pertaining to the 1988 trial were raised in any state court prior to being raised in the instant action and, as such, his claims are procedurally defaulted for purposes of federal *habeas corpus* review. (DE # 26, pp. 43-44) The petitioner countered in his traverse that he presented each of his claims in state court. (DE # 34, p. 19)

In his motion for summary judgment, the respondent repeats his argument that these claims are procedurally defaulted. (DE # 122, p. 11) Referring to his traverse, the petitioner argues that they are not. (DE # 146, ¶ V.U, p. 104)

The petitioner raised several ineffective assistance of appellate counsel claims on appeal from the 1988 trial in his first-amended and amended-first-amended post-conviction petitions. (Add. 7, Vol. 1, pp. 000053-57; Vol. 3, pp. 000121-29) However, in its Order denying post-conviction relief, the post-conviction court noted that post-conviction counsel failed to present any proof regarding the petitioner's ineffective assistance of appellate counsel claims. (Add. 7, Vol. 3, p. 000361)

Thereafter, the petitioner did not raise any ineffective assistance of appellate counsel claims on appeal from the judgment of the post-conviction court. Rather, he argued only that the post-conviction court erred in finding that "certain claims" had been waived. (Add. 10, Vol. 1, pp. 78-81) The Court of Criminal Appeals wrote on appeal from the judgment of the post-conviction court:

> The petitioner fails to identify on appeal those claims that are the subject of his complaint. Without more, we cannot adequately review this issue, and we decline to do so.

159

(Add. 10, Vol. 4, p. 51)

It is clear from the record that the petitioner has not exhausted any of his claims of ineffective assistance of appellate counsel with respect to the 1988 trial. For the reasons previously explained, *supra* at pp. 57-62, the petitioner's claims of ineffective assistance of appellate counsel on appeal from the 1988 trial are procedurally defaulted for purposes of federal *habeas corpus* review.

### Certificate of Appealability

Reasonable jurists would not debate the court's procedural ruling. Accordingly, a COA will not issue.

### V. Ineffective Assistance of Counsel at the
### 1995 Resentencing Hearing
### (Twenty-second Claim)

The petitioner alleges numerous claims of ineffective assistance of counsel from the 1995 resentencing hearing in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments. (DE # 16, ¶¶ 84-98, pp. 41-53) The petitioner incorporates by reference the claims set forth in his *pro se* post-conviction petition, his first amended post-conviction petition, and his amended first amended post-conviction. (DE # 16, ¶ 84, p. 41)

Relying on his response to the petitioner's Fifth Claim in this action, the respondent argued in his response to the petition that all but two of the petitioner's claims are procedurally defaulted for purposes of federal *habeas corpus* review. (DE # 26, p. 44) Those two claims are that: 1) counsel failed to properly investigate, prepare, and present available mitigating evidence as set forth in ¶¶ 25-32 of his amended petition (DE # 16, ¶ 88.b, p. 42); and 2) counsel failed to investigate possible defenses by requesting and obtaining expert services to present the defense's case in chief or on rebuttal, and/or to aid with the cross-examination of Dr. Harlan concerning the length of time

160

the victims were conscious before they died (DE # 16, ¶ 88.c, p. 42).

As to the first of the two claims above, the respondent argued that the Court of Criminal Appeals determination on the issue is neither contrary to nor an unreasonable application of clearly established federal law, and that it was based on a reasonable determination of the facts in light of the evidence presented at petitioner's capital resentencing and post-conviction proceedings. (DE # 26, pp. 20, 22, 25) Regarding the second part of the claim, the respondent argues that it does not satisfy the requirements of Rule 2(c), Rules – Section 2254 Cases to the extent that it alleges ineffective assistance of counsel for failure to obtain expert assistance to assist in the defense's case-in-chief or on rebuttal. To the extent that the second claim pertains to expert assistance to challenge evidence presented by the prosecution, the respondent argues that this factual predicate is procedurally defaulted for purposes of federal *habeas corpus* review. (DE # 26, pp. 44-45) In his traverse, the petitioner replied that each of these claims was raised in state court and, as such, they are not procedurally defaulted.

The petitioner argues in his motion for summary judgment that this claim is procedurally defaulted for purposes of federal habeas corpus. (DE # 122, p. 11) Referring to his traverse (DE # 34, p. 20), the petitioner asserts in his response that this claim is not procedurally defaulted and that the court should "either grant relief . . . or set additional briefing to consider any arguments Respondent may have in opposition to the merits" (DE # 146, ¶ V.V, pp. 104-05).

A review of the petitioner's brief on appeal from the judgment of the post-conviction court shows that the petitioner raised the following ineffective assistance claims in the context of the 1995 resentencing hearing: 1) counsel failed to obtain relevant witnesses and expert assistance to tell the petitioner's story (Add. 10, Vol. 1, ¶¶ I.A, C-H, pp. 2, 6-45); 2) counsel failed to challenge the prosecution's characterization of the petitioner as the "'evil one' whom all citizens and [the] jurors must fear" (Add. 10, Vol. 1, ¶ I.B, pp. 4-5); 3) counsel failed to investigate Patterson, to present him

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 161 of 168 PageID #: 2081

as the primary actor, and to challenge the jury instruction that the fact Patterson received two life sentences had no bearing on the petitioner's resentencing hearing (Add. 10, Vol. 1, ¶ I.I(1), pp. 45-48); 4) counsel failed to cross-examine Andrew regarding whether he was sober at time the petitioner admitted his part in the Smith murders, as well as his motive to lie (Add. 10, Vol. 1, ¶ I.(2), pp. 48-50); 5) counsel failed to cross-examine Denning concerning the lack of forensic evidence to support his wine cooler testimony (Add. 10, Vol. 1, ¶ I.(3), pp. 51-54); and 6) counsel failed to investigate the petitioner's background pertaining to his citizenship (Add. 10, Vol. 1, ¶ J, pp. 54-60). With the exception of the single claim addressed below, the claims enumerated above already have been addressed, *supra* at pp. 72-110, 115-17, and deemed either without merit, or procedurally defaulted.

The only ineffective assistance claim arising out of the 1995 resentencing hearing that has not already been determined is the petitioner's claim that counsels' representation was deficient because they did not object to the prosecution's closing argument, during which the petitioner was characterized as the "evil one." As previously determined, however, *supra* at pp. 30-37, the petitioner was not prejudiced by that characterization. Because the petitioner cannot establish that he was prejudiced by the prosecution's reference to him as the "evil one," he cannot establish that he received ineffective assistance of counsel. Therefore, this claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### W. Ineffective Assistance of Counsel on Appeal from the 1995 Resentencing Hearing (Twenty-third Claim)

The petitioner asserts that defense counsel's representation on appeal from the 1995 resentencing hearing was deficient in violation of his rights under the Sixth, Eighth, and Fourteenth

Amendments.  (DE # 16, ¶¶ 99-101, pp. 53-58)  The petitioner incorporates by reference the claims in his *pro se* post-conviction petition, his first amended petition on post-conviction and his amended first amended petition on post conviction.  (DE # 16, ¶ 99, p. 53)

The respondent argued in his response to the petition that the petitioner's claims are procedurally defaulted for purposes of federal *habeas corpus* review.  (DE # 26, p. 45)  In his traverse, the petitioner argued that they are not, apparently reasoning that they are covered in his "'myriad . . . challenges to appellate ineffectiveness."  (DE # 34, p. 20)

In his motion for summary judgment, the respondent again argues that this claim is procedurally defaulted.  (DE # 122, p. 12)  Referring to his traverse (DE # 34, p. 20), the petitioner asserts in his response that this claim is not procedurally defaulted, and that the court should "either grant relief . . . or set additional briefing to consider any arguments Respondent may have in opposition to the merits" (DE # 146, ¶ V.W, p. 105).

A review of the petitioner's brief on appeal from the judgment of the post-conviction court reveals that the petitioner raised a single claim of ineffective assistance of counsel on appeal from the 1995 resentencing hearing.  In his brief, the petitioner alleged that representation of appellate counsel was deficient because counsel did not challenge the constitutionality of the death penalty, there being several factual predicates underlying this claim. (Add. 10, Vol. 1, ¶ VI, pp. 81-102) The Court of Criminal Appeals rejected this claim.  (Add. 10, Vol. 4, p. 51)

With the exception of the single claim noted above, all of the remaining claims of ineffective assistance of counsel on appeal from the 1995 resentencing hearing are, for reasons previously explained, *supra* at pp. 57-62, procedurally defaulted for purposes of federal *habeas corpus* review. The court has previously addressed, *supra* at pp. 149-54, the several factual predicates underlying the single claim noted above that are not procedurally defaulted and determined that the death penalty is not unconstitutional based on the grounds presented.  Because the factual predicates

Case 3:04-cv-01100   Document 167   Filed 03/31/10   Page 163 of 168 PageID #: 2083

underlying this claim are without merit, counsels' representation on appeal from the 1995 resentencing hearing was not deficient, nor was the petitioner prejudiced.

The petitioner has failed to show that the state court determination on this single issue was contrary to, or an unreasonable application of, clearly established federal law.  Neither has he established that the trial courts' decision on this issue was unreasonable in light of  the evidence presented in those proceedings.  This claim is without merit.

### Certificate of Appealability

Reasonable jurists would not debate the court's procedural ruling.   The petitioner also has not made a substantial showing of the denial of a constitutional right as to the one claim that was not procedurally defaulted.  Accordingly, a COA will not issue on this claim.

### X.  Constitutionality of Lethal Injection
### (Twenty-fourth Claim)

The petitioner asserts that lethal injection constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments.  (DE # 16, ¶ 102, pp. 58-59)  The petitioner has withdrawn this claim as one more properly brought under 42 U.S.C. § 1983.  ((DE # 146, ¶ V.X, p. 106)

### Y.  The State's Forensic Pathologist, Dr. Charles Harlan
### Was Not Competent  to Give Credible
### and Reliable Testimony
### (Twenty-fifth Claim)

The petitioner alleges that, Dr. Harlan "was not competent to give credible and reliable opinions,"because he was "found to be incompetent, and his medical license has been revoked." (DE # 16, ¶ 103, p. 59)  The respondent argued in his response to the petition that this claim is procedurally defaulted for purposes of federal *habeas corpus* review.  (DE # 26, p. 46)

In his traverse, the petitioner agreed that this claim has not been raised in state court.  (DE # 34, p. 21)  He claims, however, that he raised on post-conviction that "trial counsel were

ineffective for failing to challenge Harlan's testimony as to the length of consciousness." (DE # 34, p. 21) The petitioner argued further that, since the state post-conviction proceedings in his case, Dr. Harlan "has lost both his position as State Medical Examiner and his medical license for improper conduct" and, therefore, this claim "was not ripe until Harlan was disciplined for his misconduct." (DE # 34, p. 21) In the alternative, the petitioner argues that because Dr. Harlan's:

> testimony provides the sole basis of torture under the HAC aggravating circumstance[] . . . his misconduct related to embellishing and outright misrepresenting medical testimony raises a reasonable allegation of innocence as to the aggravating circumstance and the death penalty. Therefore, discovery and/or a hearing is necessary for Petitioner to demonstrate the miscarriage of justice exception.

(DE # 34, p. 22)

In his motion for summary judgment, the respondent again argues that this claim is procedurally defaulted. (DE # 122, p. 12) In his response to the respondent's motion, the petitioner argues again that another discovery hearing is necessary for the him to demonstrate the miscarriage of justice exception to procedural default rule. (DE # 146, ¶ V.Y, p. 106)

The court assumes without deciding that this claim is not procedurally defaulted for purposes of federal *habeas corpus* review, because it was not ripe until Dr. Harlan was disciplined.

Although he alleges that Dr. Harlan was not competent to give credible and reliable medical opinions in his case, the petitioner has provided no proof that Dr. Harlan's testimony was improper and/or incorrect at either the 1988 trial or the 1995 resentencing hearing. That Dr. Harlan lost his license to practice and was dismissed as the medical examiner for improper conduct does not establish that he was not competent to testify in the petitioner's case.

As to the petitioner's claim that Dr. Harlan's testimony "provide[d] the sole basis of torture under the HAC aggravating circumstance[e]," the trial court instructed the jury that, to be considered heinous, atrocious, or cruel, the murders must have involved "torture or serious physical abuse

165

beyond that necessary to produce death." (Add. 5, Vol. 4, p. 472)  The trial court defined "torture" as "infliction of severe physical **or** mental pain upon the victim while he or she remains alive and conscious." (Add. 5, Vol. 4, p. 472)(emphasis added)  The trial court did not instruct the jury that it had to base its decision to impose the HAC aggravator solely on Dr. Harlan's testimony as to the length of time it may have taken the Smiths to die under the circumstances described, or on any of his other testimony.  Indeed, the circumstances under which the petitioner murdered Rosemary clearly establish  torture and physical abuse beyond that necessary to produce death independent of Dr. Harlan's testimony.  This claim is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### Z.  The Petitioner Was Shackled During His
### Resentencing Hearing
### (Twenty-sixth Claim)

The petitioner asserts that he appeared in shackles before the jury at resentencing in violation of his rights under the Fourteenth Amendment.  (DE # 16, ¶ 104, p. 59)  The petitioner has withdrawn this ground for relief.  (DE # 146, ¶ V.Z, p. 107)

### AA.  Cumulative Error
### (Twenty-seventh Claim)

The petitioner asserts that the cumulative effect of errors at the guilt and sentencing phases of his trial rendered the results of those phases unfair, unconstitutional, and unreliable in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments.  ( DE # 16, ¶ 105, p. 59)

The respondent argued in his response to the petition that this claim is not cognizable under § 2254 because the Supreme Court has never held that federal *habeas corpus* relief is warranted based on cumulative error.  (DE # 26, p. 46)  The respondent argues further that, to grant *habeas*

*corpus* relief on this ground would "constitute the use of federal habeas corpus to announce a new rule of constitutional law or constitutional criminal law/procedure . . . ."  (DE # 26, p. 46)

Citing *Brecht v. Abrahamson, supra* at p. 32, the petitioner argued in his traverse that "[t]he United States Supreme Court requires a consideration of the entire record when determining whether a claim is harmless."  (DE # 34, p. 22)  Therefore, according to the petitioner, "if more than one error occurs, it stands to reason that the prejudice from each error present are aggregately considered."  (DE # 34, p. 22)  On the basis of this reasoning, the petitioner argues that the court is not barred from considering this claim under *Teague.*

In his motion for summary judgment, the respondent repeats the argument that he raised in his response to the petition.  (DE # 122, p. 45)  Although the petitioner does not say so specifically, it appears from his response that the petitioner disputes whether relief on these grounds would constitute a new rule within the meaning of *Teague* and *Saffle*.  (DE # 146, ¶ V.AA, pp. 107-09)

"'The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.'"  *Millender*, 376 F.3d at 529 (quoting *Lorraine*, 291 F.3d at 447).  The Sixth Circuit, likewise, has not held that cumulative error can form the basis for *habeas corpus* relief but, assuming that it could, a cumulative error claim fails where there are simply no errors to cumulate. *See Getsy*, 495 F.3d at 317; *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004).  As established herein, there were no errors of a constitutional dimension in the petitioner's proceedings in state courts that entitle the petitioner to federal *habeas corpus* relief.  The petitioner's cumulative-error claim not only is barred by *Teague* and *Saffle*, it is without merit.

### Certificate of Appealability

The petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a COA will not issue on this claim.

### V.  CONCLUSION

For the reasons explained herein, the respondent's motion for summary judgment will be granted, the petitioner's motion for summary judgment will be denied, this action will be dismissed, and a COA will not issue as to any of the issues raised by the petitioner.

An appropriate Order will be entered.

_____
ALETA A. TRAUGER
United States District Judge